# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kenneth Macek, Matthew Harner, Avi Setton, Lionel Alicea, and Robert Walker, individually and on behalf of all others similarly situated, | Case No. _____ |
| *Plaintiff*, | |
| v. | **COMPLAINT—CLASS ACTION** |
| DraftKings, Inc.; Crown PA Gaming Inc. d/b/a DraftKings; Golden Nugget Online Gaming LLC, | JURY TRIAL DEMANDED |
| *Defendants*. | |

Plaintiffs Kenneth Macek, Matthew Harner, Avi Setton, Lionel Alicea, and Robert Walker ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this class action against Defendants DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC (collectively "DraftKings"). Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## **INTRODUCTION**

1.      In October 2017, Pennsylvania passed a bill to legalize internet gambling. Today, both Pennsylvania's internet casino industry and online sports betting industry are among largest in the nation in terms of dollars bet annually.

2.      Online betting allows consumers to use mobile apps on their smartphones to bet on casino games or sports anywhere in a state where it is legal, at any time.

3.      While the industry started off a little slow, the popularity of internet gambling rapidly increased with the COVID-19 pandemic and has continued growing since.

1

4.    Today it is a massive industry. The Pennsylvania Gaming Control Board said that iGaming (online casino games), a market in which DraftKings is the most popular operator, reported over $2.18 billion of revenue in 2024.[1]

5.    Likewise, sportsbooks in Pennsylvania, among which DraftKings is also a leader, brought in almost $510 million in revenue in 2024 from wagers totaling $8.42 billion.[2]

6.    Meanwhile, over the past few years, signs of gambling addictions in Pennsylvania have skyrocketed.

7.    Online gambling is particularly dangerous for people developing and struggling with gambling addiction. As one industry expert put it, "America can survive sports betting. It survived illegal betting for years. Whether it can survive a casino on everyone's phone — that I can't answer. That might be the tipping point."[3]

8.    DraftKings is the most dominant player in Pennsylvania's internet gambling industry and has driven much of its growth over the past few years.

9.    As of the end of 2024, Hollywood Casino at Penn National, of which DraftKings is the largest operator-partner, reported that it had earned almost $821 million in revenue.

10.    Consumers can also use DraftKings's online casino in Connecticut, Michigan, New Jersey, and West Virginia. DraftKings has the largest or one of the largest online casinos in each of these states as well and is constantly lobbying more states to legalize online casino gambling.

---

[1] Pennsylvania Gaming Control Board, *Press Release: PA Gaming Control Board Reports Record High Gaming Revenue for 2024*, (Jan. 21, 2025) https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-reports-record-high-gaming-revenue-2024se/pa-gaming-control-board-reports-record-high-gaming-revenue-2024 (last visited Mar. 24, 2025).
[2] *Id.*
[3] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

11.    Plaintiffs bring this action because DraftKings is earning enormous amounts of revenue by misleading and addicting its users.

12.    DraftKings's business model has long involved pushing the boundaries of the law, misleading consumers, and luring naïve gamblers into developing addictions.

13.    DraftKings uses these tactics to identify and cultivate the people it wants on its platform: those who are most susceptible to these sorts of promotions and most likely to lose a lot of money betting. In other words, marks.

14.    DraftKings uses its copious user data to create profiles of users based on their demographic and financial information as well as their betting behavior. DraftKings then deploys sophisticated targeted marketing to its users to maximize the amount of money they deposit and lose on its platforms.

15.    DraftKings goes even further than this in knowingly targeting addicted gamblers. The company frequently targets users that are on state self-exclusion lists for addicted gamblers or users who have directly asked the company to suspend or close their accounts to prevent them from continuing to gamble. DraftKings, nevertheless allows and actively solicits these users to gamble large sums of money despite knowing they are struggling to control their gambling addictions.

16.    DraftKings attracts new users and keeps existing users coming back by advertising an all-upside gambling experience, falsely promising users that they will get free money which they can wager without any risk. In reality, DraftKings has created an all-upside opportunity only for itself: the hidden terms of its promotions require users to deposit and gamble almost exclusively with their own money, which they almost always lose. DraftKings also engages in other undisclosed manipulations, enticing those users who are able to initially

win to make worse and worse bets until their funds are exhausted.

17.    Many customers have gambled and lost more money than they intended as a result of these deceptive and unfair promotions, and some customers have developed gambling addictions and lost thousands or—in the case of some of the Plaintiffs—hundreds of thousands of dollars.

18.    One of DraftKings's deceptive practices is a promotion that promises users the chance to place bets at no risk to them ("Risk-Free Bet" or "No Sweat First Bet")

19.    These purportedly no-risk bets, however, are not as advertised. The promotion requires that the customer deposit funds and place the bet with their own money.  If a customer loses their bet, they are not returned to their original position. Instead, their accounts are credited with an expiring "Bonus Bet" rather than the amount the user initially wagered in U.S. dollars.

20.    Receiving "Bonus Bets" when the original bet loses does not make the original bet "Risk-Free" as advertised.  "Bonus Bets" cannot be withdrawn for cash. Instead, they must be both wagered and won before they have any cash value.

21.    Furthermore, wagers made with Bonus Bets are not paid out like wagers made with U.S. dollars. A winning $100 bet made with U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of ~9%, which results in a payment of approximately $191. By contrast, a winning bet made with a $100 Bonus Bet converts only to $100 US dollars less vig, which results in a payment of approximately $91.

22.    Thus, the new customer responding to the no-risk advertisement can get some of their money back only if they win their second bet, which is not risk free, and even then they

are not going to receive as much as they deposited back unless they get lucky on a long-odds bet with a payout high enough to make up for DraftKings's vig.

23.    The Bonus Bet is thus worth significantly less than the initial bet, meaning that the money the customers was induced to deposit was never in fact risk-free as advertised.

24.    DraftKings further engages in deceptive practices through its near-ubiquitous advertisements that offer to match a new user's first deposit up to $1,000. This promotion, too, is misleading and inaccurate.

25.    In order to receive the promised matching amount, users have to deposit up to 5x the matching amount and then bet up to 25x the matching amount on long-shot bets that users have low odds of winning, all within a relatively short period of time. Even then, and even if they win, customers do not actually receive a cash match of their deposit as the promotion implies. Instead, they receive "DK Dollars" equal to their deposit amount. Like "Bonus Bets," "DK Dollars" are not redeemable for cash and must be wagered and won before they have any value.

26.    Perhaps DraftKings's most deceptive scheme is its Casino Deposit Match Promotion, in which users are tricked into opting into a deposit match promotion with nearly-impossible-to-satisfy terms. These terms, written in opaque language, also give DraftKings the ability to take all of a user's money should they begin but fail to complete the promotion.

27.    DraftKings advertisements for the Casino Deposit Match Promotion use large print and clear language to promise users free money if they make a deposit and wager in the online casino. In reality, this promotion ends up only one of two ways: users either lose their initial deposit because they are unable or unwilling to satisfy the unreasonable play-through requirements that are only revealed to users after they have begun the promotion, or they make

far more bets than they initially intended and risk developing a dangerous gambling addiction.

28.     Rather than meeting user's reasonable expectation that they will be able to walk away with whatever portion of their initial deposit they did not lose on bets—as they can in the sportsbook promotion—DraftKings surprises users by taking their deposit because, they say, it has been transformed into "winnings associated with the promotion."

29.     DraftKings's adverting promises users that they will get up to $2,000 in free money if they make a deposit on DraftKings and gamble with it in the online casino. In reality, most users walk away without any free money and without their initial deposit.

30.     The hidden and confusing terms of DraftKings's Casino Deposit Match Promotion regularly result in consumers losing all the money they deposited or accidentally forfeiting it once they realize the terms of the promotion.

31.     And consumers who do try to satisfy the playthrough requirements often develop addictions that, as DraftKings intends, result in them gambling far beyond their means on DraftKings's online casino.

32.     Sometimes consumers are not even losing their money because they gambled it away but simply because DraftKings treats them as having forfeited it—often a thousand dollars or more—just because they attempted to opt out of the deposit match promotion after realizing that to complete it, they will need to place tens of thousands of dollars in high-risk casino bets.

33.     When consumers ask DraftKings for their money back, they are rebuffed and told they should have more carefully parsed the long and confusing terms, that, as described below, are unclear even on close examination.

34.     Due to DraftKings's market dominance in a regulated industry, customers trust

that the company will comport itself fairly and run promotions that are as-advertised.

35.    Additionally, consumers familiar with the way DraftKings's signup bonus promotions associated with its sportsbook work, assume that its casino promotion have terms that are similar to those they've seen on the sportsbook in the past.

36.    DraftKings is taking advantage of consumers' misplaced trust and tricking users into irrevocably committing themselves to make a Hobson's choice between gambling so much they are likely to develop an addiction—and lose a significant amount of money in the process—or walk away from all of the money they initially deposited.

37.    No user could reasonably expect this would happen to them, even if they carefully read the terms associated with this promotion.

38.    Moreover, often DraftKings is opting users into this promotion without them even realizing it, simply because they place a single bet in its online casino after making a deposit.

39.    Countless users have lost money through this confusing scheme. Many have reported it to the Better Business Bureau and state gambling regulators, but despite—or because—its knowledge of how many people are being deceived and inadvertently losing money, DraftKings continues misleading customers.

## **PARTIES**

40.    Plaintiff Robert Walker is a resident of Folcroft, Pennsylvania (Delaware County). Plaintiff Walker began using DraftKings to place sports bets in 2019 or 2020 with the username "robwalker76". Plaintiff Walker used deposit match and "risk-free" promotional offers after seeing numerous advertisements on television and social media.

41.    Plaintiff Kenneth Macek is a resident of Pittsburgh, Pennsylvania. Plaintiff

Macek began using both DraftKings Sportsbook and Casino offerings in November of 2020 with the username "GolfProX". Plaintiff Macek used a number of promotional offers across DraftKings's Casino and Sportsbook, including "risk-free" bets and deposit match offers. Shortly after signing up for the platform, Plaintiff Macek was wagering enough to be granted VIP status, and was assigned a "VIP host", who contacted Plaintiff Macek personally with promotional offers and instructions on how to increase his bet and deposit limits and how get access to and wager deposited funds faster.

42.    Plaintiff Matthew Harner is a resident of Reading, Pennsylvania. Plaintiff Harner was allowed to create an account and gamble on DraftKings and Golden Nugget casinos in 2024, with the usernames "mharner02" (DraftKings) and "huey2323" (Golden Nugget) despite being on the permanent Pennsylvania casino self-exclusion list since late 2022. Plaintiff Harner lost approximately $57,000 in the course of a few months. Most other online casinos turned Plaintiff Harner away because of his presence on the self-exclusion list, but not DraftKings.

43.    Plaintiff Avi Setton is a resident of Allentown, Pennsylvania. Plaintiff Setton created his account on DraftKings in 2019 with the username "balthazar444". Plaintiff Setton quickly began to struggle with a gambling addiction and he asked DraftKings to close his account in 2020 because of his problem gambling. DraftKings did not do so, and between 2020 and 2024 Plaintiff Setton lost more than $350,000 on DraftKings. Then, in November 2024, DraftKings suddenly closed Plaintiff Setton's account, citing his 2020 request.

44.    Plaintiff Lionel Alicea is a resident of Scranton, Pennsylvania. Plaintiff Alicea moved to Pennsylvania in early 2024. Shortly after he moved to Pennsylvania, Plaintiff Alicea created an account on Golden Nugget in May 2024 after seeing deceptive advertisements for its casino deposit match promotion on YouTube and TikTok. He created an account on DraftKings

in June 2024 after seeing similar deceptive advertisements for a casino deposit match promotion via email and on YouTube and TikTok. Since signing up, Plaintiff Alicea has developed a serious gambling addiction and lost $39,000 in two months on DraftKings and $19,000 on Golden Nugget.

45. Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2020, DraftKings is a publicly traded company that trades on the Nasdaq Stock Exchange.

46. DraftKings purchased Golden Nugget Online Gaming, Inc. in May 2022. Golden Nugget Online Gaming LLC was then incorporated as a wholly owned subsidiary of DraftKings, Inc. in Delaware with its principal place of business in Boston Massachusetts. DraftKings continues to operate a separately branded Golden Nugget online casino in Pennsylvania through Golden Nugget Online Gaming LLC.

47. Defendant Crown PA Gaming Inc. is a privately held company incorporated in Delaware with its principal place of business in Boston, Massachusetts. Crown PA Gaming Inc. is a subsidiary of DraftKings and is responsible for conducting some portion of DraftKings business in Pennsylvania.

## JURISDICTION AND VENUE

48. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because, given the number of DraftKings's users and the prevalence of the promotions and practices at issue, the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendants. The number of members of the proposed class in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

49.     This Court has personal jurisdiction over Defendants because they regularly

conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or

derive substantial revenue from products and/or services provided to persons in this District.

50.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

Defendant does business in this District and because a substantial part of the events or

omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.  Online Gambling in Pennsylvania and DraftKings's dominant industry position

51.     In October 2017, Pennsylvania became the fourth state to legalize online

gambling, paving the way for licensed operators to offer online slots, table games, and other

forms of digital casino wagering through mobile smartphone apps in every corner of the state.

52.     Pennsylvania's gambling market is regulated by the Pennsylvania Gaming

Control Board, which imposes rules and requirements to ensure fairness, transparency, and

consumer protection.

53.     In 2018, the United States Supreme Court held, in *Murphy v. National

Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that a federal law could not prohibit

Pennsylvania and other states from legalizing sports betting within their borders.

54.     As a result of this decision, the market for sports betting has exploded. The total

U.S. revenue of sportsbooks exploded from $430 million in 2018 to $10.92 billion in 2023.[4]

55.     Pennsylvania remains one of the most popular sports betting states in the

---

[4] Mike Reynolds, *American Gaming Association: Legal sports betting hits record revenue in 2023*, S&P
GLOBAL, Feb. 21, 2024, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-
headlines/american -gaming-association-legal-sports-betting-hits-record-revenue-in-2023-80522087 (last
visited Nov. 27, 2024).

country, with over $8.42 billion wagered on sports bets in 2024 alone.[5]

56.    DraftKings began operating in Pennsylvania shortly after the Supreme Court struck down the Professional and Amateur Sports Protection Act, giving the company a head start in the nascent online sports betting market.

57.    Part of how DraftKings was able to capture a significant share of the online sports betting market from the moment it was legalized in Pennsylvania was by leveraging its brand recognition and success in daily fantasy sports—particularly with young men who bet money on daily fantasy sports contests in Pennsylvania long before the *Murphy* decision.

58.    Long before gambling was legalized, DraftKings offered "daily fantasy sports" contests to Pennsylvania consumers, including sometimes to those who were under the age of eighteen.

59.    In practice, "daily fantasy sports" is sports betting by another name. In these contests, users bet on the performance of athletes in sporting events, but in doing so they "compete" against each other rather than the sportsbook, which keeps a portion of the pot.

60.    Daily fantasy sports are very popular with adolescents, which gives DraftKings an important advantage in terms of brand recognition and a head start in turning young people into reliable sports betters on its platform.[6]

61.    In the years before the recent wave of sports betting legalization, regulators across the country raised alarms around DraftKings's daily fantasy sports offering, its advertising, and its lax enforcement of age restrictions.

62.    DraftKings is perennially among the top online sportsbooks nationally in terms

---

[5] *See supra* note 1.
[6] Michael Sekich, *Drawing the Line of Scrimmage: Global Perspective of Daily Fantasy Sports in the Advertising Space*, 12 PENN. ST. J.L. & INT. AFF. 178, 202 (2023).

of annual revenue. In 2024, DraftKings was the second largest sportsbook by revenue in Pennsylvania and the largest operator of online gaming.

63.     DraftKings reinvests a lot of its revenue in hooking more users on sports betting.

64.     For example, DraftKings's sales and marketing expenses totaled $1.2 billion in 2023.[7] DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads showcased various promotions that DraftKings was running, typically targeting new users and promising bonuses and no-risk bets for signing up and making their first deposit.

65.     As DraftKings has repeatedly said in its annual 10–K reports, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts."

66.     DraftKings's target audience for these marketing efforts is new users and casual gamblers—those who are most likely to lose money and who might turn into high-value addictive gamblers losing thousands of dollars a month to DraftKings.

67.     In fact, DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets in its sports book.

68.     Meanwhile naïve losing consumers are targeted with more and more deceiving promotions and sometimes even VIP hosts to encourage their gambling more money with more frequency.

69.     DraftKings could set standardized bet limits for all its users, but instead it dynamically limits the maximum allowable bet for each individual user in order to maximize the amount more addictive gamblers lose to the company while minimizing the company's

---

[7] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%202020

exposure to more successful bettors.

70.    This practice of dynamically limiting amounts to prevent bettors from winning too much is one more fact that DraftKings does not disclose in its promotions.

71.    DraftKings's CEO has admitted that the company is only interested in serving bettors who are likely to lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[8]

72.    Professional gamblers know that DraftKings is looking to exclude them in favor of problem gamblers and attempt to mimic the behavior of gambling addicts in their app use. For exampling, reporting indicates that professional gamblers try to take advantage of DraftKings's customer data by logging into their accounts repeatedly late at night, to appear like they are interrupting their sleep to compulsively check their bets, or opting into and then out of deposit limits to appear like they are unable to control themselves from depositing more and more.[9]

73.    DraftKings is not, however, following a traditional "entertainment" industry business model of trying to "entertain" as many customers as possible.

74.    Instead, DraftKings is seeking to exclude customers who are successful at betting while trapping those who are not. The latter customers, many of whom end up losing more than they can afford, are the source of most of DraftKings's revenues.

75.    Addicted gamblers represent the most important demographic for DraftKings and, under its present business model, are a key driver of its profitability.

---

[8] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).
[9] Isaac Rose-Berman, *Why Professional Gamblers Act like Addicts,* HOW GAMBLING WORKS (Sept. 10, 2024), https://howgamblingworks.substack.com/p/why-professional-gamblers-act-like (last visited April 7, 2025).

76.     On information and belief, more than 80% of DraftKings's revenue comes from just 5% of its users, most of whom are addicted gamblers or at high risk of becoming addicted gamblers.

77.     DraftKings mines its user data to identify the most potentially-lucrative users—those with developing gambling addictions—and then intentionally targets them with personalized outreach to increase the amount and frequency of their wagering on DraftKings.

78.     Meanwhile, there is some data that DraftKings intentionally does not collect to allow the company to deny that it knows it is taking every dollar its customers have. For example, DraftKings has a policy of not conducting income verification checks for its users who are frequent, high-volume gamblers even though doing so is common in the casino industry for high rollers.

79.     As further described below, DraftKings designs its promotional offers to lure in and identify those users most likely to become consistent gamblers.

80.     These promotional offers include promises to match users deposits and offers of "Risk-Free" (later termed "No Sweat") bets. But rather than coming through on the large-print offers made to new users in advertisements for these promotions, DraftKings contradicts the large-print offers by inserting difficult to read, legally-opaque fine print terms hidden behind hyperlinks that are only available when a user is about to opt-in to the promotions and, thereafter, by enforcing complicated rules that DraftKings knows will be overlooked and misunderstood.

81.     Not only do these false promises lure consumers into opening and funding accounts on DraftKings, but they also lure many users into wagering larger amounts and more frequently than they otherwise would.

82.     This was DraftKings's goal all along. DraftKings knows that the money it

invests to sign up a customer often pays for itself many times over. According to McKinsey partner Dan Singer, "When a market opens up, you've got to get out there and start acquiring, because being the first book that someone downloads gives you roughly twice as much action as being the second or the third."[10]

83.     As the sports betting market in Pennsylvania became more saturated, DraftKings began turning its attention from recruiting new customers at any cost to retaining the most vulnerable customers it already has hooked on its platform.

84.     The customer retention stage is much more profitable for DraftKings than the initial customer acquisition stage.[11]

85.     Originally, DraftKings and other sportsbooks used to make good on the promises they made to new users of cash deposit matches and no-risk bets—where you get cash back if you lose. However, to do so, they hemorrhaged profit as they entered new markets.

86.     As the Washington Post has reported, "the days of companies giving away straightforward deposit matches worth thousands of dollars are largely over. Instead, sportsbooks are deploying increasingly complicated deals that advertise a big dollar figure but are far less generous [than advertised] upon closer examination."[12]

87.     Today, while DraftKings still makes the same bold promises in their ads, it now gives users "Bonus Bets" and "DK Dollars" that cannot be cashed out and must be used on the platform in accordance with complicated and unintuitive terms.

---

[10] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST, Sept. 27, 2022, https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/ (last visited Nov. 15, 2024).
[11] *Online Sportsbook: A Shift In Player Retention?*, GAMING AMERICA, Mar. 17, 2023 https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention (last visited Nov. 15, 2024).
[12] *Supra* note 10.

88.     In an online gambling marketplace saturated by sign-up promotions targeting vulnerable individuals with big "free" or "risk-free" dollar figures—some of which are truly risk-free and some of which, like those offered by DraftKings, are not—consumer confusion reigns. DraftKings exploits that confusion.

## B.  DraftKings's Pivot to Online Casino Gambling

89.     Online casino gambling has become a significant component of Pennsylvania's gaming industry, generating billions in revenue and attracting millions of consumers.

90.     In 2020, as in-person entertainment dropped during the COVID-19 pandemic and online gambling boomed, DraftKings added online casino gambling to its offerings in Pennsylvania.

91.     DraftKings sees online casino gambling as an important area for growth because it is more predictable and therefore profitable compared to handling sports betting, where the company faces the risk of uncontrolled outcomes and dynamic—and therefore error-prone—odds.[13]

92.     Driven by this business prerogative, DraftKings has established itself as the most dominant player in the nascent national online casino betting market.

93.     DraftKings has done so by leveraging its brand recognition and existing user base, as well as aggressive marketing, celebrity endorsements, and promotional offers.

94.     DraftKings regularly has the highest monthly market share of any online casino platform in Pennsylvania in terms of monthly revenue.

95.     In Connecticut, Michigan, New Jersey, and West Virginia, the other states where

---

[13] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

DraftKings operates online casino gambling, it has a similarly dominant market position.

96.    For example, in January 2025, DraftKings's online casino partner in Pennsylvania, Hollywood Casino at Penn National Race Course, reported a monthly gross revenue of over $79 million from online casino gaming, almost $22 million more than the closest competitor.[14]

97.    DraftKings's brand recognition and market position allows it to exert considerable influence over consumer expectations and industry practices in the online gambling ecosystem and to get away with practices that smaller, less-established operators could not.

98.    DraftKings's large userbase of online sports bettors can use the same funds they deposit to the app for sports betting to try out online casino gambling, and DraftKings often entices them to do so with appealing-sounding promotions.

99.    DraftKings also portrays itself as a fair, transparent, and consumer-friendly operator, encouraging users to participate in its promotions and deposit funds into its platform.

100.   These promotions often come with complex, opaque, and poorly disclosed terms and conditions, which are concealed from consumers until after they have made their deposits to the site.

**C. DraftKings intentionally targets young men who are most vulnerable to developing gambling addictions and designs its interface to prevent them from understanding the terms of offers advertised to them**

101.   Gambling products are not typical consumer products. Both the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental

---

[14] *PA Gaming Control Board Announces Revenue for January Up Nearly 11%*, PENNSYLVANIA GAMING CONTROL BOARD, Feb. 20, 2025, https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-announces-revenue-january-nearly-11 (last visited March 14, 2025).

Disorders (DSM-V) and the World Health Organization treat addiction to gambling in the same diagnostic category as addiction to heroin, cocaine, and tobacco.

102.    Digital mediums, like computers and cell phones that host DraftKings, increases the likelihood of habit-forming behavior through portability and connectivity, which provide greater ease-of-use, ready availability, rapid gratification, and a tendency to enable "context-independent" cues that trigger habit response.[15]

103.    Furthermore, habits are most often formed as the result of goal-directed behavior, which DraftKings enables by requiring users to chase arduous playthrough requirements.

104.    Goals drive people to form habits by encouraging repeat actions, even when they are actively aware of not wanting to develop an undesirable habit. Because most people are unaware of the habit-cuing influencing their behavior, they often attribute the formation of an undesirable habit to the pull of temptations or suppressed desires.

105.    DraftKings designs its promotions—which standout in the industry for their high playthrough requirements and forfeiture consequences for non-completion—to maximize the likelihood that users will begin to develop habits in the course of completing them.

106.    Unsurprisingly, as online gambling on DraftKings exploded in 2021, the National Council on Problem Gambling reported overall increases of 43% in calls and 84% in online chats in just that year.[16]

107.    States that have legalized online gambling have seen dramatic increases in calls

---

[15] Bas Verplanken, *The Psychology of Habit: Theory, Mechanisms, Change, and Contexts*, Springer Nature Switzerland AG, 2018, https://link.springer.com/book/10.1007/978-3-319-97529-0

[16] *National Problem Gambling Helpline Modernization Project*, NATIONAL COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/problem-gambling/helpline-modernization/#:~:text=In%202021%2C%20calls%20to%20the%20National%20Problem%20Gambling,we%20expect%20these%20numbers%20to%20continue%20to%20grow (last visited Nov. 21, 2024).

to gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the first year after legalization.

108.     Call volume to Pennsylvania's Council on Compulsive Gambling more than doubled between 2020 and 2023.[17]

109.     Gambling addiction is particularly prevalent in young men in their twenties and thirties, not coincidentally a key demographic for DraftKings.

110.     According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30 percent from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[18]

111.     According to a spokesperson for Gamblers Anonymous, there has been "a dramatic increase in the number of young men developing compulsive gambling issues and showing up to meetings since online sports gambling became legal."[19]

112.     Unsurprisingly, DraftKings's target demographic overlaps heavily with the group most at risk of gambling addiction. As of 2021, 90% of DraftKings's users were male and more than half were in their teens, twenties, or early thirties.

113.     In fact, according to recent research from the American Psychological Association, analysis of data from New Jersey reveals that "the fastest-growing group of sports

---

[17] Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms,* NBC NEWS, April 5, 2024, https://www.nbcnews.com/health/mental-health/gambling-addiction-hotline-calls-online-sports-betting-rcna145539

[18] Meghan Gunn, *These are the Real Dangers of the Sports Betting Boom for Young Men,* NEWSWEEK MAGAZINE, Mar. 22, 2023 https://www.newsweek.com/2023/04/07/sports-betting-boom-linked- rising-gambling-addiction-anxiety-suicide-1789055.html (last visited Nov. 15, 2024)

[19] Maxwell Strachan, *The Rise of Mobile Gambling is Leaving People Ruined and Unable to Quit,* VICE, Sept. 6, 2022, https://www.vice.com/en/article/ake7gk/therise-of-mobile-gambling-is-leaving-people-ruined-and-unable-to-quit (last visited Dec. 2, 2024).

gamblers are between 21 and 24 years old".[20]

114.    In Pennsylvania, people between 18 and 34 years old made up about 34% of all callers to the gambling helpline in 2024, compared to just 23% in 2019.[21]

115.    DraftKings touts that its "[s]ophisticated data science drives marketing decisions," which "delivers the right message, to the right user at the right time," to maximize return on investment.[22]

116.    DraftKings leverages its user data to identify customers who exhibit the potential to gamble lots of money very quickly, profiles them are priority customers and deploys tactics designed to cultivate problem gambling behaviors.

117.    DraftKings comprehensively tracks its user behavior both on its platform and on other digital platforms using digital targeting and sophisticated customer analytics software.

118.    DraftKings collects and analyzes user metrics far beyond simple demographic information such as betting frequency, betting times of day, average bet size, length of time on app, and the length of the user's relationship with the platform. Then DraftKings analyzes how various factors and offers affect a users' betting and deploys targeted tactics designed to get its users to bet more money and more frequently.

119.    One of these tactics is to assign these users "VIP Hosts:" DraftKings employees who are trained and incentivized to get users to gamble more and more money.

120.    DraftKings's VIP Hosts are trained to make DraftKings users feel like they are

---

[20] Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, AMERICAN PSYCHOLOGICAL ASSOCIATION – MONITOR ON PSYCHOLOGY, July 1, 2023, https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain
[21] Abigail Hicks, *With wagering just a click away, younger gamblers call for help,* PITTSBURGH UNION PROGRESS, Jan. 28, 2025, https://www.unionprogress.com/2025/01/28/with-wagering-just-a-click-away-younger-gamblers-call-for-help/
[22] https://www.slidebook.io/company/draftkings/presentation/4482ce71d778bb9781863ed375bebca1-/slide-/4482ce71d7-78bb9781863ed375bebca1_24/ (last visited Nov. 21, 2024).

their friends and like they are getting personalized attention.

121.    However, VIP Hosts are only pretending to be user's friends. In reality, VIP Hosts follow a standardized playbook that is carefully designed to entice their assigned users to return to DraftKings's platform often and gamble more.

122.    DraftKings is aware that users often feel a kinship with their VIP hosts and tell them when they are struggling with gambling addiction.

123.    Despite this, DraftKings's VIP Hosts are not given adequate training to identify users in the throes of gambling addictions or adequate resources to respond when a user is exhibiting signs of a gambling problem.

124.    Instead, the VIP Hosts are given a single mission from DraftKings: keep the most valuable users frequently gambling and gambling big.

125.    VIP Hosts are incentivized to ignore even obvious signs of gambling addiction.

126.    Even when a user explicitly states that they are gambling too much or beyond their means, VIP Hosts are trained not continue encouraging them to gamble on DraftKings.

127.    VIP Hosts are trained to follow a gambler's activity on the platform and to follow up with them at strategic moments when they might otherwise take a break from gambling or stop gambling all together.

128.    Among the tactics that VIP Hosts are trained to use is offering users deposit match promotions after they have experienced a large loss or have been absent from the platform for several days.

129.    DraftKings has its VIP Hosts do this because these promotions are themselves designed to encourage users to gamble more and to develop and entrench gambling habits.

130.    DraftKings collects copious amounts of data on its players' behavior and is

capable of identifying players who are developing or have developed gambling addictions.

131.    DraftKings does not use this data to prevent users from gambling beyond their means or engaging in destructive behavior.

132.    Instead, DraftKings uses its data on users' betting patterns to deploy its VIP Hosts and other tactics to ensure that even when a user has just experienced a large loss or is trying to take a break from the platform, they get a message that will ensure they are back on the platform as soon as possible.

133.    DraftKings tracks when a user has opted into a cool-down or self-exclusion period because they are gambling too much and heavily targets them with offers as soon as the period expires.

134.    DraftKings is so eager to continue receiving users money that it solicits them to resume gambling immediately upon the expiration of self-imposed cooldown periods, and, for Plaintiffs Macek and Harner, during active state gambling exclusion periods.

135.    DraftKings engages in this behavior despite knowing that many users have opted into cooldown or self-exclusion periods precisely because they are struggling with gambling addictions and do not want to be exhorted to continue gambling once their cycle of gambling has been interrupted.

136.    In this way DraftKings prioritizes continuing to milk gambling addicts over connecting them with help or respecting their boundaries.

137.    In short, DraftKings uses its data and trains its hosts to induce rather than prevent problem gambling.

138.    Not only does DraftKings intentionally target young people and those it knows are struggling with problem gambling, DraftKings also designs its product and its promotions

so that once users download the DraftKings app, they quickly form gambling habits.

139.    Moreover, DraftKings intentionally designs its marketing and platform interface to

minimize the likelihood that users will engage with the terms of use.

140.    Consumer psychology research has identified several factors that decrease

people's likeliness to read the fine print of consumer contracts.[23] First, researchers point out

that when contract forms are intentionally made not user-friendly, consumers are less likely to

engage with them.

141.    For example, researchers at New York University note that "Font sizes are often

very small and the clauses within sentences can be very long which can make it physically

difficult and taxing for consumers to read."[24]

142.    The terms of DraftKings's Casino Deposit Match Promotion are over fifteen

hundred words long with small font sizes, lengthy sentences, legalistic language, and confusing

organization that all make it excessively taxing for users to follow.

143.    The NYU researchers' paper goes on to mention that "Even if consumers were

able to dissect the legalese in which contracts are written, the process of doing so would be

exceedingly difficult especially since relevant passages are often buried in other language."

144.    DraftKings only reveals the truth of its unfavorable promotions after multiple

---

[23] Meirav Furth-Matzkin & Roseanna Sommers, , *Fool Me Once, Shame On Me: How Consumers And Lawyers Perceive The Fine Print In Deception Cases*, HARVARD JOHN M. OLIN CENTER FOR LAW, ECONOMICS, AND BUSINESS - FELLOWS' DISCUSSION PAPER SERIES, June 2018, https://www.law.harvard.edu/programs/olin_center/felows_papers/pdf/Furth_82.pdf (last visited Dec. 10, 2024); Florencia Marotta-Wurgler, , *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, U. CHI. L. REV., Feb. 6, 2011, https://lawreview.uchicago.edu/sites/default/files/78-1-Increased%20Disclosure%20in%20Software%20Contracts-Marotta-Wurgler.pdf (last visited Dec. 10, 2024).
[24] Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, NYU JOURNAL OF L. AND BUS., Feb. 9, 2009, https://papers.ssrn.com/-sol3/papers.cfm?abstract_id=1340166 (last visited Dec. 10, 2024).

paragraphs describing age and location requirements for betting on their platform. Even if a user is able to hunt down language that describes the promotion's reality, it is written in a way that makes it unlikely that a layperson—who is eager to get gambling—will understand.

145.    Furthermore, according to the NYU researchers, "consumers will also often have difficulty imagining problems that might arise. That is, scenarios under which things can go wrong never enter their minds."

146.    After exposure to DraftKings promising headlines, consumers are unlikely to predict that redeeming these promotions will entail such onerous requirements and fruitless rewards.

147.    The authors also write that "even if some consumers manage to foresee the possibility of potential negative consequences, they will often be overly optimistic in assessing the probability of those negative consequences once they have invested even a small amount of time, effort, or other resources pursuing a goal."

148.    By the time a user is presented with the full terms of a promotion, they have grown excited about DraftKings's alluring promises and have put time and effort into navigating to the platform's compelling offer.

149.    Moreover, research shows that social norms often discourage reading the fine print of a contract. Consumers believe that DraftKings, a company operating in a heavily regulated industry, can be trusted for the promises it's making in its advertisements. Consumers do not think, therefore, that they need to carefully read pages of fine print to protect themselves.

150.    Finally, DraftKings's contract is one of adhesion with terms that are non-negotiable, "[a]nother major reason why people might not read the contracts that they sign… [is that t]he consumers' choice is to accept the offered agreement or go elsewhere." DraftKings

customers understand that reading the fine print will not lend itself to mediating a more favorable deal.

151.    DraftKings exploits these factors and misleads consumers about material aspects of its promotions, secure in the knowledge that few consumers will notice if the fine print contradicts what they believed they had signed up for.

Plaintiffs Macek, Setton, Harner, Alicea, and Walker, like many young men targeted by DraftKings, have lost a significant amount of money gambling on DraftKings's online platform.

## D.  DraftKings's Casino Deposit Match Promotion

152.    DraftKings offers a series of promotions that promise to match a deposit users make into their DraftKings casino account. While the offers have varied monetarily, they all made materially similar promises with opaque and onerous requirements.

153.    These promotions have been titled "Casino Deposit Match" and are offered to both new and existing DraftKings users.

154.    DraftKings advertises the Casino Deposit Match Promotion on billboards and in digital media as well as directly to people on its own platform.

155.    These offers lure those familiar with DraftKings's sportsbook to try its online casino by promising to match 100% of a customer's deposit up to $2,000 (or up to $1,000 on Golden Nugget).

156.    The advertisements have eye-catching promises in large print of a massive cash bonus matching a deposit.



*Figure 1: example advertisement for the Casino Deposit Match Promotion promulgated on digital media in Pennsylvania*

157.    Conspicuously missing from this advertisements is any mention of the terms and conditions that will eventually lead most users to regret ever making a deposit.

158.    Frequently Plaintiffs saw ads like these within the DraftKings app itself, which did not disclose the terms of the promotion.

159.    Other advertisements for the promotion have tokens raining down and fireworks.



*Figure 2: Example advertisement for the Golden Nugget Casino Deposit Match Promotion that is substantially similar to those that Plaintiffs viewed before first opting into the promotion.*

160.    Even when these advertisements did include some terms, they were in very small, often unreadable print and did not include the most material terms regarding the promotion, described below.



*Figure 3: Another example advertisement for the Casino Deposit Match Promotion with the full terms obscured, promulgated on digital media throughout Pennsylvania around in 2022 and 2023 and substantially similar to the advertisements Plaintiffs saw and relied on when opting into the Casino Deposit Match Promotion.*

161.    One television advertisement for the promotion, that ran in 2023 promised customers a "100% deposit match up to $2,000" for playing blackjack on DraftKings' online casino without audibly disclaiming the existence of a playthrough requirement or the fact that blackjack contributes towards the requirement at only a 20% rate. Some, but not all, of the terms associated with the promotion were shown in tiny font at the bottom of the screen for the last five seconds of the advertisement but were too small and disappeared too quickly to actually be read.

162.    Plaintiffs saw multiple ads substantially similar to these shortly before they first made a deposit and opted in to the Casino Deposit Match Promotion in the DraftKings app.

163.    The promotional materials fail to communicate the true lengths to which a user must go in order to receive any tangible benefit from the promotion and the fact that a user's

entire deposit will be forfeited should they choose to opt out or fail to meet the Herculean prerequisites.

164.     DraftKings's Casino Deposit Match Promotions are subject to egregious playthrough requirements, often set at 10x or 15x the combined amount of the deposit and bonus funds. Thus, to redeem a $2,000 bonus (a common DraftKings offer) at a 10x playthrough requirement, a user would need to wager at least $40,000 (10x playthrough of BOTH the $2,000 deposit and the $2,000 bonus).

165.     Additionally, these promotions have a seven-day window for users to satisfy the playthrough requirements.

166.     Accounting for this, a user would have to wager over $5,700 every day for a week in order to satisfy the $2,000 bonus playthrough requirement.

167.     DraftKings further manipulates the terms such that not all wagers contribute equally to the playthrough requirement. In fact, casino games with the most favorable statistical returns to users, like table games, contribute to the playthrough requirements at rates significantly lower than other casino games where users have a much lower chance of winning, like slot machines. For example, blackjack, a game known for its close-to-even returns, counts at a rate of just 20% towards the playthrough requirement. In other words, if a user bet $100 on a hand of blackjack, only $20 would count towards their playthrough requirement.

168.     For a user to satisfy a $40,000 playthrough requirement playing just blackjack, they have to gamble a minimum of $200,000 in a seven-day timeframe.

169.     This means that, assuming a hand of blackjack takes ~1 minute, a user betting $50 every hand would have to spend more than 66 hours in a 7-day period playing blackjack to satisfy the playthrough requirement. That amounts to almost ten hours of blackjack a day,

without stopping to eat or go to the bathroom.

170.    As described below, the fact that users must spend a tremendous amount of time gambling in a short timespan is an intentional aspect of the promotions' design. DraftKings intends for customers to spend enough time engaging in habit-forming gambling behavior that they do, in fact, form a habit.

171.    DraftKings knew, or should have known, that its customers would not find or understand the proviso, hidden deep in the promotions' terms (and not included in even the small print accompanying many advertisements for the promotions), that casino games contribute to the playthrough requirement at varying rates and that the most favorable games contribute only marginally to the playthrough.

172.    The hard-to-understand terms and conditions further specify that "Order of Funds for wagering [are]: (1) customer's initial qualifying deposited funds (the Original Deposit) are wagered first prior to casino bonus funds, (2) winnings accrued during the play-through of the Original Deposit, (3) bonus amount." This provision is confusing and appears to suggest that a user has to play-through anything they have won beyond the amount of their initial deposit after first satisfying their initial deposit play-through requirement before they can use the bonus funds.

173.    Despite these terms providing that each pool of money will be treated differently, DraftKings shows only one number in a user's account: the total of their deposit, additional winnings, and bonus.

174.    The "order of funds for wagering" provision is paired with language that states, "Failure to complete the play-through requirement, defined below, of the Original Deposit and Casino Bonus Funds within seven (7) days (the "Play-through Period") of the Casino Bonus

Funds being credited to your account will void the award. This will result in forfeiture of any wagered and lost portion of the Original Deposit, Casino Bonus Funds and any accumulated winnings."

175.    DraftKings claims this language establishes that, in the event a user fails to complete the playthrough within seven days or decides to opt out of the promotion after realizing it is impossible to satisfy, they stand to lose their entire original deposit and any money they have won wagering it—not just the promotion's bonus funds.

176.    In practice this means that, if a user deposited $2,000 and wagered it to win, say, $500 before deciding that they cannot satisfy the playthrough requirement, their account balance would be reset to $0 because DraftKings would treat their $2,000 deposit as gone, and the $2,500 in their account as "accumulated winnings" that are subject to forfeiture.

177.    DraftKings supplements the confusion by including in the terms, in bold, the statement that "**At any point, a customer may decide to forfeit their bonus and remove themselves from the promotion.**" But DraftKings fails to warn users that "forfeit[ing]" their bonus will not leave them any better off than just allowing the promotion to expire—or deleting the app and never returning—because once they bet their initial deposit, no matter how much money remains in their account, DraftKings treats all the funds as forfeitable if the playthrough is not met.

178.    A reasonable expectation, especially for gambling-naive users, is that failure to satisfy the requirements would result in a user's account being reset to the amount of their initial deposit, plus or minus any gambling wins or losses, sacrificing only the opportunity to get the matching bonus. DraftKings users could not reasonably be expected to understand that their money was to be wagered in a specific order and treated differently after being wagered,

particularly when their account balance reflected a single dollar amount and was not represented as separate "pools" of money to be treated differently.

179.    This expectation is particularly reasonable because it is consistent with how DraftKings's <u>sportsbook</u> deposit match promotions work. Under the sportsbook deposit match promotion, a user is progressively given bonus funds as they satisfy the playthrough requirement and can opt out at any time.  A DraftKings user who was first deceived by the DraftKings' sportsbook deposit promotions (discussed below) and then thinks they have an understanding of it would be deceived again by the Casino Deposit Match Promotion when they opt into it thinking it will operate like the sportsbook deposit match promotions.

180.    In many cases, customers who failed to satisfy the terms were shocked when their account balance was reset to zero, forfeiting even their initial deposit. Numerous individuals have reported this experience on Reddit, to the Better Business Bureau, and to state gambling regulators.

181.    When users discover that their deposit has been locked up in the Casino Deposit Match Promotion simply by placing a single bet in the casino, they are faced with either trying to recoup it by gambling an enormous amount in a short period of time or walking away from it.

182.    One Reddit user posted a detailed description in December 2023 of his experience with a "100% Casino Deposit Match".[25] After depositing $1,000 into DraftKings and playing hundreds of hands of blackjack, this user decided that the requirements were too onerous to complete, particularly given the negligible contribution of his blackjack playing to the playthrough. Deciding he was not willing to wager $100,000 on virtual blackjack in just

---

[25] https://www.reddit.com/r/DraftKingsDiscussion/comments/18uj96p/bonus_forfeiture/

seven days, this user navigated to the "bonus forfeiture" option. Without being asked to confirm or warned that he would be losing his entire initial deposit, this user's account balance was reset to zero. The user was shocked that "forfeiture" of the bonus included not just the promotional incentives and associated winnings, but his own $1,000 deposit.

183.    A number of complaints to the Better Business Bureau reflect identical concerns about unknowingly forfeiting deposits associated with DraftKings's "Casino Deposit Match" promotions.[26] Other complaints to the Better Business Bureau reflect customers' confusion surrounding the varying contributions of different games to the playthrough and uncertainty about the meaning of a "15x playthrough."

184.    Furthermore, several individuals have reported this promotion to state gambling regulators.

185.    Plaintiffs Macek, Setton, Alicea, and Harner were all deceived by this promotion, deposited money and opted into it believing they would have their deposits matched, and lost money as a result.

186.    Plaintiffs Alicea and Harner began gambling on DraftKings and Golden Nuggets online casinos in mid-2024 after seeing numerous advertisements for the deceptive Casino Deposit Match Promotion including those described above and substantially identical advertisements.

187.    The first time Plaintiff Macek used the Casino Deposit Match Promotion, he placed a bet without realizing it would tie his money up in the playthrough requirements. Upon realizing he attempted to cancel out of the promotion without losing his money but was told by DraftKings that was not possible.

---

[26] https://www.bbb.org/us/ma/boston/profile/online-gaming/draftkings-inc-0021-134635/complaints

188.    As described below, this promotion also worked as intended to inculcate problem gambling behaviors in Plaintiffs, including causing them to gamble a large amount in a short period of time and to chase their losses.

189.    After first participating in the sportsbook deposit match promotions, Plaintiffs Macek, Walker and Setton were surprised when they did not get their deposit matched in cash, but instead only got a portion of it matched in DK Dollars after satisfying some of the playthrough requirements by making numerous wagers on sporting events.

190.    In attempting to satisfy the sportsbook deposit match playthrough requirements, Plaintiffs Macek, Walker, and Setton placed many wagers on DraftKings of increasing amounts. The Casino Deposit Match Promotion instilled and exacerbated compulsive gambling habits in each of them.

**E.  DraftKings's "Risk-Free Bet" Promotions**

191.    DraftKings sportsbook offers a variety of promotions to new users that falsely state they can try out the platform without any risk of losing money. The dollar amount that can be placed "Risk-Free" or "No Sweat" varies but can be as much as $1,000.

192.    These tantalizing offers have been effective at persuading new users to open betting accounts they may not otherwise have opened and persuading existing users to wager amounts they may not otherwise have risked. That is what happened to Plaintiffs Macek, Setton, and Walker.

193.    After DraftKings's lured Plaintiffs Macek, Setton, and Walker into placing bets based on the promise that they would be risk-free, Plaintiffs discovered that the money they wagered had in fact been lost.

194.    Since at least 2020, DraftKings has advertised no-risk gambling promotions to countless people watching professional and collegiate sports on television.

195.    For those not watching televised sports, DraftKings ads for no-risk promotions were inescapable on Pennsylvania highways and public transportation.

196.    DraftKings has also advertised risk-free betting on Twitter, Instagram, Facebook, and TikTok feeds of millions of potential users—including Plaintiffs—through direct advertising and paid partnerships with influencers.



*Figure 4: Post on Twitter (now X) from user @SoManyWays2Joey (host of a popular NHL podcast on a network partnered with DraftKings) advertising a "Risk-Free Bet" up to $1,000; dated July 14, 2022. (https://x.com/SoManyWays2Joey/status/1547647893254746116)*

197.    Finally, DraftKings directly emails and texts its users, including Plaintiffs Macek, Setton, and Walker encouraging them to log in and place no-risk bets.

198.    The bets placed pursuant to these promotions involve substantially more risk than DraftKings's promotional materials lead customers to believe. When a customer loses their initial bet, they are not in the same position as they were before placing the wager.

199.    DraftKings's advertising misleadingly implied the contrary and concealed several key feature of the no risk promotion that would have allowed customers to determine that using the promotions did, in fact, put them at risk of losing their money.

200.    First, DraftKings misrepresented that a user could place a bet at no risk to themselves when there was necessarily risk, because a consumer cannot simply cash out a refund if they lose but instead must place another bet (the so-called "Bonus Bet") that they receive in the event they lost their original wager.

201.    Second, DraftKings misleadingly implied that a user could be restored to their original position if their original bet lost because they would receive "Bonus Bets."

202.    When a user places a bet as part of a no-risk promotion, they are wagering their own money and their account is debited the amount of the bet in U.S. dollars (in this case $100). If they lose, that money is not credited back to their account (as it would be if the bet was actually without risk), instead their account is credited with a "Bonus Bet" of the same amount. But a "Bonus Bet" is not worth its cash equivalent.

203.    "Bonus Bets," have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn from the account.

204.    In order to turn a "Bonus Bet" into U.S. dollars that can make them whole for their prior loss, a user must use the "Bonus Bet" to place an additional wager within the specified time limit *and win*.

205.    Furthermore, even when a customer places and wins a "Bonus Bet", they do not receive the stake back—which is what DraftKings purportedly gave them to make up for their loss. For example, if a customer uses a $100 "Bonus Bet" on a winning wager with 50/50 odds, they are paid out $91 ($100 winnings, minus 9% vig, without a return of the $100 stake).

206.    And of course, there is no guarantee that a user will win the "Bonus Bet". If a "Bonus Bet" loses, the user will be left with nothing to show for their "risk-free" bet.

207.    DraftKings thus misrepresented there was no risk because there is the risk of

losing all the money originally wagered. If a user loses their "Bonus Bet," they have no further means of recouping the initial amount they wagered.

208.    The false promise of "Risk-Free" and "No Sweat" bets was strategically and misleadingly designed to overcome new users' skepticism of gambling and to grab market share in the Pennsylvania sports betting industry.

209.    DraftKings was aware of the effects of such promises on users'—including Plaintiffs'—thinking: "If it's no-risk, why not bet more?"

210.    DraftKings deliberately tricked gambling-naive customers in Pennsylvania into falling for these promotions by not clearly communicating that those signing up for the no-risk promotions were, in fact, at risk of losing their money.

211.    Customers relying on their commonsense understanding of the "No Sweat" or "Risk-Free" offers on promotional materials—and not understanding the complex terms laid out several layers deep in fine print that contradict DraftKings's large-print promises—were surprised to discover upon losing their bets that, in order to get *some* of their money back, they needed to make an additional, successful wager.

212.    DraftKings intentionally supplemented this confusion by using the dollar symbol ($) in its promotional materials.

213.    As alleged above, DraftKings advertised these no-risk bets to Pennsylvania users on numerous occasions, often targeted specifically to new customers or existing customers who had not placed a certain type of bet before.



*Figure 5: An April 2025 advertisement on DraftKings's website offering users a "Risk Free" bet up to $50.*



*Figure 6: A March 2024 advertisement promoting a "No Sweat Bet" of up to $1,000 for new customers used by DraftKings in various digital advertising media including on Twitter.*



*Figure 7: Twitter post, dated April 19, 2022, promoting a "Risk-Free Bet".*
*(https://x.com/DKSportsbook/status/1516544714425708552)*

214.    Some of DraftKings's advertisements for no-risk promotions include very small print referencing other terms.

215.    In fact, DraftKings goes to great lengths to make it onerous to even comprehend that fine print terms apply. First, the link to the terms of the promotion are not even made available to a user until after the customer has already logged into the platform in response to an off-platform advertisement for the promotion and clicked through several steps to get to the point of placing the supposedly no-risk bet.

216.    Even then, DraftKings buries the most important term—that if you lose your original bet you only get an expiring "Bonus Bet" back which is not treated like a normal bet in how it is paid out. This vital information, which contradicts the large print promises that the

customer is not at risk if they lose, only appears behind a tiny hyperlinked information symbol and then, if the symbol is clicked, deep in very small text below several blocks of much larger text focusing on other aspects of the promotion.



*Figure 8: Screenshot taken November 11, 2024, of the DraftKings user interface for placing a "No Sweat" bet. No terms and conditions are displayed. Instead, they are obscured by an easy-to-miss hyperlink, seen here as the almost imperceptible "i" with a small green circle around it next to "NBA No Sweat SGP or SGPx"*

217.    A user need not—and Plaintiffs Macek, Setton, and Walker did not—ever see the full terms before opting in to the promotion on the basis of DraftKings's advertising that led them to believe they could place a bet with no risk.

218.    For example, a user could opt into a "No Sweat" NBA same game parlay on DraftKings by flipping the green switch in the app shown above without ever clicking the tiny "i" symbol linking to the promotion's full terms, which themselves bury the lead:






years of age or older (18+ if in DC/KY/NH/WY) (19+ if in CA-ONT). Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gambling, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

In addition to the eligibility requirements set forth above and in the DraftKings Terms of Use, to participate in the Promotion, customers must (1) be a registered DraftKings Sportsbook customer with an active account; (2) receive an offer to participate in this Promotion; and (3) opt-in by clicking on the appropriate link or button within the Promotional Period.

**NO SWEAT BET REDEMPTION**

Upon completion of the promotion requirements, eligible customers will be awarded one (1) No Sweat Bet (the "Token"). Token valid only on 11/27 NBA bets (the "Qualifying Bet"). Minimum odds per leg of -500 or longer. Cashed-out bets and voided bets will void this Promotion. Bets placed with bonus rewards (including but not limited to Bonus Bets, Odds Boosts/Surges, Profit Boosts, etc.) are not valid. Token expires at the conclusion of the final 11/27 NBA game. Qualifying Bet must be placed using cash from your cash balance or DK dollars. Maximum reward limits apply and vary by customer cohort. Maximum reward limits will be clearly and conspicuously disclosed to the customer upon opting in.

No Sweat Bet Tokens are single-use, non-withdrawable, and have no cash value. Must meet Qualifying Bet criteria and select Token BEFORE placing Qualifying Bet. Token only applies to Qualifying Bet. Reward issued only if Qualifying Bet loses after applying Token. Reward issued as Bonus Bet(s) based on the amount of losing Qualifying Bet. No Sweat Bet may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

**REWARD LIMITATIONS**

Bonus Bets are single-use, non-transferable, non-withdrawable, and have no cash value. Bonus Bets are valid for seven (7) days (168 hours) from the time they are credited to customers' accounts. Customers can choose when to use Bonus Bets and must select the Bonus Bet in their betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus is placed at +100 odds and

betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus is placed at +100 odds and wins, only the profit of $10 will be credited to the customer's account. Bonus Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

**GENERAL TERMS**

Limit one (1) offer per customer. Customers must opt-in to this Promotion each time it is offered. Opting-in to this Promotion during a single day is only valid during that day and does not opt the customer into future periods. See DraftKings Sportsbook Terms of Use for information and limitations on wagering. Each customer will be notified when they have received an award by (1) a bell notification (this is a notification that displays as a bell icon on the home page of the DraftKings Sportsbook app and website that can be clicked on to view short confirmation copy and terms) and/or (2) an automatically triggered email if the customer successfully entered the promotion and completed the promotion requirements. Whether a customer has committed abuse of this Promotion, violated the Promotion Terms or DraftKings Terms of Use, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. Should you wish to cancel your participation in this promotion at any time, please contact customer experience at sportsbook@draftkings.com. Upon cancellation, you may withdraw any remaining funds deposited in connection with this promotion subject to DraftKings Terms of Use. Any wager placed on DraftKings Sportsbook in connection with the promotion cannot be rescinded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the terms and conditions of this Promotion. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings account holders are responsible for any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors in bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Promotion Terms or DraftKings Terms of Use, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or



*Figure 9: The full terms of use for the promotion pictured in Figure 6. If a user navigates to these terms through the obscured hyperlink, they are met with an impractically small font size.*

219.    Regulators are increasingly catching on to the misleading language DraftKings and other sportsbooks use in advertising "risk-free" bets. Several illustrative examples are discussed below.

220.    In Ohio, gambling regulators have said such "free" or "risk-free" inducements are "false, misleading and explicitly against" state law. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions isn't good enough, he added. "We are not

supportive of trying to put the truth in small print."[27]

221.   DraftKings was sent a notice of violation by the Ohio Casino Control Commission which included a penalty of $150,000 for the use of "Risk-Free Bet" language. Previously, DraftKings had received a notice of violation from the same commission for advertising to individuals under the age of twenty-one.

222.   In 2022, the New York Attorney General's office admonished: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness."[28]

223.   The Massachusetts Gaming Commission prohibits sportsbooks from running promotions advertised as "free" or "risk-free" if a bettor needs to risk their own money as part of the promotion. *See* 205 Mass. Code Regs. § 256.04. Colorado has imposed a similar prohibition. *See* 1 Colo. Code Regs. § 207-2:9.4.

224.   Even the NBA took a stance on the "risk-free" language, banning it on platforms operated by the NBA or its franchises in February of 2023.[29]

225.   Many of the sportsbooks, including DraftKings, started to quietly move away from explicit "risk-free" language in late 2022. In that year, DraftKings pivoted to labeling

---

[27] Danny Funt, *Sportsbooks call them risk-free bets. Just don't read the fine print.*, WASHINGTON POST, Dec. 26, 2022, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/ (last visited Nov. 17, 2024).
[28] *CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl*, NEW YORK ATTORNEY GENERAL, Feb. 10, 2022, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became,strings%20attached%20without%20consumers'%20awareness (last visited Nov. 17, 2024).
[29] Bill King, *Concerned about betting's inherent dangers, NBA to ban 'risk free' advertising*, SPORTS BUSINESS JOURNAL, Feb. 6, 2023 https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Upfront/betting.aspx (last accessed Nov. 21, 2024).

these offers "No Sweat" bets. These promotions are materially no different, and just as misleading, as their "Risk-Free" predecessors, particularly considering that consumers in Pennsylvania still associate these offers, however labeled, with the "Risk-Free" promotion campaigns that were incessantly advertised on countless NFL, NBA, NHL, and MLB games. Nevertheless, DraftKings has continued to imply that betting on its platform can be no-risk as recently as December 2024.



*Figure 10: A "No Sweat" NBA offer on the DraftKings Sportsbook app from December 4,*
*2024.*

226.    According to a Washington Post article, industry participants admitted publicly
that advertising offers as no-risk was "unclear."

227.    Nevertheless, DraftKings continued to make these offers because it expected and
intended consumers to be misled by its "Risk-Free" and "No Sweat" promotions.

228.    At no time in DraftKings's marketing or during DraftKings's sign-up or
promotion opt-in processes were Plaintiffs Macek, Setton, and Walker, and the Class Members
warned of the true financial risks of using DraftKings's services to place a bet, including the
immediate and acute risk of losing the entire amount in that initial bet, the risk that losses would
never be reimbursed by Defendant, or the risks of developing a gambling addiction.

229.    As described above, Defendants' marketing (including during the user sign-up
process) misrepresented and omitted several key facts about the "No Sweat" bet promotions.

230.    Because a "Bonus Bet" must be gambled quickly and cannot be deposited in the
customer's bank account as cash, there is nothing free of risk about the transaction.

231.    However, customers like Plaintiffs Macek, Setton, and Walker were misled into
thinking that they could bet without risk and then ended up losing all of their initial stake.

232.    Had Plaintiffs Macek, Setton, and Walker and Class Members understood the
true risk inherent in making these "risk-free bets," they would have acted differently and not
lost as much money.

**F.  DraftKings's $1,000 Sportsbook Deposit Match Promotions**

233.    No-risk bet offers are not the only deceptive promotions that DraftKings
sportsbook employs. For several years, DraftKings has also been offering deposit match
bonuses of up to $1,000, often, but not always, targeting new customers.

234.    Since at least 2020, DraftKings has advertised their promises of a "$1,000 Sign Up Bonus" to countless Pennsylvanians watching televised MLB, NFL, NBA, and NHL games, and have made themselves regulars on the Twitter, Instagram, Facebook, and TikTok feeds of their millions of followers.

235.    DraftKings also advertised sign-up bonuses on billboards and public transportation in Pennsylvania.

236.    The unfair and deceptive terms of this promotion, which they offer to this day, make it inordinately unlikely for a user to obtain the advertised $1,000. Omitted from the promising headline is the reality that DraftKings will only match 20% of a user's deposit and will require a user to play through (and risk) 25x the amount of bonus money rewarded.

237.    In plain terms—which the fine print regarding this promotion deliberately obscures and the large-print advertisements for this promotion completely misrepresent—in order for a user to get a $1,000 bonus, they actually need to deposit five times that amount ($5,000), and then, within 90 days, *risk $25,000 on DraftKings sports bets*.

238.    Additionally, in order to satisfy the playthrough requirement, DraftKings requires that these bets be placed at minimum odds of -300 (meaning a bettor must risk $300 to win $100). This means bettors must place a series of highly-risky bets to satisfy the playthrough requirements.

239.    None of the foregoing is adequately disclosed to the customer.

240.    A new user is statistically likely, even using the most conservative betting approach, to lose money trying to satisfy the playthrough requirement.

241.    But even if they make it through all those steps, the $1,000 bonus is not rewarded as withdrawable cash funds, but rather as "DK Dollars" that hold no cash value, are

non-withdrawable, non-transferable, non-refundable, and can only be used for further gambling.

242.    DraftKings's advertising of the Bonus is also unfair and deceptive because an eligible consumer who is often a new participant in sports betting, would be unlikely to understand the cost and risk involved in qualifying for the $1,000 Bonus. In fact, if Plaintiff Walker had been adequately informed of the cost or the odds associated with the promotion, he would not have acted upon it.

243.    DraftKings advertised the "$1,000 Bonus" as a reward for signing up for its Sportsbook platform in these terms:



*Figure 11: DraftKings post on Twitter, dated February 15, 2022, using fan-favorite NBA player*

Paul Pierce to promote false promises of a "Deposit Bonus up to $1,000".

*(https://x.com/DKSportsbook/status/1493660970870312967)*



*Figure 12: Screenshot from an advertisement typical of those broadcasted by DraftKings on television and digital media in Pennsylvania during the Class Period.*



*Figure 13: A Twitter post, dated April 20, 2022, featuring rapper Lil Wayne and promising customers that they can simply "Download the [DraftKings] app today and get a deposit bonus up to $1,000". (https://x.com/DKSportsbook/status/1516830656721993729)*

244.    Plaintiffs Macek, Setton, and Walker saw advertisements for DraftKings's Sportsbook Deposit Match Promotion shortly before they initially deposited funds in their accounts on DraftKings.

51

245.    Plaintiffs Macek, Setton, and Walker were misled by the advertising for the promotion and, as a result, deposited more money than they would have with DraftKings had they been informed of the actual terms of the promotion.

246.    The result was that Plaintiffs gambled and lost more money than they otherwise would have.

247.    As with the no-risk promotion advertisements, the terms of this promotion are not fully disclosed in the advertisements and, to the extent that they are communicated, they appear in an illegibly small font-size—an order of magnitude smaller than the misleading text advertising the promotion—and are confusingly worded.

248.    Plaintiffs Macek, Setton, and Walker, and many other users transferred money into their DraftKings accounts anticipating that their deposit would be "matched" in full up to $1,000.

249.    Plaintiffs Macek, Setton, and Walker, and most users never became aware that there were additional terms, much less saw the full terms of the promotion or learned that their funds would not be matched in U.S. Dollars, not be matched on a 1:1 basis, and would only be matched at a rate of one "DK Dollar" for every $25 USD wagered, until after they had made their deposits and opted into the promotion.

250.    Notwithstanding the large text of DraftKings's advertisements, Plaintiffs were never going to simply receive "up to $1,000" in exchange for depositing $1,000, as the ads implied. In order for a customer to obtain the "$1,000 Bonus," he or she would have to satisfy three onerous requirements, explained only in the unreadably small font size above:

    a.    They would have to deposit $5,000 up front;

    b.    They would have to bet $25,000 within 90 days on wagers with odds of "-300 or

longer;"

   c.   They would then have to place wagers using their DK Dollars and win enough of
        those to accrue a cash value of $1,000 in their account.

251.    Plaintiffs Macek, Setton, and Walker, and other users could not reasonably have
been expected to understand from the face of DraftKings's advertisements that, in order to
receive a $1,000 bonus, he or she needed to immediately deposit $5,000, because the bonus
amount is calculated as 20% of the consumer's first deposit.

252.    Plaintiffs Macek, Setton, and Walker, and other DraftKings sportsbook users
could not reasonably have been expected to understand from the face of DraftKings's
advertisements that the $1,000 bonus would not be provided at the time of their initial deposit,
but that instead they would earn the bonus only $1 at a time for every $25 wagered. Thus, to
receive the $1,000 bonus, the new customer would have to risk $25,000 within 90 days on long-
odds bets where to win $100 a customer would have to wager $300.

253.    Plaintiffs Macek, Setton, and Walker, and other DraftKings sportsbook users did
not understand and could not reasonably have been expected to understand based on
DraftKings's advertisements that, in order to place bets for at least $25,000 over 90 days to
qualify for the Bonus, they would have had to wager an average of more than $276 gambling on
sports every day for three months.

254.    Plaintiffs Macek, Setton, and Walker, and other DraftKings sportsbook users
also did not understand that despite the advertisements using dollar signs and thus conveying
that the bonus funds would be in the form of US Dollars, the bonus would actually be awarded
only as a non-withdrawable credit ("DK Dollars") to be used for further gambling.

255.    Plaintiffs Macek, Setton, and Walker, and other DraftKings sportsbook users

also could not reasonably be expected to understand that they would be required to make bets with a high level of risk to satisfy the play-through requirements. They could not have been expected to understand that, contrary to the advertisements for the "Bonus Match" promotion, not all bets they made on DraftKings Sportsbook would count toward the $1,000 bonus. In fact, any bets that DraftKings's oddsmakers believe have a greater than ~75% chance of winning would not count toward the required total bets of $25,000 within 90 days.

256.    Gambling regulators, like the New York Attorney General, have sounded warning bells about the misleadingness and illegality of deposit match promotions just like the ones DraftKings used on Pennsylvania residents.

257.    DraftKings knew, or should have known, that its advertisements for this promotion was deceptive to its target customers, who were mostly new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were conveyed clearly and in a font size that a reasonable consumer could be expected read on the company's advertisements and platform.

258.    DraftKings knowingly and intentionally designed this promotion to maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms.

**G.  These promotions worked on Plaintiffs exactly as DraftKings intended**

259.    Around 2019, when DraftKings's online sportsbook became available in Pennsylvania, Plaintiff Walker saw ads for new sportsbook user promotions including a deposit match promotion on a variety of digital platforms and already having an account on DraftKings and believing it to be a trustworthy company, he took the opportunity to begin sports betting.

260.    Plaintiff Macek also learned of the sportsbook promotions from media

advertisements as well as direct email and text correspondence with DraftKings after signing up for a DraftKings account in 2020 and betting in the casino.

261.    Plaintiff Macek repeatedly tried to stop gambling and sometimes would go several months or even a year without betting on DraftKings or Golden Nugget. Invariably, the Defendants would entice him back to the site with a misleading casino promotion and intentionally restart a cycle of compulsive gambling.

262.    Based on Plaintiff Macek's behavior on the platform, DraftKings's algorithms identified Plaintiff Macek as the type of user that might be most profitable to the company, and he was assigned to one or more target user groups in the company's internal customer data. This lead DraftKings to begin offering him more and more promotions requiring more and more playthroughs to satisfy.

263.    Among these promotions were "Risk-Free Bet" promotions, which Plaintiff Macek was surprised and dismayed to discover were not actually risk free and, as described above, required him to place more wagers if he lost the initial "risk-free" bet just to have a chance to win back some of the money he lost. These promotions were also intentionally designed to and did inculcate dangerous gambling habits in Plaintiff Macek.

264.    One of these dangerous gambling habits that the "Risk-Free Bet" promotions develop is chasing losses, wherein a gambler tries to win back money that they've lost in one bet by placing further bets. Prior to being enticed into using the "Risk-Free" promotions, Plaintiff Macek did not chase his losses, but after opting into it, discovering his initial bet was not actually risk-free and that all it gave him was an opportunity to gamble more to recoup his money, Plaintiff Macek began chasing his losses on DraftKings more and more.

265.    Eventually, because Plaintiff Macek was betting more and more money on

DraftKings, he was invited to become part of the VIP Player Program, which offered him some "perks" like expedited account treatment, "custom offers," and a VIP host who would reach out personally to him entreating him to gamble more and offering him opportunities to earn deposit bonuses for doing so.

266.     When Plaintiff Macek first signed up for DraftKings in November 2020, he was a conservative player, placing wagers of amounts that he could afford to lose given his income as a teacher.

267.     Shortly after signing up, however, Plaintiff Macek received a deposit bonus offer from DraftKings. Enticed by the promotion, he deposited $1,500 into DraftKings and received $500 credit in non-refundable, non-transferable, no-cash-value bonus funds.

268.     With a newfound excitement for the four-digit balance in his account, Plaintiff Macek began to bet larger amounts, bet more often, and increase his deposit frequency.

269.     Over the next months, DraftKings contacted Plaintiff Macek repeatedly, offering him an array of deposit match offers and "risk-free" sports betting offers.

270.     Plaintiff Macek fell deeper and deeper into his new gambling habit. In March 2021, without request, DraftKings doubled Plaintiff Macek's deposit limit from $10,000 to $20,000 and assigned him a "VIP host".

271.     At the same time, Plaintiff Macek sent DraftKings certain financial documents, including bank statements, which gave the company full visibility into his finances including the fact that he was making a teacher's salary of ~$50,000, with a take-home pay of $1,796 every two weeks. Nevertheless, DraftKings increased Macek's daily deposit limit to 10x his bi-weekly pay.

272.     A DraftKings VIP host instructed Plaintiff Macek on how to make deposits from

PayPal, which allowed him, on multiple occasions, to deposit significantly more money than was presently available in his bank account. On one occasion, Plaintiff Macek spent over $100,000 via PayPal in a single day – money he could not afford to lose.

273.    By June 2021, Plaintiff Macek was entangled in the throes of addiction. Plaintiff Macek recalls that on a single day in June 2021, he lost a total of $15,000 before texting his VIP host for assistance. Instead of encouraging Plaintiff Macek to seek problem gambling support, the VIP host, who knew that Plaintiff Macek was surviving on a high school teacher's salary, encouraged Plaintiff Macek to deposit another $5,000 via PayPal, which was promptly lost. By the end of the day, Plaintiff Macek had lost $20,000.

274.    Plaintiff Macek's VIP host continued to contact him with high-deposit promotion offers and VIP gifts, including DraftKings-branded clothing and coffee cups. Often, these offers came directly following significant losses, including by way of site credit (calculated as a percentage of his total losses).

275.    Despite a principal interest in DraftKings online casino, Plaintiff Macek also bet thousands on the sportsbook, unable to resist the beck and call of the "risk-free" bets his VIP host offered in an intentional attempt to expand Plaintiff Macek's addiction to DraftKings's gambling offerings.

276.    Both DraftKings and Golden Nugget routinely sent Plaintiff Macek advertisements for casino deposit match bonuses. These bonuses had varying playthrough requirements, often more than 10x and but occasionally only 1x. These differences were never clearly articulated in the offers sent to Plaintiff Macek. Instead they were hidden in confusing language in the fine print of the terms, which DraftKings knew Plaintiff Macek, in the throes of a gambling addiction, was not going to read.

277.    By April 2023, Plaintiff Macek could not resist chasing his losses. On multiple occasions, Plaintiff Macek would be down $20,000-30,000. Invariably, if chasing these losses proved temporarily successful and Plaintiff Macek recovered some of his money, DraftKings would reach out with new, tantalizing offers and incentives to induce him to continue gambling beyond his means.

278.    The following is an conversation between Plaintiff Macek and a DraftKings employee, in which he reached out a "Player Advocate" to report having lost $15,000 in one day and was told he would be offered a new bonus to try to win back some of his lost money. He was not, as he should have been, connected to any addicted gambling resources. Plaintiff Macek had numerous conversations of this sort with DraftKings employees over the years and was never cut off from gambling despite clearly gambling far beyond his means.

**Andrew F–S** (DraftKings)

Jul 27, 2023, 1:15 PM EDT

Hi Kenneth,

I wanted to reach out to give you an update.

I've gone ahead and sent this situation over to the VIP team so they can evaluate this request!

They should be able to provide you with this bonus and possibly more.

Stay tuned...

Andrew F-S

DraftKings Player Advocate

**GolfProX**

Jul 27, 2023, 11:05 AM EDT

Good morning.

I just wanted to reach out to see if anyone from the vip team would be able to add any dk dollars to my account. I had a rough day yesterday (-15k) and anything would be appreciated.

Please consider.

Thanks.

*Figure 14: Correspondence between Plaintiff Macek and DraftKings dated July 27, 2023, in which Plaintiff Macek is promised a "bonus" after disclosing that he lost $15,000 in a single day.*

279.    In August 2023, Plaintiff Macek was assigned a new VIP host who pretended to take interest in his hobbies, work life, and living situation. Under the guise of friendship, this VIP host manipulated Plaintiff Macek's trust and encouraged his gambling addiction through unsolicited promotional offers, gifts, and deposits of site credit. The host also learned about Plaintiff Macek's limited financial resources.

280.    The following is a text conversation between Plaintiff Macek and his VIP host

59

from October, 2023 in which he admitted to chasing his losses of tens of thousands of dollars.

His Host replied only that there is "great sports action this weekend."



Oct 13, 2023 at 2:34PM

Hey Ken, I hope you are having a good week, congrats on the big win on Cash Eruption!

Hey man! Thanks. So unbelievable!

I want the mercy of gods win

Nice!  Agreed that would be awesome!

I had to withdraw that money. Otherwise, I probably would've burned through it playing to get the mercy of gods jackpot lol.

Lol love seeing those big wins.  Have a great weekend!

The big winds are nice, especially when you're not already 10 grand in the hole, chasing it back the same day

But thanks again for the congrats. I'm super pumped nice way to start the weekend.

No doubt, lots of great sports action on this weekend!

For sure! Have a nice weekend

You too, thanks!

*Figure 15: Texts between Plaintiff Macek and his VIP host, dated October 13, 2023, showing the VIP host congratulate Plaintiff Macek on a big win. Plaintiff Macek tells the VIP host that these wins are "nice, especially when you're not already 10 grand in the hole, chasing it back the same day".*

281.    From September 2023 to January 2024, Plaintiff Macek also lost over $50,000 to Golden Nugget. Plaintiff Macek felt he had no choice but to take out large personal loans to pay off his gambling debts.

282.    Around this time, Plaintiff Macek attempted to get a handle on his out-of-control gambling and opted into Golden Nugget's temporary self-exclusion program.

283.    Nevertheless, in August 2024, Plaintiff Macek was contacted by a new DraftKings VIP host attempting to lure him back with deposit match promotions.

284.    Then in January of 2025, Plaintiff Macek Golden Nugget managed to lure Plaintiff Macek back with direct outreach about a casino deposit match promotion that obscured the playthrough requirement associated with it.

285.    Golden Nugget broke Plaintiff Macek's resistance again and he connected his bank account to the app, showing that he had $15,000 in it. He made a deposit of $2,500 and began to play late on the evening of January 25th.

286.    Defendants had led Plaintiff Macek to believe that they would not allow him to deposit more money than he had in his linked account.

287.    Plaintiff Macek relapsed and went on a gambling bender. From late the night of January 25th until the afternoon of January 26th, Plaintiff Macek gambled over $100,000, depositing more and more funds in his Golden Nugget account due to Defendants' calculated inducements.

288.    Despite knowing that Plaintiff Macek only had $15,000 in his bank account, Golden Nugget caused him to overdraft the account by $17,000 and lose over $32,000 in approximately eighteen hours.

289.    During this gambling binge, Plaintiff Macek reached out to employees of the Defendants when a deposit attempt failed. Instead of cutting him off, connecting him with resources, or cancelling out his bets, Defendants provided him with bonus funds, more promotions, and encouraged him to attempt another deposit.

290.    When the dust settled on January 27th and Plaintiff Macek realized he had somehow deposited $17,000 more dollars than he owned in his account, he reached out to Defendants again, only to be told that it was impossible for him to have withdrawn that money and that his bank had made an error. When he explained that his account history on Golden Nugget and his bank were both showing that he had withdrawn $32,000 and asked to discuss the matter over the phone, he was told by "Marie C," a so called "Player Advocate" that "You didn't deposit $1 with DraftKings or Golden Nugget" and that the company did not "call back players for these issues."

291.    As more money was deposited into Plaintiff Macek's bank account over the following days (through personal loans from those close to him), Golden Nugget took it all until the full amount Plaintiff Macek had (but should not have been able to) wagered from January 25th and 26th was transferred to the Defendants.

292.    Defendants' employees still did not take any steps to cut Plaintiff Macek off or connect him with problem gambling resources.

**Marie C (Golden Nugget Casino)**
Jan 27, 2025, 6:27 PM EST

Hello Kenneth,

Thank you for contacting us about the status of your deposit.

We do not call back players for these issues. You didn't deposit $1 with DraftKings or Golden Nugget.

You need to discuss further with your bank to about this issue.

These funds have not been retrieved by us.

Please check your bank account in the next few days.

Marie C
Player Advocate

**Golfprox**
Jan 27, 2025, 5:59 PM EST

Can someone please call me to discuss this further? If you look at the transaction history on my account, it's showing all the debits and online banking are totaling 32k. However you said that I did not spend that. Please I just want to figure this out as I never should've been able to spend more than I had.

**Marie C (Golden Nugget Casino)**
Jan 27, 2025, 5:04 PM EST

Hello Kenneth,

Thank you for contacting us about the status of your deposit.

The funds just have a hold that will be released in 5days or less.

Marie C
Player Advocate

*Figure 16: Correspondence between Plaintiff Macek and Golden Nugget employees dated January 27, 2025, discussing his deposits from the previous days.*

293.     After this incident Plaintiff Macek enrolled in Pennsylvania's five-year self-exclusion program. This meant that no casino in the state should have accepted his bets or deposits any more.

294.     Other casinos contacted him to let him know they were closing or suspending his accounts, however he heard nothing from DraftKings or Golden Nugget, on which Plaintiff Macek had done most of his gambling.

295.     On March 17, 2025, while still on the Pennsylvania self-exclusion list, Plaintiff

Macek received a mailer from DraftKings to his home address (where DraftKings knew he lived) offering him a $1,000 casino deposit match.

296.    In total, as a direct result of the gambling addiction that DraftKings had intentionally inflicted upon him, Plaintiff Macek suffered losses in excess of $134,000.

297.    Plaintiff Macek also suffers from anxiety, post-traumatic stress disorder and has been unable to sleep through the night because of his gambling addiction and the effects it has had on him and those around him. DraftKings infected Plaintiff Macek with a lifelong gambling addiction that he will always struggle with.

298.    Like Plaintiff Macek, Plaintiff Setton was identified by DraftKings's data analytics as a valuable user and was targeted with promotions and by VIP Hosts.

299.    Plaintiff Setton participated in every one of DraftKings' misleading promotional offers described above. At first Plaintiff Setton used the Casino Deposit Match Promotion because he was misled by its large-print promises that are inconsistent with its small-print terms.

300.    Then, as the promotion worked as designed and hooked him on gambling, Plaintiff Setton also compulsively opted into deposit match promotion, hoping that *this* would be the time he did not lose his deposit.

301.    Plaintiff Setton frequently was induced to deposit and gamble by this casino promotion, which required him to playthrough his initial deposit 50 times when using casino table games. There were times when Plaintiff Setton would spend an entire day trying and failing to meet this requirement.

302.    Invariably, Plaintiff Setton would lose his entire deposit and worsen his addiction by forcing him to gamble as much and as fast as possible.

303.    Likewise, Plaintiff Harner was quickly identified by DraftKings as a target for promotions and VIP Host outreach based on his gambling history and he was inundated with outreach from Defendants.

304.    These promotions worked as intended on Plaintiff Harner and he began to gamble more and more frequently and deposit increasingly large amounts of money on DraftKings.

305.    Plaintiff Harner was assigned a VIP Host by DraftKings who exhorted him to continue gambling more and more, including immediately after he suffered losses.

306.    Based on the quantity Plaintiff Harner was gambling and other data from his pattern of behavior on its platform, DraftKings knew that he was in the throes of a gambling addiction.

307.    DraftKings did not take any steps to cut off or limit Plaintiff Harner's gambling or connect him with gambling addiction resources.

308.    Finally, Plaintiff Alicea was induced to begin gambling on DraftKings and Golden Nugget because of deposit match promotions he saw advertised by them on his social media feed.

309.    Plaintiff Alicea was made to believe, based on DraftKings's and Golden Nugget's false advertising for their promotions, that he could not lose money because his deposits would be matched.

310.    Plaintiff Alicea rapidly developed a gambling addiction when he attempted to satisfy the playthrough requirements that he learned—after making a deposit and an initial wager—were part of the deposit match promotions.

311.    Plaintiff Alicea began, as Defendants intended, to chase his losses, pouring more

and more money into the apps in an attempt win back his losses.

312.    Plaintiff Alicea eventually contacted a manager at DraftKings and asked if it was normal to lose $7,000 over the course of two days.

313.    Based on this conversation and data that Defendants had showing Plaintiff Alicea's escalating pattern of compulsive gambling behavior on the apps, Defendants knew that Plaintiff was addicted to gambling and was wagering far beyond his means.

314.    Nevertheless, Defendants did not ever connect Plaintiff Alicea with resources to treat his gambling addiction. Instead, they continue to actively solicit him to gamble more on their platform.

## H.  Plaintiffs Setton, Macek, and Harner were induced to gamble by DraftKings even though it knew they were gambling addicts who had actively tried to cut themselves off

315.    From the start of his relationship with DraftKings, Plaintiff Setton struggled to control his compulsive gambling on the site.

316.    In a moment of strength, after losing thousands of dollars in the first months he used DraftKings, Plaintiff Setton asked for DraftKings to permanently close his account on July 22, 2020. In doing so, he made clear to DraftKings that he was unable to control his compulsive gambling on the site and needed to permanently remove the temptation to do so.

317.    Plaintiff Setton received confirmation from DraftKings that his account had been closed and that he would never again be able to gamble on the platform.

318.    Plaintiff Setton relied on DraftKings's representations that his account had been closed and that he would no longer be able to harm himself or his family through his gambling on the platform.

319.    Within a month, Plaintiff Setton was driven by his gambling addiction back to

DraftKings, where he attempted to log back into his old account. Plaintiff Setton knew he should not be able to access his closed account and was hoping that he would be prevented from doing so after asking for it to be permanently closed.

320. Instead, Plaintiff Setton was able to access his old account and to pick up gambling right where he left off.

321. Over the course of the next four years, Plaintiff Setton continuously used DraftKings—often for hours a day—and it continued to destroy his finances and his life and wreak havoc on his family.

322. As described above, Plaintiff Setton participated in many of the site's promotional offers, constantly chasing his losses as those offers are intended to train users to do.

323. After asking to close his account Plaintiff Setton lost approximately $350,000 on DraftKings, devastating his family's finances.

324. Plaintiff Setton's life was ruined gambling on DraftKings. He has suffered from nightmares, anxiety, PTSD, uncontrollable body tics, and an inability to focus, resulting in the loss of a stable job and many of his friends. His family also suffered and continues to suffer.

325. During the course of Plaintiff Setton's use of DraftKings, he interacted with numerous employees of DraftKings for account support questions or issues, all of whom could see that Plaintiff Setton should not have been allowed to be gambling on DraftKings.

326. And, as described above, Plaintiff Setton also had two long-term DraftKings VIP Hosts assigned to him, who communicated with him on a regular basis and were aware that he was a gambling addict who had previously tried to permanently close his DraftKings account.

327. On November 19, 2024, Plaintiff Setton was suddenly locked out of his

DraftKings account and when he contacted DraftKings support to ask what had happened he was told by "Matt M, Player Advocate" that "You requested permanent account closure on 2020-07-22. Once a player requests to have their account closed we cannot reopen the account under any circumstances. This is due to responsible gaming regulations."

328.    Plaintiff Setton was not offered a refund of the $350,000 he was permitted to gamble on DraftKings after asking that his account be permanently closed.

329.    When DraftKings locked Plaintiff Setton out of his account, he had $45,000 of un-wagered money in it. DraftKings has still not returned that money despite requesting it be released.

330.    Plaintiff Harner struggled with drug addiction early in his life and has been sober for ten years.

331.    Following the death of his father in 2022, Plaintiff Harner developed a casino gambling addiction.

332.    With the support of his family and friends, Plaintiff Harner interrupted the cycle of his addiction and placed himself on the Pennsylvania self-exclusion list a few months into his gambling addiction.

333.    Then, in the summer of 2024, after seeing advertisements for online gambling, including for DraftKings' Casino Deposit Match Promotion, Plaintiff Harner relapsed and attempted to create accounts with online gambling companies in Pennsylvania.

334.    Most companies with whom Plaintiff Harner attempted to open an account rejected his request, citing his presence on the Pennsylvania casino self-exclusion list.

335.    DraftKings and Golden Nugget, however, welcomed Plaintiff Harner with open arms, despite knowing that he had taken steps to prevent himself from ever again gambling at

Pennsylvania casinos.

336.    Plaintiff Harner was allowed to open an account on DraftKings in August, 2024 and on Golden Nugget in December, 2024.

337.    Despite offering an equally—or more—addictive form of casino gambling that is more easily accessed than traditional casinos, Defendants not only allowed Plaintiff Harner to create an account but quickly took more than $75,000 from him using deceptive promotions and VIP hosts to keep him gambling more and more.

338.    In just a few short months, Plaintiff Harner borrowed and lost more than his annual income on DraftKings and Golden Nugget.

339.    Plaintiff Harner should never have been permitted to open an account and gamble on DraftKings's online casinos, let alone incited into losing such a stunning amount of money.

340.    As described above, Plaintiff Macek, too, was directly solicited by Defendants and lured back into a cycle of addicted gambling despite having asked the companies to cut him off.

## CLASS ACTION ALLEGATIONS

341.    Plaintiffs Macek, Setton, Harner, Alicea, and Walker bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the following class and subclasses, which is defined as follows:

342.    **Casino Deposit Match Promotion Class:** Any person who participated in a DraftKings (or Golden Nugget) Casino Deposit Match Promotion and lost part or all of their initial deposit or winnings.

    a. **Pennsylvania Casino Subclass:** any person in the Casino Deposit Match Promotion Class who entered the promotion while in the Commonwealth of Pennsylvania.

343.    **No-Risk Promotion Class:** Any person who opted into a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their bet.

    a. **Pennsylvania No-Risk Promotion Subclass:** any person in the No-Risk Promotion Class who placed the wager in the Commonwealth of Pennsylvania.

344.    **Sportsbook Deposit Match Promotion Class:** Any person who deposited money in response to a DraftKings sportsbook "$1,000 Bonus" promotion for new customers.

    a. **Pennsylvania Sportsbook Deposit Match Promotion Subclass:** any person in the Sportsbook Deposit Match Promotion Class who entered the promotion while in the Commonwealth of Pennsylvania.

345.    **Targeted Gambling Addiction Class:** Any person who developed or displayed problem gambling behavior in their use of DraftKings's platform, and was targeted by DraftKings's VIP programs, hosts, and other forms of direct inducements to perpetuate and increase their gambling.

    a. **Pennsylvania Targeted Gambling Addiction Subclass:** Any person who developed or displayed problem gambling behavior in their use of DraftKings's platform, and was targeted by DraftKings's VIP programs, hosts, and other forms of direct inducements to perpetuate and increase a user's gambling while located in the Commonwealth of Pennsylvania.

346.    **Self-Exclusion, Cool Down, or Account Closure Violation Class:** Any person who appeared on a state self-exclusion list or asked DraftKings to suspend or close their

account and was nevertheless permitted to gamble on DraftKings after doing so.

    a.   **Pennsylvania Self-Exclusion, Cool Down, or Account Closure Violation**

       **Subclass:** any person in the Self-Exclusion, Cool Down, or Account Closure

       Violation Class who was permitted to gamble in the Commonwealth of

       Pennsylvania

347.    Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

348.    The Class Period for each promotion class is tolled from August 2018 through the present under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the true terms of the promotions herein challenged. As described more fully above, Plaintiffs have been misled and injured by the cumulative effect of DraftKings's misleading advertisements and promotions.

349.    Alternatively, the Class Period is tolled to the earliest limitations in any previously filed class action complaints against DraftKings raising the claims at issue here, which, on information and belief is the statutory limitations period running back from December 8, 2023.

350.    Alternatively, the Class Period extends from the relevant statutory limitations period for each cause of action.

351.    The Class Period runs through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

352.    This case is properly brought as a class action under Rule 23 for the following

reasons:

    a.  **Ascertainability:** The Class Members can be readily identified through Defendants' records which will include a record of all those users who signed up for the promotion and must also track customer's state of residence. The members will be identified by filtering DraftKings's records for users from the relevant jurisdictions who entered into each of the identified promotions and lost money.

    b.  **Numerosity (Rule 23(a)(1)):** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiffs at this time. However, Plaintiffs believe there are at least tens of thousands of Class Members. The number and identity of Class Members can be determined through discovery.

    c.  **Commonality and Predominance (Rule 23(a)(2)):** Plaintiffs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

        •  Whether DraftKings knows when its users are gambling beyond their means or as a result of gambling addictions;

        •  What duties DraftKings owes to its users who it knows are gambling beyond their means or as a result of gambling addictions;

        •  What duties DraftKings owes to its users who have requested their accounts be closed or that they be excluded from gambling;

- Whether DraftKings misrepresented in its advertisements that Plaintiffs and the other No-Risk Promotion Class Members would not be at risk of losing money when they made a deposit and placed a first bet;

- Whether DraftKings intentionally designed its advertisements for the no-risk bet in such a way as to mislead Plaintiffs and the other No-Risk Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings's representations and omissions about the no-risk promotions are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings misrepresented in its advertisements the material terms of the Sportsbook Deposit Match Promotion it was offering to Plaintiffs and the other Sportsbook Deposit Match Promotion Class Members:

- Whether DraftKings intentionally designed its advertisements for these promotion in such a way as to mislead Plaintiffs and the other Class Members in order to induce them to sign up and make more bets than they otherwise would have;

- Whether DraftKings's representations and omissions about the Casino Deposit Match Promotion are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings adequately disclosed the facts and/or risks concerning the use of its Casino Deposit Match Bonus;

- Whether DraftKings's actions violate state statutory laws regarding unfair business practices invoked herein;

- Whether DraftKings's actions violate the common law causes of action invoked herein;

- The appropriate measure of damages to award Plaintiffs and the other Class Members; and

- The appropriate injunctive relief to which Plaintiffs and the other Class Members are entitled.

d. **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiffs and each of the other Class Members were injured in the same way by the deceptive promotion at issue. The promotions identified were widely distributed by DraftKings over a long period of time with consistent terms and the promotions that Plaintiffs responded to do not materially differ from promotions that any other Class Member would have responded to. The misrepresentations at issue were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members. Plaintiffs' injuries have been caused by the same conduct of DraftKings, which would provide the same basis for a claim for all Class Members.

e. **Adequacy of Representation (Rule 23(a)(4)):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class Members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have

retained counsel that is competent and experienced in complex class action and consumer protection and Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

f.  **Superiority (Rule 23(b)(3)):** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for many individual Class Member is likely relatively small, and if each Class Member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class Member. This is an appropriate forum in which to litigate these claims, as the Pennsylvania state population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

g.  **Declaratory and Injunctive Relief (Rule 23(b)(2)):** DraftKings acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Negligence (Asserted on behalf of Targeted Gambling Addiction Class)

353.    Plaintiffs Macek, Setton, Alicea, and Harner repeat and reallege the other allegations in this Complaint as if fully set forth herein.

354.    Plaintiffs Macek, Setton, Alicea, and Harner bring this claim individually and on behalf of the Targeted Gambling Addiction Class.

355.    DraftKings owes a duty of care to its users and other foreseeable victims of gambling addictions, which its products and practices have the potential to create and exacerbate.

356.    Part of this duty includes the obligation to take action to help users that DraftKings knows or has reason to know are gambling beyond their means.

357.    Part of this duty includes the obligation to not directly target with inducements to gamble more users that DraftKings knows or has reason to know are gambling beyond their means.

358.    Part of this duty includes an obligation to discover through reasonable diligence when its users are gambling beyond their means and to cut them off from continuing to gamble.

359.    As a further component of this duty, DraftKings must verify the income and source of funds for users who are gambling a substantial amount on its platform.

360.    DraftKings has a policy of not equipping its customer-facing employees, including VIP Hosts, with the training and tools they need to satisfy these duties.

361.    DraftKings incentivizes its VIP Hosts to not identify or stop a user who is gambling beyond their means.

362.    Industry standards and state regulations establish these and other components of DraftKings' duty of care to users that DraftKings must observe including a standard of care that

76

includes cutting off users who are gambling beyond their means as a result of a gambling addiction.

363.    Failing to cut off an addicted gambler and affirmatively inducing them to continue gambling is a practice associated with illegitimate gambling proprietors, not operators who are meeting the industry's standards.

364.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its income or source-of-funds verification practices.

365.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its training of customer facing staff to intervene on users who are exhibiting signs of problem gambling.

366.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its digital interventions on users who are exhibiting signs of problem gambling.

367.    DraftKings also does not meet Pennsylvania state regulations in its the development and implementation of a compulsive and problem gambling plan and its employee training. *See* 58 Pa. Code §§ 814a.1 *et seq*.

368.    DraftKings breaches its duty of care where it induces a user to place bets when it knows or should know that user is compulsively gambling beyond their means.

369.    Defendants breach their duty of care to Plaintiffs Macek, Setton, and Harner and other Targeted Gambling Addiction Class Members by sending them a series of enticements including relentlessly pursuing him through VIP Hosts which Defendants know or should know will have the effect of creating, nurturing, expediting, and/or exacerbating compulsive gambling

in those users including Plaintiff Macek.

370.    DraftKings' breach of each of these duties as described throughout this Complaint resulted in significant damage to Plaintiffs Macek, Setton, and Harner and members of the Targeted Gambling Addiction Class, both financial and emotional.

371.    DraftKings' actions were intentional and done with a wanton and willful disregard of persons who foreseeably might be harmed by their acts, such as Plaintiff Macek.

372.    In the alternative, DraftKings' negligence was reckless to the foreseeable risk to Plaintiffs Macek, Setton, and Harner and VIP Host Targeted Class Members.

373.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligence, including compensatory and punitive damages, fees, and costs.

## SECOND CAUSE OF ACTION
### Negligence (Asserted on behalf of Self-Exclusion, Cool Down, or Account Closure Violation Class)

374.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

375.    Plaintiffs Setton, Macek, and Harner bring this claim individually and on behalf of the Self-Exclusion, Cool Down, or Account Closure Violation Class.

376.    DraftKings owes a duty of care to its users and other foreseeable victims of gambling addictions, which its products and practices have the potential to create and exacerbate.

377.    A component of this duty is to prevent a user from gambling when they have temporarily or permanently suspended their accounts or when they are on a gambling self-exclusion list.

378.    Industry standards and state regulations establish these and other components of

DraftKings' duty of care to users that DraftKings must observe.

379.    State regulations require DraftKings to implement a temporary or permanent account suspension request and to prevent self-excluded persons from gambling. *See e.g.*, 58 Pa. Code §§ 812a.9; *id.* at § 815a.5.

380.    DraftKings breached its duty of care by allowing Plaintiffs and Class Members to gamble despite being on self-exclusion lists or having suspended their accounts.

381.    DraftKings' breach of these duties as described throughout this Complaint resulted in significant damage to Plaintiffs Setton, Macek and Harner and members of the Self-Exclusion, Cool Down, or Account Closure Violation Class, both financial and emotional.

382.    DraftKings' actions were intentional and done with a wanton and willful disregard of persons who foreseeably might be harmed by their acts, such as Plaintiff Macek.

383.    In the alternative, DraftKings' negligence was reckless to the foreseeable risk to Plaintiffs and Self-Exclusion, Cool Down, or Account Closure Violation Class Members.

384.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligence, including compensatory and punitive damages, fees, and costs.

## THIRD CAUSE OF ACTION
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL") —Misleading and Deceptive Advertisements, 73 P.S. § 201–1, *et seq.* (Asserted on behalf of Casino Deposit Match Promotion Class)**

385.    Plaintiffs Setton, Harner, Alicea, and Macek repeat and reallege the other allegations in this Complaint as if fully set forth herein.

386.    Plaintiffs Setton, Harner, Alicea, and Macek bring this claim against DraftKings under the Pennsylvania CPL, 73 P.S. § 201–1, *et seq.*, individually and on behalf of the Pennsylvania Casino Deposit Match Promotion Sub-Class.

387.    Plaintiffs also bring this claim under the unfair and deceptive trade practices

statutes of the other states in which DraftKings has offered this promotion including Michigan, Connecticut, New Jersey, and West Virginia. *See* Mich. Comp. Laws § 445.903(1); Conn. Gen. Stat. § 42-110b(a); N.J. Stat. §§ 56:8–1 *et seq.*; and W. Va. Code §§ 46A-6-101 *et seq.*

388.    The CPL declares unlawful "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," 73 P.S. § 201–3(a) including "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201–2(4)(xxi).

389.    The services and product offered to Plaintiffs Setton, Harner, and Macek and each member of the Class constitutes "trade or commerce" as defined by 73 P.S. § 201–2(3).

390.    Plaintiffs Setton, Harner, Alicea, and Macek and Class Members are therefore entitled to the protections and remedies provided for by the CPL.

391.    Defendants' promulgated false and deceptive promises and misrepresentations in its advertisements for the Casino Deposit Match Promotion.

392.    Defendants' advertisements suppressed and omitted material facts as to the terms of the promotion, including not including in readable print the terms of the promotions anywhere in advertisements about them.

393.    This suppression and omissions were knowing and intentional.

394.    Defendants' conduct also violated Pennsylvania law because its advertisements affirmatively and falsely represented that consumers were likely to receive a cash-value match of their deposit of as much as $2,000 when, in fact, DraftKings knew it was unlikely that consumers would ever qualify for such a match.

395.    In particular, Defendants engaged in misrepresentation when they failed to include in the advertisement any warning regarding the large play-through requirements for the

bonus promotion or any mention of the risk that a consumer's initial deposit would be forfeit if they began but did not complete the promotion.

396.    These advertisements created a likelihood of confusion and misunderstanding among consumers.

397.    These misrepresentations were material because they were likely to deceive reasonable consumers—often uninitiated in the industry of online gambling—about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs Setton, Harner, Alicea, and Macek and Class Members.

398.    DraftKings intended that Plaintiffs Setton, Harner, Alicea, and Macek and Class Members be misled by these misrepresentations and omissions.

399.    Plaintiffs Setton, Harner, Alicea, and Macek would not have wagered as much or as frequently on DraftKings were it not for DraftKings's misrepresentations regarding this promotion.

400.    DraftKings induced Plaintiffs Setton, Harner, Alicea, and Macek and Class Members to rely on its misrepresentations and omissions to their detriment, when they deposited money, opted into the casino deposit match bonus and began betting on the casino without realizing the consequences of their doing so.

401.    As a result of Defendants' misconduct, Plaintiffs Setton, Harner, Alicea, and Macek and Class Members suffered ascertainable losses.

402.    In light of the foregoing, Defendants violated the CPL.

403.    Plaintiffs Setton, Harner, Alicea, and Macek and Class Members bring this action pursuant to 73 P.S. § 201–9.2 and, in accordance therewith, are entitled to compensatory

damages, statutory treble damages in an amount to be determined at the time of trial, attorney

fees, and court costs.

## FOURTH CAUSE OF ACTION
### Intentional Misrepresentation (Asserted on behalf of Casino Deposit Match Promotion Class)

404.    Plaintiffs Setton, Harner, Alicea, and Macek repeat and reallege the other

allegations in this Complaint as if fully set forth herein.

405.    Plaintiffs Setton, Harner, Alicea, and Macek bring this claim against DraftKings

individually and on behalf of all Class Members.

406.    As described above, Defendants made material misrepresentations regarding the

Casino Deposit Match Promotion.

407.    Defendants knew these representations were false and made them intentionally

with the intention that users like Plaintiffs Setton, Harner, Alicea, and Macek and Class

Members would rely on them in signing up for the promotion.

408.    These representations were material, in that a reasonable viewer would rely on

them when deciding to proceed with creating and funding an account on DraftKings's platform

and placing a bet in reliance on the promotion.

409.    Plaintiffs Setton, Harner, Alicea, and Macek and Class Members did rely on

these misrepresentations when they deposited money, opted into the casino deposit match

bonus and began betting on the casino without realizing the consequences of their doing so.

410.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of

care to reasonably disclose and inform customers of material dangers and risks of the

DraftKings service and to not mislead its customers and the public at large about its offerings,

particularly as a leading competitor in a highly regulated industry.

411.    Plaintiffs Setton, Harner, Alicea, and Macek and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

412.    As a state licensed betting platform, Defendants knew or should have known that its representations in marketing materials about the promotion were inaccurate and misleading. Defendants had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

413.    Neither Plaintiffs Setton, Harner, Alicea, and Macek nor any reasonable consumer would have used Defendants in the same way if they had known of the true operation and risks of Defendants' service—risks the Defendants alone were aware of and misrepresented.

414.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs Setton, Harner, and Macek and members of the Classes were induced into Defendants' service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

415.    Plaintiffs Setton, Harner, Alicea, and Macek seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## FIFTH CAUSE OF ACTION
### Failure to Warn (Asserted on behalf of Casino Deposit Match Promotion Class)

416.    Plaintiffs Setton, Harner, Alicea, and Macek repeat and reallege the other

allegations in this Complaint as if fully set forth herein.

417.    Plaintiffs Setton, Harner, Alicea, and Macek bring this claim against DraftKings individually and on behalf of all Casino Deposit Match Promotion Class Members.

418.    The Defendants owed Plaintiffs and Class Members a duty of care to ensure that users of the DraftKings platform were made aware of the material terms of and the risks (including the risk of developing a gambling addiction) associated with the Casino Deposit Match Promotion and did not inadvertently opt into the promotion without intending to.

419.    Defendants breach their duty of care by failing to prominently and clearly present the material terms and risks of the Casino Deposit Match Promotion.

420.    Defendants breached their duty of care by failing to ensure that users were opted into the Casino Deposit Match Promotion only if they understood its terms and risks.

421.    The Defendants' breaches of their duty of care were actual and proximate causes of Plaintiff Macek and Class Members' damages, in whole or in part.

422.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligence, including compensatory damages and costs.

### SIXTH CAUSE OF ACTION
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL") —Misleading and Deceptive Advertisements, 73 P.S. § 201–1, *et seq.* (Asserted on behalf of Pennsylvania No-Risk Promotion Class)**

423.    Plaintiffs Macek and Walker reasserts, realleges, and incorporates by reference all other paragraphs in the complaint.

424.    Plaintiffs bring this claim individually and on behalf of all other Class Members under the CPL.

425.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, false promises, and misrepresentations about the nature of the no-risk

promotions.

426.    DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the no-risk promotions.

427.    DraftKings's conduct violated Pennsylvania law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers could place bets without risking their own money when, in fact, this was not the case.

428.    DraftKings's conduct also violates the Pennsylvania gambling regulations as described above.

429.    DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

430.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its no-risk offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

431.    DraftKings intended that Plaintiffs and Class Members be misled by the misrepresentations and omissions in its no-risk promotions.

432.    DraftKings induced Plaintiffs and Class Members to rely on its misrepresentations and omissions.

433.    Without the misrepresentation and omissions in DraftKings advertising, Plaintiffs and the No-Risk Promotion Class Members would not have created accounts with

DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed as many or as large of bets on DraftKings's platform.

434.     As a direct and proximate result of DraftKings's unfair and deceptive practices, Plaintiffs and the No-Risk Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive cash refunds for bets they placed and lost in reliance on DraftKings "Risk-Free" and "No Sweat" promotions.

435.     Plaintiff Macek and other Class Members' developing gambling addictions were also a direct and proximate result of these misleading and deceptive promotions, which were designed to inculcate gambling addictions in DraftKings's users.

436.     These acts caused substantial monetary injury to Plaintiffs and the members of the No-Risk Promotion Class that they could not reasonably avoid.

437.     DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the No-Risk Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intentional, and/or done with reckless indifference with respect to the rights of Plaintiffs and the No-Risk Promotion Class.

438.     DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Class and will continue to both damage Plaintiffs and the No-Risk Promotion Class and deceive the public unless enjoined by this Court.

439.     Plaintiffs and the No-Risk Promotion Class seek relief under the Pennsylvania CPL, including (but not limited to) actual damages, compensatory damages, statutory treble damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

## SEVENTH CAUSE OF ACTION

**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL")—Misleading and Deceptive Advertisements, 73 P.S. § 201–1, et seq. (Asserted on behalf of Pennsylvania Sportsbook Deposit Match Promotion Class)**

440.    Plaintiffs Macek and Walker repeat and reallege the other allegations in this Complaint as if fully set forth herein.

441.    Plaintiffs bring this claim against DraftKings under the CPL, individually and on behalf of the Pennsylvania Sportsbook Deposit Match Promotion Class.

442.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, false promises, and misrepresentations about the nature of the deposit match promotions.

443.    DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the deposit match promotions.

444.    DraftKings's sportsbook "$1,000 Bonus" offer is also unfair and deceptive because Plaintiffs and the members of the Class were required to act differently than they could reasonably expect based on the advertisements in order to obtain the promised bonus. Plaintiffs and the members of the Class were required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

445.    DraftKings's conduct violated Pennsylvania law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers would receive a cash-value match of their deposit when, in fact, this was not the case.

446.    DraftKings advertised its promotion with no intent to sell its services as advertised.

447.    DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

448.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

449.    DraftKings intended that Plaintiffs and Class Members be misled by the misrepresentations and omissions in its signup bonus promotions.

450.    DraftKings induced Plaintiffs and Class Members to rely on its misrepresentations and omissions.

451.    Without the misrepresentations and omissions in DraftKings advertising, Plaintiffs and Deposit Match Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed as many or as large of bets on DraftKings's platform.

452.    As a direct and proximate result of DraftKings unfair and deceptive practices, Plaintiffs and Signup Bonus Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive a cash deposit match for the funds they deposited in their DraftKings accounts.

453.    These acts caused substantial injury to Plaintiffs and the members of the Deposit Match Promotion Class that they could not reasonably avoid.

454.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the Deposit Match Promotion Class. DraftKings's

actions in engaging in the above-named unfair practices and deceptive acts were willful, intentional, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Deposit Match Promotion Class.

455.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Deposit Match Promotion Class and will continue to both damage Plaintiffs and the Class and deceive the public unless enjoined by this Court.

456.    Plaintiffs and the Class seek relief under the Pennsylvania CPL, including (but not limited to) actual damages, compensatory damages, statutory treble damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

**EIGHTH CAUSE OF ACTION**
**Intentional Misrepresentation (Asserted on behalf of No-Risk Promotion Class)**

457.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

458.    DraftKings has intentionally represented that it will ensure that customers will not be liable for losing initial bets. Although DraftKings advertised that consumers could place a "risk free" or "no sweat" bet these representations were false. Despite this representation, the promotions in fact carry a substantial risk of loss and when users lose their first bet, they receive credits with no cash value that may never allow them to recoup their initial losses. Therefore, Defendants misrepresented the promotional offers.

459.    These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform, and placing an initial bet in reliance on the promotion.

460.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the

DraftKings service and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

461.    At all relevant times when Defendants made such representations, Defendants knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

462.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to wager on DraftKings.

463.    DraftKings intended its consumers to rely on these misrepresentations. It could have honestly represented the terms of its promotion: "if you lose, you'll get an expiring bonus bet that will not pay back the stake if it wins." But DraftKings knew that such an offer would not entice customers to bet more money or more frequently.

464.    Plaintiffs and Class Members did rely on these misrepresentations in placing bets on DraftKings' platform.

465.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

466.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about its service being without risk are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

467.    Plaintiffs and Class Members acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings service to make initial bets.

468.    Neither Plaintiffs nor any reasonable consumer would have used DraftKings in the same way if they had known of the true operation and risks of DraftKings's service—risks the Defendants alone were aware of and misrepresented.

469.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into using DraftKings's service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

470.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## NINTH CAUSE OF ACTION
**Intentional Misrepresentation (Asserted on behalf of Deposit Match Promotion Class)**

471.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

472.    DraftKings has intentionally misrepresented that it will ensure that customers would receive a cash match of their initial deposit up to $1,000. These representations were false. Consumers actually received only a percentage of their deposit *only if* they wagered their initial deposit amount twenty-five times on long-odds bets. Even then, consumers only received "DK Dollars", not redeemable for cash and not treated like normal bets. Therefore, Defendants misrepresented the promotional offers.

473.    These representations were material in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing an initial bet in reliance on the promotion.

474.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the promotion and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

475.    At all relevant times when Defendants made such representations, Defendant knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

476.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to deposit and wager on DraftKings.

477.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

478.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about deposit matches are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was intentional or reckless in advertising those misrepresentations.

479.    Plaintiffs and members of the Classes acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings service to make initial bets. prior to making them.

480.    Neither Plaintiffs nor any reasonable consumer would have initially deposited as much money on DraftKings if they had known the true terms of the signup bonus promotion that DraftKings misrepresented.

481.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into wagering more money and more frequently than they otherwise would have and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result.

482.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

**TENTH CAUSE OF ACTION**
**Fraudulent Inducement (Asserted on behalf of Casino Deposit Match, Sportsbook Deposit Match and Risk-Free Promotion Classes)**

483.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

484.    Plaintiffs bring this claim against Defendants individually and on behalf of all Class Members.

485.    Defendants misrepresented multiple material facts about its promotional offers, as described throughout this Complaint.

486.    Plaintiffs and Class Members relied on Defendants' misrepresentations and omissions in creating accounts on DraftKings and in placing wagers on the platform in reliance on the promotions.

487.    Plaintiffs and Class Members were justified in so relying, because they were entitled to believe that DraftKings, a leader in a highly regulated industry, would not violate the law by failing to make requisite disclosures to its consumers, or to misrepresent the nature of its advertised offers.

488.    At the time Defendants made these misrepresentations to consumers, it knew

them to be false.

489.    At the time Defendants made these misrepresentations to consumers, it had no

present intent to fulfil the terms of the promotional offers as advertised to consumers.

490.    As a result of Defendants' misrepresentations, Plaintiffs and Class Members

sustained monetary damages amounting to the total losses each sustained in reliance on funding

accounts and placing bets in response to the unlawful promotions discussed herein.

491.    Absent these misrepresentations, Plaintiffs and the Class Members would not

have created accounts or placed bets on DraftKings's platform.

492.    Therefore, as a direct and proximate result of Defendant's intentional

misrepresentations, Plaintiffs and Class Members have suffered economic losses and other

general and specific damages, including, but not limited to, the amounts paid to Defendant for

placing bets in the first place, as well as losses associated with any subsequent bets placed in an

effort to recover their original funds.

## ELEVENTH CAUSE OF ACTION
### Unjust Enrichment (Asserted on behalf of all Classes)

493.    Plaintiffs repeats and realleges the other allegations in this Complaint as if fully

set forth herein.

494.    Plaintiffs bring this claim against Defendants individually and on behalf of all

Class Members.

495.    As alleged herein, Defendant has intentionally and/or recklessly made

misleading misrepresentations to Plaintiffs and Class Members to induce them to create

accounts and place bets on its platform.

496.    As further alleged herein, DraftKings created and implemented a scheme to

increase its share of the legal gambling market through a pervasive pattern of deceptive and

unfair conduct including with deceptive advertising and the deliberate targeting young people at high-risk of developing gambling addictions.

497.    DraftKings was unjustly enriched as a result of its wrongful conduct, including through the false and misleading promises that: (i) DraftKings would give users an amount equal in U.S. dollar value to their deposit when they opted into the Casino and Sportsbook Deposit Match Promotions; (ii) customers could cancel the Casino Deposit Match Promotion without losing their initial deposit; and (iii) that certain bets on DraftKings could be placed at no-risk to the user.

498.    DraftKings was also unjustly enriched as a result of its wrongful conduct of targeting users with its advertising and intentionally allowing them to use its platform without adequate age verification.

499.    Plaintiffs and the Class Members reasonably relied on these misleading representations and have not received the benefits promised by Defendant.

500.    Plaintiffs and the Class Members therefore have been induced by DraftKings's misleading and deceptive representations about the promotional offers and its deceptive and wrongful conduct in targeting addicted users and have paid more money to DraftKings to place bets than they otherwise would and/or should have paid.

501.    Plaintiffs and the Class Members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiffs and the Class Members.

502.    The money DraftKings received was obtained under circumstances that were unfair and at the expense of Plaintiffs and the members of the Class Members.

503.    Therefore, it is inequitable and unjust for DraftKings to retain the profit, benefit, or compensation conferred upon it without paying Plaintiff Macek and the Class Members back

for the difference of the full value of the benefits compared to the value actually received.

504.    As a direct and proximate result of DraftKings's unjust enrichment, Plaintiffs and Class Members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by DraftKings from its deceptive misleading, and unlawful conduct as alleged herein.

505.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### TWELFTH CAUSE OF ACTION
**Intentional Infliction of Emotional Distress (Asserted on behalf of Targeted Gambling Addiction and Self-Exclusion, Cool Down, or Account Closure Violation Classes)**

506.    Plaintiffs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

507.    Plaintiffs bring this claim against Defendants individually and on behalf of the Class Members.

508.    Defendants' conduct described herein in targeting Plaintiffs and similarly situated class members to continue gambling despite or because of their having a gambling addiction was intentional and/or reckless.

509.    Defendants' conduct described herein in soliciting Plaintiffs and similarly situated class members to resume gambling despite knowing they had opted into programs designed to prevent them from gambling was intentional and/or reckless.

510.    The conduct described in the preceding two paragraphs (and throughout the Complaint) was extreme and outrageous.

511.    This conduct caused Plaintiffs to suffer severe emotional distress.

512.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' tortious conduct, including compensatory damages and costs

## THIRTEENTH CAUSE OF ACTION
### Conversion (Asserted on behalf of all Plaintiff Setton)

513.    Plaintiffs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

514.    Plaintiff Setton is the owner of approximately $45,000 of un-wagered funds in his closed DraftKings account.

515.    DraftKings deprived Plaintiff Setton of his right to his $45,000 when it closed his account without warning and retained his funds without his consent and in spite of his requests for their release.

516.    DraftKings has no lawful justification to retain the $45,000 that Plaintiff Setton deposited in his account or won with money that he deposited in his account and that belongs to him.

517.    Plaintiff Setton seeks all available remedies, damages, and awards as a result of DraftKings's conversion, including the return of his property, compensatory and punitive damages, interest, fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Classes, appointing Plaintiff Macek, and Setton as representative of each of the asserted Classes, appointing Plaintiffs Alicea and Harner as representatives of the Casino Deposit Match and Targeted Gambling Addiction Classes, appointing Plaintiff Walker as representative of the Risk-Free and Sportsbook Deposit Match Promotion Classes, and appointing counsel for Plaintiffs as Class Counsel;

B.  Declaring that Defendants are financially responsible for notifying the Class Members of the pendency of this suit;

C.  Declaring that Defendant's policies and practices as described herein constitute a violation of the state consumer protection statutes;

D.  Enjoining Defendant from the wrongful conduct as described herein;

E.  Awarding actual and/or compensatory, multiple, punitive (as available according to law), and statutory damages;

F.  Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

G.  Awarding pre- and post-judgment interest to the extent the law allows; and

H.  Awarding such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demands trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: April 18, 2025

Respectfully submitted,

*/s/ Michael Kanovitz*

Counsel for Plaintiffs

Amelia Maxfield

LOEVY & LOEVY
1712 N Street NW Ste. 401
Washington DC 20011
(312) 243-5900

Michael Kanovitz (*pro hac vice application forthcoming*)
Jon Loevy (*pro hac vice application forthcoming*)
Isaac Green (*pro hac vice application forthcoming*)

98

Aaron Tucek (*pro hac vice application
forthcoming)*

LOEVY & LOEVY
311 N Aberdeen Street, Suite 3
Chicago, IL 60607
(312) 243-5900
mike@loevy.com

## CERTIFICATION

I, Amelia Maxfield, the undersigned attorney of record for Plaintiff, do hereby certify that this

complaint was filed via electronic filing system and will be served on the Defendants. I further

certify, pursuant to Local Rule 53.2(3)(C) that the damages sought in this case exceed $150,000

exclusive of interests and costs.


Dated: April18, 2025


*/s/ Amelia Maxfield*

LOEVY & LOEVY
1712 N Street NW Ste. 401
Washington DC 20011
(312) 243-5900
Maxfield@loevy.com