## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kenneth Macek, Matthew Harner, Avi Setton, Lionel Alicea, Shane Spencer, and Rangaraj Sadagopan, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>    v.<br><br>DraftKings, Inc.; Crown PA Gaming Inc. d/b/a DraftKings; Golden Nugget Online Gaming LLC,<br><br>*Defendants*. | Civil Action No. 5:25-cv-01995-JFL<br><br>Judge Joseph F. Lesson, Jr. |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Kenneth Macek, Matthew Harner, Avi Setton, Lionel Alicea, Shane Spencer, and Rangaraj Sadagopan ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this class action against Defendants DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC (collectively "DraftKings"). Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## INTRODUCTION

1.    In October 2017, Pennsylvania passed a bill to legalize internet gambling. Today, both Pennsylvania's internet casino industry and online sports betting industry are among largest in the nation in terms of dollars bet annually.

2.    Online betting allows consumers to use mobile apps on their smartphones to bet on casino games or sports anywhere in a state where it is legal, at any time.

3.    While the industry started off a little slow, the popularity of internet gambling

1

rapidly increased with the COVID-19 pandemic and has continued growing since.

4.    Today it is a massive industry. The Pennsylvania Gaming Control Board said that iGaming (online casino games), a market in which DraftKings is the most popular operator, reported over $2.18 billion of revenue in 2024.[1]

5.    Likewise, sportsbooks in Pennsylvania, among which DraftKings is also a leader, brought in almost $510 million in revenue in 2024 from wagers totaling $8.42 billion.[2]

6.    Meanwhile, over the past few years, signs of gambling addictions in Pennsylvania have skyrocketed.

7.    Online gambling is particularly dangerous for people developing and struggling with gambling addiction. As one industry expert put it, "America can survive sports betting. It survived illegal betting for years. Whether it can survive a casino on everyone's phone — that I can't answer. That might be the tipping point."[3]

8.    DraftKings is the most dominant player in Pennsylvania's internet gambling industry and has driven much of its growth over the past few years.

9.    As of the end of 2024, Hollywood Casino at Penn National, of which DraftKings is the largest operator-partner, reported that it had earned almost $821 million in revenue.

10.    Consumers can also use DraftKings's online casino in Connecticut, Michigan, New Jersey, and West Virginia. DraftKings has the largest or one of the largest online casinos in each of these states as well and is constantly lobbying more states to legalize online casino

---

[1] Pennsylvania Gaming Control Board, *Press Release: PA Gaming Control Board Reports Record High Gaming Revenue for 2024*, (Jan. 21, 2025) https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-reports-record-high-gaming-revenue-2024se/pa-gaming-control-board-reports-record-high-gaming-revenue-2024 (last visited Mar. 24, 2025).
[2] *Id.*
[3] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

gambling.

11.     Plaintiffs bring this action because DraftKings is earning enormous amounts of revenue by misleading and addicting users like them.

12.     DraftKings's business model has long involved pushing the boundaries of the law, misleading consumers, and luring naïve gamblers into developing addictions.

13.     DraftKings uses these tactics to identify and cultivate the people it wants on its platform: those who are most susceptible to these sorts of promotions and most likely to lose a lot of money betting. In other words, marks.

14.     DraftKings intentionally designs its mobile phone application ("app") to instill an impulse to gamble more and to overcome users' ability to resist this impulse.

15.     DraftKings also designs the so called "Responsible Gaming" features in the app so that they are not as effective as they reasonably could be in helping users stop gambling beyond their means. For example, it requires far more clicks for a user to find their total losses than to make a deposit or place a bet. And DraftKings knows, from its internal research and date, that its tools are unlikely to be effective in preventing gambling addicts from developing addictions and continuing to use its product.[4]

16.     DraftKings top executives know that a substantial portion of its revenue comes from gambling addicts but rather than cautioning users of the risks of developing a harmful gambling addiction, DraftKings proclaims on its website that it is "committed to educating and empowering" customers to gamble responsibly. The truth is DraftKings uses its "Responsible Gaming" tools to give customers and prospective customers a false sense of security around the risks associated with using its platform.

---

[4] Flora I. Matheson et al., *The use of self-management strategies for problem gambling: a scoping*, 19 BMC Pub. Health 445, 7 https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-019-6755-8/

17.    DraftKings also uses its copious user data to create profiles of users based on their demographic and financial information as well as their betting behavior. DraftKings then deploys sophisticated, targeted marketing to its users to maximize the amount of money they deposit and lose on its platforms.

18.    DraftKings goes even further than this in knowingly targeting addicted gamblers. The company frequently targets users that are on state self-exclusion lists for addicted gamblers or users who have directly asked the company to suspend or close their accounts to prevent them from continuing to gamble. DraftKings, nevertheless, allows and actively solicits these users to gamble large sums of money despite knowing they are struggling to control their gambling addictions.

19.    Many customers have gambled and lost more money than they intended as a result of DraftKings's manipulation, and some customers have developed gambling addictions and lost thousands or—in the case of some of the Plaintiffs—hundreds of thousands of dollars.

## PARTIES

20.    Plaintiff Kenneth Macek is a resident of Allegheny County, Pennsylvania. Plaintiff Macek began using both DraftKings Sportsbook and Casino offerings in November of 2020 with the username "GolfProX". Shortly after signing up for the platform, Plaintiff Macek was wagering enough to be granted VIP status, and was assigned a "VIP host", who contacted Plaintiff Macek personally with promotional offers and instructions on how to increase his bet and deposit limits and how get access to and wager deposited funds faster.

21.    Plaintiff Matthew Harner is a resident of Berks County, Pennsylvania. Plaintiff Harner was allowed to create an account and gamble on DraftKings and Golden Nugget casinos in 2024, with the usernames "mharner02" (DraftKings) and "huey2323" (Golden Nugget)

despite being on the permanent Pennsylvania brick-and-mortar casino self-exclusion list since late 2022. Plaintiff Harner lost approximately $57,000 in the course of a few months as a VIP Host urged him to bet more and more. Most other online casinos turned Plaintiff Harner away because of his presence on the self-exclusion list, but not DraftKings.

22.     Plaintiff Avi Setton is a resident of Lehigh County, Pennsylvania. Plaintiff Setton created his account on DraftKings in 2019 with the username "balthazar444". Plaintiff Setton quickly began to struggle with gambling addiction and asked DraftKings to close his account in 2020 because of his problem gambling. DraftKings did not do so, and between 2020 and 2024 Plaintiff Setton lost more than $350,000 on DraftKings. Then, in November 2024, DraftKings suddenly closed Plaintiff Setton's account, citing his 2020 request.

23.     Plaintiff Lionel Alicea is a resident of Lackawanna County, Pennsylvania. Plaintiff Alicea moved to Pennsylvania in early 2024. Shortly after he moved to Pennsylvania, Plaintiff Alicea created an account on Golden Nugget in May 2024and created an account on DraftKings in June 2024. Since signing up, Plaintiff Alicea has developed a serious gambling addiction and lost $39,000 in two months on DraftKings and $19,000 on Golden Nugget.

24.     Plaintiff Shane Spencer is a resident of Lehigh County, Pennsylvania. Plaintiff Spencer created an account on DraftKings in September 2021 and began placing bets using the online casino. For the first few years, Plaintiff Spencer was losing considerable amounts of money using DraftKings. In 2024, DraftKings identified Plaintiff Spencer as a high-value customer who should be targeted with increased outreach and promotional offers. Plaintiff Spencer's gambling addiction worsened in 2024, and he lost over $1,000,000 in a calendar year.

25.     Plaintiff Rangaraj Sadagopan is a resident of Montgomery County, Pennsylvania. Plaintiff Sadagopan created an account on DraftKings in January 2024. After just

twelve months of using DraftKings casino offerings, Plaintiff Sadagopan lost more than $150,000.

26.     Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2020, DraftKings, Inc. is a publicly traded company that trades on the Nasdaq Stock Exchange.

27.     DraftKings, Inc. purchased Golden Nugget Online Gaming, Inc. in May 2022. Golden Nugget Online Gaming LLC was then incorporated as a wholly owned subsidiary of DraftKings, Inc. in Delaware with its principal place of business in Boston Massachusetts. DraftKings, Inc. continues to operate a separately branded Golden Nugget online casino in Pennsylvania through Golden Nugget Online Gaming LLC.

28.     On information and belief, DraftKings, Inc. controls the design of Golden Nugget's online casino app, which is substantially similar to DraftKings's app. DraftKings also employs and directs the policies and training for Golden Nugget's VIP Hosts.

29.     Defendant Crown PA Gaming Inc. is a privately held company incorporated in Delaware with its principal place of business in Boston, Massachusetts. Crown PA Gaming Inc. is a subsidiary of DraftKings, Inc. and is responsible for conducting some portion of DraftKings business in Pennsylvania.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because, given the number of DraftKings's users and the prevalence of the practices at issue, the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendants. The number of members of the proposed class in aggregate

exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

31.     This Court has personal jurisdiction over Defendants because they regularly

conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or

derive substantial revenue from products and/or services provided to persons in this District.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

Defendant does business in this District and because a substantial part of the events giving rise

to the claims occurred in this District.

## **FACTUAL ALLEGATIONS**

**A.  Online Gambling in Pennsylvania and DraftKings's dominant industry position**

33.     In October 2017, Pennsylvania became the fourth state to legalize online

gambling, paving the way for licensed operators to offer online slots, table games, and other

forms of digital casino wagering through mobile smartphone apps in every corner of the state.

34.     Pennsylvania's gambling market is regulated by the Pennsylvania Gaming

Control Board, which imposes rules and requirements to ensure fairness, transparency, and

consumer protection.

35.     In 2018, the United States Supreme Court held, in *Murphy v. National*

*Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that a federal law could not prohibit

Pennsylvania and other states from legalizing sports betting within their borders.

36.     As a result of this decision, the market for sports betting has exploded. The total

U.S. revenue of sportsbooks exploded from $430 million in 2018 to $10.92 billion in 2023.[5]

---

[5] Mike Reynolds, *American Gaming Association: Legal sports betting hits record revenue in 2023*, S&P GLOBAL, Feb. 21, 2024, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/american -gaming-association-legal-sports-betting-hits-record-revenue-in-2023-80522087 (last visited Nov. 27, 2024).

37.     Pennsylvania remains one of the most popular sports betting states in the country, with over $8.42 billion wagered on sports bets in 2024 alone.[6]

38.     DraftKings began operating in Pennsylvania shortly after the Supreme Court struck down the Professional and Amateur Sports Protection Act, giving the company a head start in the nascent online sports betting market.

39.     Part of how DraftKings was able to capture a significant share of the online sports betting market from the moment it was legalized in Pennsylvania was by leveraging its brand recognition and success in daily fantasy sports—particularly with young men who bet money on daily fantasy sports contests in Pennsylvania long before the *Murphy* decision.

40.     Long before gambling was legalized, DraftKings offered "daily fantasy sports" contests to Pennsylvania consumers, including sometimes to those who were under the age of eighteen.

41.     "Daily fantasy sports" is sports betting by another name. In these contests, users bet on the performance of athletes in sporting events, but in doing so they "compete" against each other rather than the sportsbook, which keeps a portion of the pot.

42.     Daily fantasy sports are very popular with adolescents, which gives DraftKings an important advantage in terms of brand recognition and a head start in turning young people into reliable sports bettors on its platform.[7]

43.     In the years before the recent wave of sports betting legalization, regulators across the country raised alarms around DraftKings's daily fantasy sports offering, its advertising, and its lax enforcement of age restrictions.

---

[6] *See supra* note 1.
[7] Michael Sekich, *Drawing the Line of Scrimmage: Global Perspective of Daily Fantasy Sports in the Advertising Space*, 12 PENN. ST. J.L. & INT. AFF. 178, 202 (2023).

44.     DraftKings is perennially among the top online sportsbooks nationally in terms of annual revenue. In 2024, DraftKings was the second largest sportsbook by revenue in Pennsylvania and the largest operator of online casino gaming.

45.     DraftKings reinvests a lot of its revenue in hooking more users.

46.     For example, DraftKings's sales and marketing expenses totaled $1.2 billion in 2023.[8] DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads showcased various promotions that DraftKings was running, typically targeting new users.

47.     As DraftKings has repeatedly said in its annual 10–K reports, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts."

48.     DraftKings's target audience for these marketing efforts is new users and casual gamblers—those who are most likely to lose money and who might turn into high-value addictive gamblers losing thousands of dollars a month to DraftKings.

49.     Meanwhile, DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets in its sports book.

50.     Naïve, losing consumers are targeted with promotions and sometimes even VIP Hosts to encourage them to gamble more money with more frequency.

51.     DraftKings could set standardized bet limits for all its users, but instead it dynamically changes the maximum allowable bet for each individual user in order to maximize the amount more compulsive gamblers lose to the company while minimizing the company's exposure to more successful bettors.

---

[8] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%202020

52.     Professional gamblers know that DraftKings is looking to exclude them in favor of problem gamblers and attempt to mimic the behavior of gambling addicts in their use of the platform. For example, professional gamblers try to take advantage of DraftKings's customer data by logging into their accounts repeatedly late at night to appear like they are interrupting their sleep to compulsively check their bets or opting into and then out of deposit limits to appear like they are unable to control themselves.[9]

53.     DraftKings's CEO has admitted that the company is only interested in serving bettors who are likely to lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[10]

54.     DraftKings is not, however, following a traditional "entertainment" industry business model of trying to "entertain" as many customers as possible.

55.     Instead, DraftKings is seeking to exclude customers who are successful at betting while trapping those who are not. The latter customers, many of whom end up losing far more than they can afford, are the principal source of DraftKings's revenues.

56.     Addicted gamblers represent the most important demographic for DraftKings and, under its present business model, are a key driver of its profitability.

57.     On information and belief, more than 80% of DraftKings's revenue comes from just 5% of its users.

58.     Many of the people in this 5% are addicted gamblers or are at high risk of becoming addicted gamblers.

---

[9] Isaac Rose-Berman, *Why Professional Gamblers Act like Addicts,* HOW GAMBLING WORKS (Sept. 10, 2024), https://howgamblingworks.substack.com/p/why-professional-gamblers-act-like (last visited April 7, 2025).
[10] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

59.     DraftKings mines its user data to identify the most potentially-lucrative users—those with developing gambling addictions—and then intentionally targets them with personalized outreach to increase the amount and frequency of their wagering on DraftKings.

60.     DraftKings could easily use this data to identify users who are gambling compulsively and cut them off. Indeed, Robins has stated that "we have models that we build that help us understand and flag risky behavior."[11] However those models are either ignored or intentionally designed to miss clear signs of gambling addiction in the user data that DraftKings has ready access to. DraftKings's demonstrated ability to identify and limit the gambling of "sharps" belies any suggestion that it could not reasonably do more to identify users like Plaintiffs who were obviously gambling compulsively on the platform.

61.     In fact, DraftKings intentionally does not collect certain data—that some of its competitors do collect—to allow the company to deny that it knows it is taking every dollar its customers have. For example, DraftKings has a policy of not conducting income verification checks for its users who are frequent, high-volume gamblers even though doing so is common in the casino industry.

62.     DraftKings's development of and adherence to income verification policies and source of funds verification policies is significantly worse than that of other online sports betting proprietors.

63.     DraftKings has prioritized taking users' money, regardless of where that money comes from or how much of it they have to lose, over implementing industry-standard practices to ensure users are betting their own money and within their means.

**B.  DraftKings's Pivot to Online Casino Gambling**

---

[11] *DraftKings Wants People to Gamble Responsibly, CEO Says*, BLOOMBERG TELEVISION, Sept. 6, 2024, https://www.youtube.com/watch?v=tq011JIlEzU (last accessed May 1, 2025).

64.     Online casino gambling has become a significant component of Pennsylvania's gaming industry, generating billions in revenue, and attracting millions of consumers.

65.     In 2020, as in-person entertainment dropped during the COVID-19 pandemic and online gambling boomed, DraftKings added online casino gambling to its offerings in Pennsylvania.

66.     DraftKings sees online casino gambling as an important area for growth because it is more predictable and therefore profitable compared to handling sports betting, where the company faces the risk of uncontrolled outcomes and dynamic—and therefore error-prone— odds.[12]

67.     Driven by this business prerogative, DraftKings has established itself as the most dominant player in the nascent national online casino betting market.

68.     DraftKings has done so by leveraging its brand recognition and existing user base, as well as aggressive marketing, celebrity endorsements, and promotional offers.

69.     DraftKings regularly has the highest monthly market share of any online casino platform in Pennsylvania in terms of monthly revenue.

70.     For example, in January 2025, DraftKings's online casino partner in Pennsylvania, Hollywood Casino at Penn National Race Course, reported a monthly gross revenue of over $79 million from online casino gaming, almost $22 million more than the closest competitor.[13]

71.     DraftKings's brand recognition and market position allows it to exert

---

[12] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).
[13] *PA Gaming Control Board Announces Revenue for January Up Nearly 11%*, PENNSYLVANIA GAMING CONTROL BOARD, Feb. 20, 2025, https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-announces-revenue-january-nearly-11 (last visited March 14, 2025).

considerable influence over consumer expectations and industry practices in the online

gambling ecosystem and to get away with practices that smaller, less-established operators

could not.

72.     DraftKings's large userbase of online sports bettors can use the same funds they

deposit to the app for sports betting to try out online casino gambling, and DraftKings often

entices them to do so with appealing-sounding promotions.

73.     DraftKings also portrays itself as a fair, transparent, and consumer-friendly

operator, encouraging users to participate in its promotions and deposit funds into its platform.

**C.  DraftKings intentionally targets those who are most vulnerable to developing gambling addictions and designs its interface to encourage addictive behaviors**

74.     Both the current edition of the American Psychiatric Association's Diagnostic

and Statistical Manual of Mental Disorders (DSM-V) and the World Health Organization treat

addiction to gambling in the same diagnostic category as addiction to heroin, cocaine, and

tobacco.

75.     However, many people do not understand that gambling can be "addictive and

harmful in many of the same ways as drugs are."[14]

76.     Gambling addiction has both psychological and physiological effects.

Physiological symptoms include hypertension, sleep deprivation, cardiovascular disease, and

other physical stress-related conditions. Psychological effects include anxiety, depression,

intense feelings of guilt and shame, and impaired decision-making.

77.     States that have legalized online gambling have seen dramatic increases in calls

to gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the

---

[14] Gambling Disorder, YALE MED., https://www.yalemedicine.org/conditions/gamblingdisorder (last visited May 1, 2025) (if link ends in landing page, navigate by clicking "Mental Health" and then "Gambling Disorder").

first year after legalization.

78.     Call volume to Pennsylvania's Council on Compulsive Gambling more than doubled between 2020 and 2023.[15]

79.     Gambling addiction is particularly prevalent in young men in their twenties and thirties, not coincidentally a key demographic for DraftKings.

80.     According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30 percent from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[16]

81.     According to a spokesperson for Gamblers Anonymous, there has been "a dramatic increase in the number of young men developing compulsive gambling issues and showing up to meetings since online sports gambling became legal."[17]

82.     Unsurprisingly, DraftKings's target demographic overlaps heavily with the group most at risk of gambling addiction. As of 2021, 90% of DraftKings's users were male and more than half were in their teens, twenties, or early thirties.

83.     In fact, according to recent research from the American Psychological Association, analysis of data from New Jersey reveals that "the fastest-growing group of sports gamblers are between 21 and 24 years old".[18]

---

[15] Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms,* NBC NEWS, April 5, 2024, https://www.nbcnews.com/health/mental-health/gambling-addiction-hotline-calls-online-sports-betting-rcna145539

[16] Meghan Gunn, *These are the Real Dangers of the Sports Betting Boom for Young Men,* NEWSWEEK MAGAZINE, Mar. 22, 2023 https://www.newsweek.com/2023/04/07/sports-betting-boom-linked- rising-gambling-addiction-anxiety-suicide-1789055.html (last visited Nov. 15, 2024)

[17] Maxwell Strachan, *The Rise of Mobile Gambling is Leaving People Ruined and Unable to Quit*, VICE, Sept. 6, 2022, https://www.vice.com/en/article/ake7gk/therise-of-mobile-gambling-is-leaving-people-ruined-and-unable-to-quit (last visited Dec. 2, 2024).

[18] Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, AMERICAN

84.     In Pennsylvania, people between 18 and 34 years old made up about 34% of all callers to the gambling helpline in 2024, compared to just 23% in 2019.[19]

85.     DraftKings engages in a variety of tactics, which are intentionally designed to inculcate gambling addiction and extract as much money as possible from users.

86.     DraftKings designs its app to maximize its revenue per user.

87.     DraftKings's app runs on cellphones, and it uses the physical capabilities phones to engage users through visual displays, sounds, and haptic feedback.

88.     The fact that DraftKings's app is a digital product that can be accessed anywhere enables ready availability, rapid gratification, and the development of "context-independent" cues that trigger habit response.[20]

89.     DraftKings's app is designed to methodically, but unpredictably, trigger dopamine-triggering rewards with dopamine gaps. The lack of predictability is key because, paradoxically, intermittent variable rewards create stronger associations (conditioned changes in the neural pathway) than fixed rewards. This phenomenon is well understood in behavioral science, and products that use this technique are known to be highly habit forming and ultimately addictive.

90.     There are multiple types of dopamine neurons that are connected with distinct networks in the brain and have distinct roles in motivational control. Apart from the dopamine reward loop triggered by positive feedback, other dopamine neurons are impacted by salient but

PSYCHOLOGICAL ASSOCIATION – MONITOR ON PSYCHOLOGY, July 1, 2023, https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain
[19] Abigail Hicks, *With wagering just a click away, younger gamblers call for help,* PITTSBURGH UNION PROGRESS, Jan. 28, 2025, https://www.unionprogress.com/2025/01/28/with-wagering-just-a-click-away-younger-gamblers-call-for-help/
[20] Bas Verplanken, *The Psychology of Habit: Theory, Mechanisms, Change, and Contexts*, Springer Nature Switzerland AG, 2018, https://link.springer.com/book/10.1007/978-3-319-97529-0

non-rewarding stimuli and even painful-aversive stimuli.[21] DraftKings's app and promotional practices capitalize on this by giving users a dopamine-payoff involving both highly positive and aversive stimuli associated not just with winning and losing bets but also with being offered and completing or failing to complete promotions.

91.    DraftKings has designed its app to increase the pace of this dopamine-payoff by offering numerous in-game bets that settle quickly. Gone are the days when sports betting simply involved gambling on the outcome of a game coming up on Sunday. Now users can wager on the outcome of individual plays and can string these bets together into multi-leg bets every day, all day.

92.    DraftKings's product is also designed to put and keep users in the "gambling zone": a hyper-focused, hypnotic state, where the user is immersed in the interface and acts reflexively in placing of bets and making deposits. DraftKings does this, in part, by serving rapid fire updates for ongoing bets—with scores and odds constantly refreshing faster than on television to keep users watching the app—and serving users precisely timed pop-ups, often in bright colors with emojis, alerting them of new bets they can place within the sporting event they are already watching or within a new sporting event as soon as the one they are watching has concluded.

93.    DraftKings has intentionally gamified gambling on its app in this way to increase customers' spending and time in the app, which it knew was likely to ultimately to lead to many customers developing addictions.[22]

---

[21] J.P.H. Verharen, Yichen Zhu, and Stephan Lammel, *Aversion hot spots in the dopamine system* 64 Neurobiology 46-52 (March 5, 2020) https://doi.org/10.1016/j.conb.2020.02.002 (last visited May 7, 2025).
[22] Allison Parshall, *How 'Dark Patterns' in Sports Betting Apps Keep Users Gambling*, SCIENTIFIC AMERICAN, Jan. 23, 2025, https://www.scientificamerican.com/article/how-sports-betting-apps-use-psychology-to-keep-users-gambling/ (last visited May 8, 2025).

94.    DraftKings also reinforces compulsive betting through slot-machine style visual, auditory, and tactile feedback. Celebratory animations and pop-ups are designed to trigger dopamine responses even in situations of net financial loss, much like electronic gaming machines that celebrate "losses disguised as wins." Customers receive colorful congratulations and upbeat notifications for small wins, creating a deceptive sense of success and reinforcing further play. DraftKings deliberately uses these features to condition users into associating betting with reward, even though they are losing money overall.

95.    DraftKings app design eliminates natural pauses between bets, mirroring the continuous loop architecture of slot machines. Through micro-betting, instant bet settlement, and automatic prompts to place new bets immediately after the previous one, the app creates a high-speed betting cycle that fosters compulsive use and makes self-regulation exceedingly difficult.

96.    The app offers endless opportunities to wager, with new betting options and odds appearing instantly after one bet concludes. Users are prompted to place additional bets in real-time, including new wagers within the same sporting event or to continue playing the same casino game. This continuous loop of betting—combined with the app's encouragement to bet in rapid succession—removes the mental space users would otherwise use to step back or reconsider.

97.    DraftKings's app also allows users to make deposits and place bets with a single click. Once a user has linked their bank account or a credit card, the app permits immediate deposits and wagers with minimal friction, allowing users to essentially bet directly out of their checking account or on credit. These features were adopted to reduce the moment of hesitation that might otherwise accompany financial transactions and to make the money being gambled

17

feel less "real."

98.     By eliminating the friction between impulse and action, these features increase the likelihood that users will place additional bets, chase losses, or deposit more money than they intended—especially those already struggling with control. These design decisions "make[s] it nearly impossible to stop" gambling for someone "already struggl[ing] to control the impulse to keep placing bets."[23]

99.     DraftKings's app is designed to create the illusion of control. Features like same-game-parlays, instant cash-outs, and casino games designed to create the illusion that skill is involved in the outcome all give users the false sense that they are actively managing risk or influencing outcomes, when in reality the odds are heavily stacked in DraftKings's favor and these products predictably take users' money over time.

100.     By providing bettors with an overwhelming array of interactive options and customizable bets, DraftKings creates a false sense of skill and mastery that lures gamblers into believing that they can beat the odds using skill.

101.     DraftKings calibrates the timing of app notifications and other outreach to users in a way that is designed to create goal-oriented behavior and encourage users to gamble more and more on the platform, including by chasing "VIP tiers" and completing promotions.

102.     DraftKings knows that encouraging users to gamble in this way creates a substantial risk of them developing a gambling addiction.

103.     Consumers believe that DraftKings, as the largest company in its industry and one that markets itself as "the safest sports betting platform," can be trusted to put in place

---

[23] Luke Whelan, *How Smartphones Fuel Gambling Addiction*, UNIVERSITY OF WASHINGTON MEDICINE, May 20, 2024, https://rightasrain.uwmedicine.org/mind/mental-health/sports-betting-smartphone-screen-addiction (last visited May 8, 2025).

common-sense designs that will keep them safe.

104.    However, DraftKings hides and softens tools like betting limits, cool-down periods, and session recaps informing users how much time and money they have lost on the app.

105.    For example, DraftKings allows users to change their deposit limits at will, so that all it takes is a single moment of weakness for a compulsive gambler to resume depositing large amounts of money in the app.

106.    DraftKings also exploits the fact that its lip service to "responsible gambling" misleads customers into thinking that as long as they act "responsibly" they are not at risk of developing a gambling addiction. DraftKings knows that gambling addiction is a mental health condition the risk of which is substantially increased by the intentional features embedded in DraftKings's app.

107.    All of this means that users are more likely to develop habit-forming behaviors on DraftKings's app than they would be placing the same bets in a brick-and-mortar casino.

108.    DraftKings touts that its "[s]ophisticated data science drives marketing decisions," which "delivers the right message, to the right user at the right time," to maximize return on investment.[24]

109.    DraftKings leverages its user data to identify customers who exhibit the potential to gamble lots of money very quickly, profiles them as priority customers and deploys tactics designed to cultivate problem gambling behaviors.

110.    DraftKings comprehensively tracks its user behavior both on its platform and on other digital platforms using digital targeting and sophisticated customer analytics software.

---

[24] https://www.slidebook.io/company/draftkings/presentation/4482ce71d778bb9781863ed375bebca1-/slide-/4482ce71d7-78bb9781863ed375bebca1_24/ (last visited Nov. 21, 2024).

111.    DraftKings collects and analyzes user metrics far beyond simple demographic information such as betting frequency, betting times of day, average bet size, length of time on app, and the length of the user's relationship with the platform. Then DraftKings analyzes how various factors and stimuli affect a users' betting and deploys targeted tactics designed to get each user to bet more money and more frequently.

112.    DraftKings does not use this data to prevent users from gambling beyond their means or engaging in destructive behavior.

113.    Instead, DraftKings uses its data on users' betting and activity patterns to deploy its promotions, push notifications, emails, and other means of reaching a user to ensure that even when a user has just experienced a large loss or is trying to take a break from the platform, they get a message that will ensure they are back placing bets as soon as possible.

114.    Despite DraftKings stating that they encourage its customers to use "helpful tools" like "cool-off periods" when they are struggling with problem gambling, it actually uses the data to strategically stymie users' efforts to take a break from gambling, especially when the users are gambling addicts who are losing significant sums of money on DraftKings.

115.    For example, DraftKings targets push notifications to users who bet frequently but have not recently logged on to the platform in order to lure them back, even though DraftKings knows this undermines compulsive gamblers' efforts to resist gambling.

116.    Instead, DraftKings uses its data on users' betting patterns to ensure that even when a user has just experienced a large loss or is trying to take a break from the platform, they get a message that will ensure they are back on the platform as soon as possible.

117.    DraftKings solicits users that have opted into a cool-down or self-exclusion period because they are gambling too much and heavily targets them with offers as soon as the

period expires.

118.    DraftKings engages in this behavior despite knowing that many users have opted into cooldown or self-exclusion periods precisely because they are struggling with gambling addictions and do not want to be exhorted to continue gambling once their cycle of gambling has been interrupted.

119.    Additionally, DraftKings frequently offers users a deposit match promotion after they have experienced a large loss or have been absent from the platform for several days.

120.    DraftKings does this because it knows that doing so makes a user more likely to continue gambling, engage in loss-chasing, and to gamble larger amounts despite having an adverse experience from a loss.

121.    Once DraftKings's data indicates that a user has the potential to gamble significant amounts of money in the app, DraftKings deploys another tactic: "VIP Hosts," which are DraftKings employees who are trained and incentivized to get users to gamble more and more money.

122.    DraftKings's VIP Hosts are trained to make DraftKings users feel like they are their friends and like they are getting personalized attention.

123.    DraftKings's job description for VIP Hosts states that they will: "Create strong, authentic, and trusted player relationships. Exceed engagement and service level performance targets. Assist in reactivation efforts to re-engage inactive users. Effectively distribute an allotted promotional budget. Compile player feedback to support improvements to the platform and identify commercial opportunities."[25]

124.    VIP Hosts are supervised by "Player Development Managers," whose job

---

[25] DraftKings VIP Host job posting from July 2024, https://perma.cc/2PLH-S3HM (last accessed May 15, 2025).

description includes, "[d]riv[ing] key VIP sales metrics, contributing to customer engagement, market share, and net revenue while maintaining and enhancing relations with existing customers," and "[w]ork[ing] closely with Analytics teams to monitor reinvestment programs including promotions and other reward incentives by routinely checking reports and actual transactions."[26]

125.    VIP Hosts are trained to cultivate trust in the users they service and to use their access to users' data to give them outreach and attention that feels personalized and fortuitous.

126.    VIP Hosts also make users feel that they can come to them with concerns they have about the platform or their betting and they will provide advice and assistance, including in the form of free credits and other promotions to help users feel like they have a chance to win back losses.

127.    In reality, VIP Hosts are only pretending to be users' friends. Instead, VIP Hosts are following a standardized playbook that is carefully designed to overcome users' attempts to limit or cease gambling and to entice them to return to DraftKings's platform often and gamble more.

128.    DraftKings is aware that users often feel kinship with their VIP hosts and tell them when they are struggling with gambling addiction.

129.    Despite this, DraftKings's VIP Hosts are disincentivized from assisting problem gamblers and are not given adequate training or resources to respond correctly when a user is exhibiting signs of a gambling problem.

130.    Rather than receiving this sort of training and being incentivized to use it, VIP Hosts are given a single mission from DraftKings: keep the users frequently gambling and

---

[26] DraftKings Player Development Manager job posting from May 2025, https://perma.cc/5ESU-8HS7 (last accessed May 15, 2025).

gambling big.

131.    VIP Hosts are evaluated and compensated based on performance metrics that reward increased gambling activity by their assigned customers.

132.    VIP Hosts often ignore obvious signs of gambling addiction.

133.    Even when a user explicitly states that they are gambling too much or beyond their means, VIP Hosts are trained to continue encouraging them to gamble on DraftKings.

134.    VIP Hosts are trained to follow a gambler's activity on the platform and to follow up with them at strategic moments when they might otherwise take a break from gambling or stop gambling all together.

135.    In fact, VIP Hosts are instructed to intensify contact with customers showing signs of attempting to limit their gambling activities.

136.    Among the tactics that VIP Hosts are trained to use is offering users promotions or site credit after they have experienced a large loss or have been absent from the platform for several days.

137.    In short, DraftKings uses its data and trains its hosts to induce rather than prevent problem gambling.

**D.  Plaintiffs became addicted to gambling on DraftKings exactly as Defendants intended**

138.    Repeatedly, Plaintiff Macek tried to stop gambling and sometimes would go for several months or even a year without betting on DraftKings or Golden Nugget.

139.    Invariably, the Defendants would entice him back to the site with promotions or promises of site credit and intentionally restart a cycle of compulsive gambling.

140.    Based on Plaintiff Macek's behavior on the platform, DraftKings's algorithms identified Plaintiff Macek as the type of user that might be most profitable to the company, and he was assigned to one or more target user groups in the company's internal customer data.

This lead DraftKings to begin contacting him more frequently with promotions, site credit, and other efforts to lure him back in

141.    These promotions incentivized Macek to chase his losses after losing a bet and he began doing so regularly.

142.    Eventually, because Plaintiff Macek was betting more and more money on DraftKings, he was invited to become part of the VIP Player Program, which offered him "perks" like custom promotional offers and a VIP host who would reach out personally to him entreating him to gamble and deposit more.

143.    When Plaintiff Macek first signed up for DraftKings in November 2020, he was a conservative player, placing wagers of amounts that he could afford to lose given his income as a teacher.

144.    Shortly after signing up, however, Plaintiff Macek received a deposit bonus offer from DraftKings. Enticed by the promotion, he deposited $1,500 into DraftKings and received $500 credit in non-refundable, non-transferable, no-cash-value bonus funds.

145.    With a newfound excitement for the four-digit balance in his account, Plaintiff Macek began to bet larger amounts, bet more often, and increase his deposit frequency.

146.    Over the next months, DraftKings contacted Plaintiff Macek repeatedly in a concerted effort to keep him gambling.

147.    Plaintiff Macek fell deeper into his new gambling habit. In March 2021, without any request from him, DraftKings doubled Plaintiff Macek's deposit limit from $10,000 to $20,000.

148.    At the same time, Plaintiff Macek sent DraftKings certain financial documents, including bank statements, which gave the company full visibility into his finances, including

the fact that he was making a teacher's salary of ~$50,000, with a take-home pay of $1,796 every two weeks. Nevertheless, DraftKings increased Macek's daily deposit limit to 10x his bi-weekly pay.

149.    A DraftKings VIP host instructed Plaintiff Macek on how to make deposits from PayPal, which allowed him, on multiple occasions, to deposit significantly more money than was presently available in his bank account. On one occasion, Plaintiff Macek spent over $100,000 via PayPal in a single day – money he could not afford to lose.

150.    Plaintiff Macek found that depositing money into his DraftKings accounts did not feel like he was losing real money. As his deposit limits were increased without request and his default "suggested deposit" amounts increased from $10-100 to $10,000, putting thousands of dollars into DraftKings at the push of a button became a surreal experience. Plaintiff Macek was able to deposit tens of thousands of dollars into DraftKings at the push of a button, and, without having to go to the ATM and hold the cash in hand (as you would at a brick-and-mortar casino), he began to detach the value of his deposits from the number on his screen.

151.    By June 2021, Plaintiff Macek was entangled in the throes of addiction. Plaintiff Macek recalls that on a single day in June 2021, he lost a total of $15,000 before texting his VIP host for assistance. Instead of encouraging Plaintiff Macek to seek problem gambling support, the VIP host, who knew that Plaintiff Macek was surviving on a high school teacher's salary, encouraged Plaintiff Macek to deposit another $5,000 via PayPal, which was promptly lost. By the end of the day, Plaintiff Macek had lost $20,000.

152.    Plaintiff Macek's VIP host continued to contact him with promotion offers, site credit, and VIP gifts, including DraftKings-branded clothing and coffee cups. Often, these offers came directly following significant losses.

153.     Despite a principal interest in DraftKings online casino, Plaintiff Macek also bet thousands on the sportsbook, unable to resist the beck and call his VIP host offered in an intentional attempt to expand Plaintiff Macek's addiction to DraftKings's sports gambling offerings.

154.     By April 2023, Plaintiff Macek could not resist chasing his losses. On multiple occasions, Plaintiff Macek would be down $20,000-30,000. Invariably DraftKings would reach out with new, tantalizing offers and incentives to induce him to continue gambling beyond his means. The following is a July 2023 conversation between Plaintiff Macek and a DraftKings employee, in which he reached out a "Player Advocate" to report having lost $15,000 in one day and was told he would be offered a new bonus to try to win back some of his lost money. He was not, as he should have been, connected to any addiction resources. Plaintiff Macek had numerous conversations of this sort with DraftKings employees over the years and was never cut off from gambling despite clearly gambling far beyond his means.

**Andrew F–S** (DraftKings)

Jul 27, 2023, 1:15 PM EDT

Hi Kenneth,

I wanted to reach out to give you an update.

I've gone ahead and sent this situation over to the VIP team so they can evaluate this request!

They should be able to provide you with this bonus and possibly more.

Stay tuned...

Andrew F-S

DraftKings Player Advocate

**GolfProX**

Jul 27, 2023, 11:05 AM EDT

Good morning.

I just wanted to reach out to see if anyone from the vip team would be able to add any dk dollars to my account. I had a rough day yesterday (-15k) and anything would be appreciated.

Please consider.

Thanks.

*Figure 14: Correspondence between Plaintiff Macek and DraftKings dated July 27, 2023, in which Plaintiff Macek is promised a "bonus" after disclosing that he lost $15,000 in a single day.*

155.    In August 2023, Plaintiff Macek was assigned a new VIP host who pretended to take interest in his hobbies, work life, and living situation. Under the guise of friendship, this VIP host manipulated Plaintiff Macek's trust and encouraged his gambling addiction through unsolicited promotional offers, gifts, and deposits of site credit. This VIP Host also learned about Plaintiff Macek's limited financial resources.

156.    The following is a text conversation between Plaintiff Macek and his VIP host from October 2023 in which he admitted to chasing his losses of tens of thousands of dollars.

His Host replied only that there is "great sports action this weekend."



*Figure 15: Texts between Plaintiff Macek and his VIP host, dated October 13, 2023, showing the VIP host congratulate Plaintiff Macek on a big win. Plaintiff Macek tells the VIP host that these wins are "nice, especially when you're not already 10 grand in the hole, chasing it back the same day".*

157.    From September 2023 to January 2024, Plaintiff Macek also lost over $50,000 to Golden Nugget. Plaintiff Macek felt he had no choice but to take out large personal loans to pay off his gambling debts.

158.    Around this time, Plaintiff Macek attempted to get a handle on his out-of-control

gambling and asked Golden Nugget and DraftKings to temporarily suspend his account.

159.    Nevertheless, shortly after the temporary suspension period ended in August 2024, Plaintiff Macek was contacted out of the blue by a new DraftKings VIP host encouraging him to resume gambling on DraftKings.

160.    Then, in January of 2025, Golden Nugget managed to lure Plaintiff Macek back with direct outreach about a new "free money" promotion offer.

161.    These entreaties broke Plaintiff Macek's resistance again, and he connected his bank account to the app, showing that he had $15,000 available. He made a deposit of $2,500 and began to play late on the evening of January 25th.

162.    Defendants had informed Plaintiff Macek that they would not allow him to deposit more money than he had in his linked account.

163.    Plaintiff Macek relapsed and went on a gambling bender. From the late night of January 25th until the afternoon of January 26th, Plaintiff Macek gambled over $100,000, depositing funds in his Golden Nugget account due to Defendants' calculated inducements.

164.    Despite knowing that Plaintiff Macek only had $15,000 in his bank account, Golden Nugget caused him to overdraft the account by $17,000 and lose over $32,000 in approximately eighteen hours.

165.    During this gambling binge, Plaintiff Macek reached out to employees of the Defendants when a deposit attempt failed. Instead of cutting him off, connecting him with resources, or cancelling his bets, Defendants provided him with bonus funds, more promotions, and encouraged him to attempt another deposit.

166.    When the dust settled on January 27th, and Plaintiff Macek realized he had somehow deposited $17,000 more than he available in his account, he reached out to

Defendants again, only to be told that it was impossible for him to have withdrawn that money and that his bank had made an error. When he explained that his account history on Golden Nugget and his bank were both showing that he had withdrawn $32,000 and asked to discuss the matter over the phone, he was told by "Marie C," a so called "Player Advocate" that "You didn't deposit $1 with DraftKings or Golden Nugget" and that the company did not "call back players for these issues."

167.    As more money was deposited into Plaintiff Macek's bank account over the following days (through personal loans from those close to him), Golden Nugget took it all until the full amount Plaintiff Macek had (but should not have been able to) wagered from January 25th and 26th was transferred to the Defendants.

168.    Defendants' employees still did not take any steps to cut Plaintiff Macek off or connect him with problem gambling resources.

**Marie C** (Golden Nugget Casino)
Jan 27, 2025, 6:27 PM EST

Hello Kenneth,

Thank you for contacting us about the status of your deposit.

We do not call back players for these issues. You didn't deposit $1 with DraftKings or Golden Nugget.

You need to discuss further with your bank to about this issue.

These funds have not been retrieved by us.

Please check your bank account in the next few days.

Marie C
Player Advocate

**Golfprox**
Jan 27, 2025, 5:59 PM EST

Can someone please call me to discuss this further? If you look at the transaction history on my account, it's showing all the debits and online banking are totaling 32k. However you said that I did not spend that. Please I just want to figure this out as I never should've been able to spend more than I had.

**Marie C** (Golden Nugget Casino)
Jan 27, 2025, 5:04 PM EST

Hello Kenneth,

Thank you for contacting us about the status of your deposit.

The funds just have a hold that will be released in 5days or less.

Marie C
Player Advocate

*Figure 16: Correspondence between Plaintiff Macek and Golden Nugget employees dated January 27, 2025, discussing his deposits from the previous days.*

169. In total, as a direct result of the gambling addiction that DraftKings had intentionally inflicted upon him, Plaintiff Macek suffered losses in excess of $134,000.

170. To this day, Plaintiff Macek struggles with the effects of the addiction DraftKings inflicted upon him. Coinciding with the start of his gambling addiction, Plaintiff Macek was diagnosed Generalized Anxiety Disorder. Plaintiff Macek is prescribed anti-anxiety

medication and sees a psychiatrist regularly as counseling for his addiction.

171.    On a regular basis, Plaintiff Macek still experiences sleepless nights and crippling panic attacks related to the thought of his gambling losses.

172.    After so many nights of depositing tens of thousands of dollars with the click of a button, Plaintiff Macek still has a distorted perception of the value of money. Plaintiff Macek finds himself desensitized to the idea of spending or saving amounts of money that carry weight in the real world, but that he would play through in just a few minutes at the height of his addiction.

173.    With all his money and free time going towards his addiction, Plaintiff Macek's social life was destroyed, and his familial relationships were fractured.

174.    Like Plaintiff Macek, Plaintiff Setton was identified by DraftKings's data analytics as a valuable user and was targeted by VIP Hosts.

175.    From the start of his relationship with DraftKings, Plaintiff Setton struggled to control his compulsive gambling on the site.

176.    In a moment of strength, after losing thousands of dollars in the first months he used DraftKings, Plaintiff Setton asked for DraftKings to permanently close his account on July 22, 2020. In doing so, he made clear to DraftKings that he was unable to control his compulsive gambling on the site and needed to permanently remove the temptation to do so.

177.    Plaintiff Setton received confirmation from DraftKings that his account had been closed and that he would never again be able to gamble on the platform.

178.    Plaintiff Setton relied on DraftKings's representations that his account had been closed and that he would no longer be able to harm himself or his family through his gambling on the platform.

32

179.    Within a month, Plaintiff Setton was driven by his gambling addiction back to DraftKings, where he attempted to log back into his old account. Plaintiff Setton knew he should not be able to access his closed account and was hoping that he would be prevented from doing so after asking for it to be permanently closed.

180.    Instead, Plaintiff Setton was able to access his old account and to pick up gambling right where he left off.

181.    Over the course of the next four years, Plaintiff Setton continuously used DraftKings—often for hours a day—and it continued to destroy his finances and his life and wreak havoc on his family.

182.    After asking to close his account Plaintiff Setton lost approximately $350,000 on DraftKings, devastating his family's finances.

183.    During the course of Plaintiff Setton's use of DraftKings, he interacted with numerous employees of DraftKings for account support questions or issues, all of whom could see that Plaintiff Setton should not have been allowed to be gambling on DraftKings.

184.    And, as described above, Plaintiff Setton also had two long-term DraftKings VIP Hosts assigned to him, who communicated with him on a regular basis and were aware that he was a gambling addict who had previously tried to permanently close his DraftKings account.

185.    On November 19, 2024, Plaintiff Setton was suddenly locked out of his DraftKings account and when he contacted DraftKings support to ask what had happened he was told by "Matt M, Player Advocate" that "You requested permanent account closure on 2020-07-22. Once a player requests to have their account closed we cannot reopen the account under any circumstances. This is due to responsible gaming regulations."

186.    Plaintiff Setton was not offered a refund of the $350,000 he was permitted to

gamble on DraftKings after asking that his account be permanently closed.

187.    When DraftKings locked Plaintiff Setton out of his account, he had $45,000 of un-wagered money in it. DraftKings has still not returned that money despite requesting it be released.

188.    Plaintiff Setton's life was ruined gambling on DraftKings.

189.    As a direct result of the gambling addiction DraftKings inculcated in him, Plaintiff Setton started taking antidepressant and anti-anxiety medications and began to visit a therapist regularly during the height of his addiction.

190.    Plaintiff Setton also developed a series of repetitive, nervous muscular spasms in his neck as a result of his addiction. Plaintiff Setton visited a physical therapist and received injections directly into his neck in order to treat these ticks.

191.    Plaintiff Setton also deals with continuing nightmares, ongoing anxiety, and post-traumatic stress because of his addiction. Plaintiff Setton's addiction was also a principal contributor to the loss of his high-paying job at Google and the decline of his independent business ventures thereafter.

192.    Plaintiff Setton's family suffered, and continues to suffer, as a result of his addiction.

193.    Similarly, Plaintiff Harner was quickly identified by DraftKings as a target for VIP Host outreach based on his gambling history and he was inundated with outreach from Defendants.

194.    Plaintiff Harner was assigned a VIP Host by DraftKings who exhorted him to continue gambling more and more, including immediately after he suffered losses.

195.    Based on the quantity Plaintiff Harner was gambling and other data from his

pattern of behavior on its platform, DraftKings knew that he was in the throes of a gambling addiction.

196.    DraftKings did not take any steps to cut off or limit Plaintiff Harner's gambling or connect him with gambling addiction resources.

197.    Plaintiff Harner struggled with drug addiction early in his life and has been sober for ten years.

198.    In the summer of 2024, after seeing advertisements for online gambling, including for DraftKings' Casino Deposit Match Promotion, Plaintiff Harner attempted to create accounts with online gambling companies in Pennsylvania but was rebuffed by most because he was on the state brick-and-mortar casino self-exclusion list.

199.    Plaintiff Harner opened an account on DraftKings in August 2024 and on Golden Nugget in December 2024.

200.    Defendants quickly took more than $75,000 from him using VIP hosts to keep him gambling.

201.    In just a few short months, Plaintiff Harner lost more than his annual income on DraftKings and Golden Nugget.

202.    A self-employed landscaper, Plaintiff Harner's business suffered as he could not stop himself from taking time away from work to gamble.

203.    On his worst days, Plaintiff Harner experienced suicidal thoughts as a result of the addiction DraftKings inflicted upon him and had trouble with motivation and basic daily functioning.

204.    In recent months, Plaintiff Harner has filed for bankruptcy. Reminiscent of his recovery from drug addiction, Plaintiff Harner continues to struggle to control his gambling

urges, especially with DraftKings's ever-present logo ubiquitous on billboards and sports broadcasts in Pennsylvania.

205.    Finally, Plaintiff Alicea began gambling on DraftKings and Golden Nugget because of "free money" promotions he saw advertised on his social media feed.

206.    Plaintiff Alicea rapidly developed a gambling addiction when he began using DraftKings due to the compulsion-inducing features of its app.

207.    Plaintiff Alicea began, as Defendants intended, to chase his losses, pouring more and more money into the apps in an attempt win back his losses.

208.    Plaintiff Alicea eventually contacted a manager at DraftKings and asked whether it was normal to lose $7,000 over the course of two days.

209.    Based on this conversation and data that Defendants had showing Plaintiff Alicea's escalating pattern of compulsive gambling behavior, Defendants knew that Plaintiff was addicted to gambling and was wagering far beyond his means.

210.    Nevertheless, Defendants never connected Plaintiff Alicea with resources to treat his gambling addiction. Instead, they continue to actively solicit him to gamble more on their platform.

211.    In total, Plaintiff Alicea lost approximately $58,000 on DraftKings and Golden Nugget.

212.    Similarly, Plaintiff Sadagopan quickly became addicted to gambling on DraftKings after creating his account in 2024.

213.    Plaintiff Sadagopan was hooked by the rapid-fire design of the app, which allowed him to deposit thousands of dollars and place bets with a single click, and blow through thousands of dollars of wagers in minutes.

36

214.    Plaintiff Sadagopan was able to play several hands of blackjack at once and would often lose over $1,000 in just a few minutes. He would become transfixed by the automated blackjack experience, which went so quickly from one wager to the next it did not allow him time to reflect on his prior bets or realize how long he had been betting.

215.    During the calendar year of 2024, Plaintiff Sadagopan placed millions of dollars in wagers and lost over $150,000 on DraftKings casino.

216.    Though he declined the offer to be assigned a "VIP Host," Plaintiff Sadagopan received an onslaught of emails and in-app notifications detailing promotional offers and enticing him to return to gambling. Plaintiff Sadagopan noticed that these offers came particularly after large losses.

217.    Despite placing more than $8 million in bets, at no point did DraftKings perform income verification or proof of funds verification on Plaintiff Sadagopan, which would have shown that Plaintiff Sadagopan was not in a position to be losing so much money.

218.    In early 2025, Plaintiff Sadagopan managed to cut himself off from gambling on DraftKings. Though he hasn't gambled since, he still deals with lasting effects of his addiction.

219.    During the time of his addiction, Plaintiff Sadagopan lost interest in his friends and work life and dedicated the vast majority of his mental energy to gambling. Plaintiff Sadagopan's interpersonal relationships with friends and coworkers remain fractured, or entirely broken, to this day.

220.    Plaintiff Sadagopan deals with ongoing chronic anxiety and sleeplessness as a result of his experience with DraftKings.

221.    For the first two years Plaintiff Spencer's DraftKings account was open, he lost over $60,000, a considerable sum for a man running a small business in felt manufacturing.

222.    Then, in 2024, Plaintiff Spencer's losses topped $1,000,000.

223.    As Plaintiff Spencer started to increase the amounts of his wagers on DraftKings's online casino, DraftKings placed him in the highest "VIP Tier" and assigned him a top-level "VIP Host." His Host would bombard him with "free money" promotional offers and promises of site credit if he continued to gamble at this unsustainable level.

224.    Plaintiff Spencer began to lose tens, and then hundreds, of thousands of dollars, and his VIP Host continued to send him texts with promotions and site credit, particularly after big losses or rough weekends.

225.    Plaintiff Spencer often reached out to his VIP Host after big losses and was greeted with thousands of dollars in site credit. Plaintiff Spencer's VIP Host also offered him a number of gifts, including tickets to luxury suites at professional sporting events, to build trust and entice Plaintiff Spencer to continue betting.

226.    Plaintiff Spencer's game of choice was Blackjack, and the deliberate design of DraftKings's online casino enabled Plaintiff Spencer to play 20-30 hands of Blackjack in just one or two minutes, a design choice deliberately intended to be addictive, and a feat impossible with a live dealer at a brick-and-mortar casino.

227.    Plaintiff Spencer's crippling addiction took control of his life, and he was unable to stop himself from gambling. By the time his losses topped one million dollars, Plaintiff Spencer lost his felt manufacturing business.

228.    He often spent over twenty hours in a single day on DraftKings, finding himself unable to give any attention, or funding, to his small business.

229.    Plaintiff Spencer's gambling addiction also fractured his personal life. The gambling addiction DraftKings inculcated in Plaintiff Spencer was the principal contributor to

his divorce and the shattering of his relationship with his children, which, to this day, has not recovered.

230.    DraftKings had any number of signs that Plaintiff Spencer was addicted to gambling and spending more money than he could afford to lose, including the fact that Plaintiff Spencer often had 20-22 hours of DraftKings screen time in a single day, the fact that Plaintiff Spencer's losses in a single year were nearly sixteen times higher than his lifetime losses until that point, the fact that Plaintiff Spencer often switched his method of depositing (including to an account associated with his small business), the fact that Plaintiff Spencer would often reach out to his VIP host in the middle of the night, and the fact that Plaintiff Spencer often had days with dozens of deposits that shrunk from several thousand dollars each to deposits of $10-50.

231.    At no point did DraftKings perform any proof of funds or income verification on Plaintiff Spencer.

232.    At no point did Plaintiff Spencer's VIP Host, or anybody from DraftKings, try to limit his spending or connect him with problem gambling resources.

233.    Plaintiff Spencer stopped using DraftKings in 2025 when he had a problem depositing large sums of money into his account and DraftKings demanded additional funds before they would release his $4,500 cash balance, a sum which they still have not returned.

234.    Plaintiff Spencer continues to suffer lasting effects from his gambling addiction. Plaintiff Spencer deals with ongoing depression, anxiety, and sleeplessness as a result of his gambling addiction.

235.    Plaintiff Spencer is prescribed a number of psychotropic medications, including antidepressant, anti-anxiety medication, and sleeping pills, to treat the lasting effects of his

addiction.

236.    Plaintiff Spencer still deals with the fallout of losing his felt manufacturing business, and nearly the entirety of his wealth, due to the addiction DraftKings intentionally inflicting upon him.

237.    Plaintiff Spencer continues to deal with the effects of losing his family as a result of his addiction. Plaintiff Spencer is divorced and his relationship with his children remains shattered.

## CLASS ACTION ALLEGATIONS

238.    Plaintiffs Macek, Harner, Setton, Alicea, Spencer, and Sadagopan bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the following class and subclasses, which is defined as follows:

239.    **Targeted Gambling Addiction Class:** Any person who DraftKings's knew or had reason to know was compulsively gambling on its platform, and who was nevertheless targeted by DraftKings through VIP hosts and other forms of direct inducements to perpetuate and increase a user's gambling.

    a.    **Pennsylvania Targeted Gambling Addiction Subclass:** Any person who DraftKings's knew or had reason to know was compulsively gambling on its platform, and who was nevertheless targeted by DraftKings through VIP hosts and other forms of direct inducements to perpetuate and increase a user's gambling while located in the Commonwealth of Pennsylvania.

240.    **Cool Down or Account Closure Violation Class:** Any person who asked DraftKings to suspend or close their account and was nevertheless permitted to gamble on

DraftKings after doing so.

    a.   **Pennsylvania Cool Down or Account Closure Violation Subclass:** who asked DraftKings to suspend or close their account and was nevertheless permitted to gamble on DraftKings after doing so while located in the Commonwealth of Pennsylvania

241.   **Product Liability Class:** Any person who was exposed to the dangerous design features of DraftKings's app and developed or could not control their compulsive gambling on DraftKings's app during the Class Period.

    a.   **Pennsylvania Product Liability Sub-Class:** Any person who was exposed to the dangerous design features of DraftKings's app and developed or could not control their compulsive gambling on DraftKings's app during the Class Period while located in the state of Pennsylvania.

242.   Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

243.   The Class Period for each promotion class is tolled from August 2018 through the present under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to foster gambling addictions in customers.

244.   Alternatively, the Class Period is tolled to the earliest limitations in any previously filed class action complaints against DraftKings raising the claims at issue here, which, on information and belief is the statutory limitations period running back from December 8, 2023.

245.    Alternatively, the Class Period extends from the relevant statutory limitations period for each cause of action.

246.    The Class Period runs through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

247.    This case is properly brought as a class action under Rule 23 for the following reasons:

a.  **Ascertainability:** The Class Members can be readily identified through Defendants' records which will include a record of all those customers who gambled compulsively on its apps and were targeted with VIP hosts.

b.  **Numerosity (Rule 23(a)(1)):** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiffs at this time. However, Plaintiffs believe there are thousands of Class Members. The number and identity of Class Members can be determined through discovery.

c.  **Commonality and Predominance (Rule 23(a)(2)):** Plaintiffs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

- Whether DraftKings knows when its users are gambling beyond their means or as a result of gambling addictions;

- What duties DraftKings owes to its users who it knows are gambling beyond their means or as a result of gambling addictions;

- What duties DraftKings owes to its users who have requested their accounts be closed or that they be excluded from gambling;

- Whether DraftKings's app is designed in a manner that is unreasonably dangerous because reasonable consumers would not expect it to be so addictive;

- Whether DraftKings has a duty to warn users about the significant risk associated with the addictive features of DraftKings's app described herein;

- The appropriate measure of damages to award Plaintiffs and the other Class Members; and

- The appropriate injunctive relief to which Plaintiffs and the other Class Members are entitled.

d. **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiffs and each of the other Class Members were injured in the same way by the manipulation at issue. The manipulations at issue were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members. Plaintiffs' injuries have been caused by the same conduct of DraftKings, which would provide the same basis for a claim for all Class Members.

e. **Adequacy of Representation (Rule 23(a)(4)):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class Members' interests will be fairly

43

and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel that is competent and experienced in complex class action and consumer protection and Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

f.  **Superiority (Rule 23(b)(3)):** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for many individual Class Member is likely relatively small, and if each Class Member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class Member. This is an appropriate forum in which to litigate these claims, as the Pennsylvania state population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

g.  **Declaratory and Injunctive Relief (Rule 23(b)(2)):** DraftKings acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members such that final injunctive and declaratory relief is appropriate with

respect to the Class as a whole.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Negligence (Asserted on behalf of Targeted Gambling Addiction Class)

248.    Plaintiffs Macek, Harner, Setton, Alicea, and Spencer repeat and reallege the other allegations in this Complaint as if fully set forth herein.

249.    Plaintiffs Macek, Harner, Setton, Alicea, and Spencer bring this claim individually and on behalf of the Targeted Gambling Addiction Class.

250.    DraftKings owes a duty of care to its customers and other foreseeable victims of gambling addictions, which its practices have the potential to create and exacerbate.

251.    Part of this duty includes the obligation to not deploy VIP Hosts and other direct inducements to encourage customers who DraftKings knows or has reason to know are addicted gamblers or are gambling beyond their means.

252.    Part of this duty includes the obligation to take action to help users that DraftKings knows or has reason to know are gambling beyond their means.

253.    As a further component of this duty, DraftKings must verify the income and source of funds for users who are gambling a substantial amount on its platform.

254.    DraftKings has a policy of not equipping its customer-facing employees, including VIP Hosts, with the training and tools they need to satisfy these duties.

255.    DraftKings incentivizes its VIP Hosts to not identify or stop a user who is gambling beyond their means.

256.    Industry standards and state regulations establish these and other components of DraftKings' duty of care to users that DraftKings must observe, including a standard of care that encompasses cutting off users who are gambling beyond their means as a result of a

gambling addiction.

257.    Failing to cut off an addicted gambler and affirmatively inducing them to continue gambling is a practice associated with illegitimate gambling proprietors, not operators who are meeting the industry's standards.

258.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its income or source-of-funds verification practices.

259.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its training of customer-facing staff to intervene on users who are exhibiting signs of problem gambling.

260.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its interventions for users who are exhibiting signs of compulsive gambling.

261.    Further evidence of DraftKings negligence is the fact that it does not meet Pennsylvania state regulations in its development and implementation of a compulsive and problem gambling plan and its employee training. *See* 58 Pa. Code §§ 814a.1 *et seq*.

262.    DraftKings breaches its duty of care where it uses VIP Hosts to induce a user to deposit and bet when it knows or should know that user is compulsively gambling beyond their means.

263.    Defendants breach their duty of care to Plaintiffs Macek, Harner, Setton, Alicea, Spencer, and other Targeted Gambling Addiction Class Members by sending them a series of enticements including relentlessly pursuing them through VIP Hosts which Defendants know or should know will have the effect of creating, nurturing, expediting, and/or exacerbating

compulsive gambling.

264.    DraftKings allows users to continue gambling even when most other online casinos and sportsbooks, with access to the same or less information regarding a users' addiction, have already cut them off.

265.    DraftKings breached its duty of care by allowing Plaintiffs Setton, Harner, Macek, Alicea, and Spencer, and Class Members to gamble despite having clear evidence that they were gambling beyond their means.

266.    DraftKings' breach of these duties as described throughout this Complaint resulted in significant damage to Plaintiffs Setton, Macek and Harner, Alicea, and Spencer, both financial and emotional.

267.    DraftKings' breach of each of these duties as described throughout this Complaint resulted in significant damage to Plaintiffs Macek, Harner, Setton, Alicea, and Spencer, and members of the Targeted Gambling Addiction Class, both financial and emotional.

268.    DraftKings' actions were done with wanton and willful disregard of persons who foreseeably might be harmed by their acts, such as Plaintiff Macek.

269.    In the alternative, DraftKings' negligence was reckless to the foreseeable risk to Plaintiffs Macek, Harner, Setton, Alicea, Spencer and VIP Host Targeted Class Members.

270.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligence, including compensatory and punitive damages, fees, and costs.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty (Asserted on behalf of Targeted Gambling Addiction Class)

271.    Plaintiff Macek, Harner, Setton, Alicea, and Spencer, repeat and reallege the other allegations in this Complaint as if fully set forth herein.

272.    Plaintiffs Macek, Harner, Setton, Alicea, and Spencer bring this claim individually

and on behalf of the Targeted Gambling Addiction Class for breach of fiduciary duty arising

from the special relationship of trust and confidence established between DraftKings's VIP

Hosts and their assigned users.

273.    DraftKings, through its VIP Hosts, deliberately cultivated relationships of trust

and confidence with Plaintiffs by, among other things:

a.    Creating the impression that VIP Hosts were acting in Plaintiffs' best interests
        rather than solely for DraftKings's financial gain;

b.    Fostering dependency by encouraging frequent communication and establishing
        patterns of regular contact; and

c.     Exploiting the vulnerable psychological state of Plaintiffs who suffer from
        gambling addiction.

274.    Plaintiffs reasonably reposed trust and confidence in their VIP Hosts based on

their conduct.

275.    As fiduciaries, DraftKings through its VIP Hosts owed Plaintiffs and Class

Members duties of:

a.    Loyalty and fidelity;

b.    Full disclosure of material information;

c.    Acting in Plaintiffs' and Class Members' best interests;

d.    Refraining from self-dealing or conflicts of interest; and

e.    Reasonable care in providing gambling-related advice and services.

276.    As alleged in further detail elsewhere, DraftKings assigned VIP Hosts to

Plaintiffs and Class Members after detecting that they had a propensity to gamble compulsively.

DraftKings understood their susceptibilities based on their app usage and betting patterns,

frequency of deposits, chasing of losses, communications with their VIP hosts, and other behavioral indicators readily available to DraftKings and recognized in the gambling industry as signs of problem gambling.

277.    DraftKings was aware of Plaintiffs' and Class Members vulnerability to gambling addiction and deliberately exploited this vulnerability through the special relationships of trust it cultivated between VIP Hosts and users. DraftKings assigned the hosts to interfere with Plaintiffs' and Class Members' attempts to protect themselves.

278.    DraftKings, through its VIP Hosts, breached its fiduciary duties to Plaintiffs by, among other things:

    a.  Exploiting Plaintiffs' addiction and relationship to VIP Hosts by encouraging continued and increased gambling during periods when Plaintiffs were attempting to reduce or cease gambling activities;

    b.  Prioritizing DraftKings's financial interests over Plaintiffs' well-being in direct contravention of the trust relationship established by the VIP Hosts;

    c.  Failing to disclose the addictive propensities of DraftKings's product;

    d.  Failing to disclose that DraftKings has detected addictive tendencies in Plaintiffs' gambling activity;

    e.  Failing to Disclose that the VIP Hosts' primary objective was to maximize Plaintiffs' gambling, rather than to ameliorate Plaintiffs' losses or act in Plaintiffs' best interests;

    f.  Concealing indicators of problem gambling from Plaintiffs while simultaneously using this information to develop targeted strategies to increase Plaintiffs' gambling activity;

g.   Offering personalized bonuses, free bets, and loss rebates specifically calculated to extend Plaintiffs' gambling sessions and increase total losses;

h.   Failing to implement reasonable safeguards or take reasonable steps to prevent harm to Plaintiffs despite knowing of their addiction; and

i.   Intentionally manipulating the personal relationship between VIP Hosts and Plaintiffs to exploit Plaintiffs' psychological vulnerabilities.

279.   DraftKings's breaches were willful, wanton, and malicious, undertaken with conscious disregard for the rights and welfare of Plaintiffs.

280.   As a direct and proximate result of DraftKings's breaches of fiduciary duty, Plaintiffs and Class Members have suffered substantial damages including financial losses from excessive gambling facilitated by DraftKings's VIP Hosts; damage to personal and professional relationships; costs of medical and psychological treatment for gambling addiction; emotional distress, anxiety, and depression resulting from excessive gambling; and other consequential damages resulting from gambling addiction.

281.   Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligence, including compensatory and punitive damages, fees, and costs.

**THIRD CAUSE OF ACTION**
**Negligence (Asserted on behalf of Cool Down or Account Closure Violation Class)**

282.   Plaintiff Setton repeats and realleges the other allegations in this Complaint as if fully set forth herein.

283.   Plaintiff Setton brings this claim individually and on behalf of the Cool Down or Account Closure Violation Class.

284.   DraftKings owes a duty of care to its users and other foreseeable victims of gambling addictions, which its products and practices have the potential to create and

50

exacerbate.

285.    A component of this duty is to prevent a user from gambling when they have temporarily or permanently suspended their accounts or asked that their accounts be closed.

286.    Industry standards and state regulations establish these and other components of DraftKings' duty of care to users that DraftKings must observe.

287.    DraftKings allows users to continue gambling even when most other online casinos and sportsbooks, with access to the same or less information regarding a users' addiction, have already cut them off.

288.    DraftKings breached its duty of care by allowing Plaintiffs and Class Members to gamble despite having asked for the closure of their accounts.

289.    DraftKings' breach of these duties as described throughout this Complaint resulted in significant damage to Plaintiff Setton and Macek and members of the Cool Down or Account Closure Violation Class, both financial and emotional.

290.    DraftKings' actions were done with a wanton and willful disregard of persons who foreseeably might be harmed by their acts, such as Plaintiff Macek.

291.    In the alternative, DraftKings' negligence was reckless to the foreseeable risk to Plaintiffs and Cool Down or Account Closure Violation Class Members.

292.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligence, including compensatory and punitive damages, fees, and costs.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment (Asserted on behalf of all Classes)

293.    Plaintiffs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

294.    Plaintiffs bring this claim against Defendants individually and on behalf of all

Class Members.

295.    As alleged herein, Defendant has intentionally and/or recklessly made concerted bets on its platform.

296.    As further alleged herein, DraftKings created and implemented a scheme to increase its share of the legal gambling market through a pervasive pattern of deceptive and unfair conduct including with deceptive advertising and the deliberate targeting people at high-risk of developing gambling addictions.

297.    DraftKings was unjustly enriched as a result of its wrongful fostering, targeting, and manipulation of Plaintiffs' gambling addictions.

298.    Plaintiffs and the Class Members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiffs and the Class Members.

299.    The money DraftKings received was obtained under circumstances that were unfair and at the expense of Plaintiffs and the members of the Class Members.

300.    Therefore, it is inequitable and unjust for DraftKings to retain the profit, benefit, or compensation conferred upon it without paying Plaintiffs and the Class Members back for the difference of the full value of the benefits compared to the value actually received.

301.    As a direct and proximate result of DraftKings's unjust enrichment, Plaintiffs and Class Members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by DraftKings from its deceptive misleading, and unlawful conduct as alleged herein.

302.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

**FIFTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress (Asserted on behalf of Targeted Gambling**

**Addiction Class)**

303.    Plaintiffs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

304.    Plaintiffs bring this claim against Defendants individually and on behalf of the Class Members.

305.    Defendants' conduct described herein in targeting Plaintiffs and similarly situated class members to continue gambling despite or because of their having a gambling addiction was intentional and/or reckless.

306.    Defendants' conduct described herein in soliciting Plaintiffs and similarly situated class members to resume gambling despite knowing they had opted into programs designed to prevent them from gambling was intentional and/or reckless.

307.    The conduct described in the preceding two paragraphs (and throughout the Complaint) was extreme and outrageous.

308.    This conduct caused Plaintiffs to suffer severe emotional distress.

309.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' tortious conduct, including compensatory damages and costs.

## SIXTH CAUSE OF ACTION
### Strict Liability – Design Defect (Asserted on behalf of Product Liability Class)

310.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

311.    Plaintiffs bring this claim individually and on behalf of all other Product Liability Class Members.

312.    DraftKings app and promotions offered on it constitute a single product that as designed is unreasonably dangerous.

313.    In the alternative, the promotions and features described in this Complaint constitute individual products, which have been designed in ways that are unreasonably dangerous.

314.    DraftKings designed its app including its promotions to addict users and especially those users who were susceptible to developing a gambling addiction.

315.    DraftKings defectively designed its application and promotions to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harms.

316.    DraftKings failed to test the safety of its promotions and other features and when it did perform testing, those tests revealed significant risks of its products addictiveness that DraftKings failed to take cost-effective, reasonably feasible steps to remedy.

317.    DraftKings products, including the promotions described herein and its app fail to meet ordinary consumers expectations regarding the propensity of its product to cause addiction when used in an intended or reasonably foreseeable manner. Indeed, DraftKings designs and times promotions to maximize their addictive power and hides that fact from its consumers. Plaintiffs and other users do not expect that DraftKings app is designed to hack their dopamine system so that they progressively gamble more regardless of financial resources or the effect on their mental health.

318.    DraftKings products are likewise defectively designed because they create an inherent risk of danger of addiction, compulsive use, and serious financial, professional, personal, and emotional consequences in its users. This inherent risk is not a necessary component of online sports gambling and could be mitigated by reasonable design changes including, without limitation, those described in this complaint.

319.    The risks inherent in the design of DraftKings app and promotions significantly outweigh any benefit of such design.

320.    DraftKings could have made cost-effective, reasonably feasible alternative designs including without limitation the following, none of which has been implemented to-date:

a.  Robust age verification across products;

b.  Analyzing user data to identify users compulsively gambling and cut them off and/or otherwise intervene;

c.  Preventing loss chasing;

d.  Requiring multiple steps to deposit and place a bet, to facilitate users exercising self-control;

e.  Tempering suggestions of additional bets after a user places one;

f.  Designing promotions to avoid encouraging and inculcating loss-chasing habits;

g.  Tempering deposit match promotions or at least eliminating playthrough requirements above 1x, the sole purpose of which is to encourage habit- formation;

h.  Clearly disclosing the terms and risks of promotions including the addictive propensity of participating in the intensive gambling required by the terms;

i.  Not marketing gambling as without risk;

j.  Maximum daily and weekly deposit limits that can only be changed through proper financial condition and source-of-funds verification;

k.  Preventing users who set deposit limits from changing them

immediately or without verification that the limits are not being removed as a result of a compulsion to gamble;

l.   Easier and more user-friendly access to responsible gaming tools like self-exclusion (including ensuring that links to state self-exclusion programs work);

m.  Session notifications including, but not limited to, amount wagered, amount lost, and time spent on the app;

n.   Advising users of their entire lifetime losses at appropriate junctures;

o.   Preventing users from depositing money into the DraftKings app using funds borrowed on credit, including preventing users from making deposits using a credit card;

p.   Improving training for customer-facing staff and revising policies that allow or encourage these staff to target specific individuals in attempts to entice users to place bets;

q.   Allowing users to opt-into self-exclusion within the DraftKings app itself for a period of longer than 4 weeks; and

r.   Setting a standard minimum amount for bets and deposits, rather than dynamically setting a suggested default based on a user's individual profile, which leads to anchoring users to deposit a higher amount than they otherwise would have.

321.   Alternative designs were available that would reduce users' addictive and compulsive engagement with DraftKings's products, and which would have served effectively the legitimate purposes of DraftKings's products while reducing the gravity and severity of

danger posed by those products' defects;

322.     Plaintiffs used Defendants' respective products as intended or in reasonably foreseeable ways.

323.     The physical, emotional, and economic injuries of Plaintiffs and Class Members were reasonably foreseeable to DraftKings when it developed, designed, advertised, marketed, promoted, and distributed its products.

324.     DraftKings's products were defective and unreasonably dangerous when they were deployed by DraftKings. The defects continued to exist through the products' distribution to and use by Plaintiffs and Class Members, who used the products without any substantial change in the products' condition.

325.     As a direct and proximate result of DraftKings products' defective design, Plaintiffs and Class Members suffered serious injuries including both economic injuries and non-economic pain and suffering injuries, not all of which can be wholly remedied by monetary relief.

326.     Some Plaintiffs and Class Members continue to use DraftKings's products. When Plaintiffs use DraftKings's products, they will not be independently able to verify whether the products continue to pose an unreasonable risk.

327.     As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

328.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**Strict Liability – Failure to Warn (Asserted on behalf of Product Liability Class)**

329.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

330.    Plaintiffs bring this claim individually and on behalf of all other Product Liability Class Members.

331.    DraftKings knew or should have known of the unreasonably dangerous properties of its app and promotions including their potential to inculcate gambling addictions and compulsive gambling habits in users and the harms associated with these conditions.

332.    DraftKings's app and promotions are dangerous to an extent beyond that contemplated by the ordinary user, who would not reasonably be expected to understand that they encourage and inculcate addictive engagement and compulsive use when used in a manner reasonably foreseeable to DraftKings.

333.    DraftKings's app and promotions are defective and unreasonably dangerous because, among other reasons described throughout this Complaint, DraftKings failed to exercise reasonable care to inform users that:

    a.    The promotions cause addiction and compulsive gambling, which are associated with concomitant physical and mental injuries;

    b.    The promotions inculcate habits like loss-chasing, escalating bets, and extended gambling sessions;

    c.    Use of the app causes addiction and compulsive gambling, which are

associated with concomitant physical and mental injuries;

    d.    Contrary to their advertising, there are numerous risks of gambling on DraftKings; and

    e.    DraftKings analyses user data and deploys promotions in ways that increase a user's risk of addiction to its products.

334.    Had Plaintiffs and Class Members received proper or adequate warnings or instructions as to the risks of using DraftKings products, they would have heeded the warning and not have become addicted to gambling, lost as much money, and suffered the foreseeable consequences of doing so.

335.    DraftKings's failures to adequately warn Plaintiffs and Class Members about the risks of its defective products was a direct and proximate cause and a substantial factor in the injuries sustained by Plaintiffs and Class Members.

336.    Some Plaintiffs and Class Members continue to use DraftKings's products. When Plaintiffs use DraftKings's products, they will not be independently able to verify whether the products continue to pose an unreasonable risk.

337.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

338.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees,

and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
### Negligence – Design Defect (Asserted on behalf of Product Liability Class)

339.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

340.    Plaintiffs bring this claim individually and on behalf of all other Product Liability Class Members.

341.    DraftKings knew or could reasonably foresee that its products were designed in a way that made them dangerous and likely to cause harm to a substantial portion of users.

342.    The risks associated with DraftKings products was knowable to DraftKings in light of DraftKings's own internal data and knowledge regarding its products and promotions at the time of their design, marketing, and deployment.

343.    DraftKings knew, or by the exercise of reasonable care, should have known that ordinary consumers such as Plaintiffs and Class Members would not have realized the potential risks and dangers of its products including the risk of developing and exacerbating gambling addictions and the cascade of negative consequences that flow from such addictions including profound financial, mental, and emotional distress.

344.    DraftKings owed a duty to all reasonably foreseeable users of its products to design products that were reasonably safe.

345.    DraftKings owed a heightened duty to those users who, as a result of DraftKings's deliberate actions in designing promotions meant to inculcate compulsive behavior and overcome inhibitions, had a diminished capacity for self-control including young people it intentionally drew to its platform.

346.    DraftKings owed a heightened duty to those users who, through its internal data

and analysis, it knew or should have known were suffering from gambling addictions.

347.    DraftKings knew that individuals with gambling addictions, including Plaintiffs and Class Members, would use its products.

348.    DraftKings breached these duties in designing its products by negligently designing them with features and algorithms as described above that are particularly addictive and likely to addict users who would not appreciate the risks posed by the products.

349.    DraftKings breached these duties by designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

350.    DraftKings breached these duties by failing to use reasonable care to use cost-effective, reasonably feasible alternative designs, including changes to the addictive features described above, and other safety measures, to minimize the harms described herein. Alternative designs that would reduce the addictive features of DraftKings's products were available, would have served effectively the same purpose as DraftKings's defectively designed products, and would have reduced the gravity and severity of danger DraftKings's products posed to Plaintiffs and Class Members.

351.    A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

352.    DraftKings's negligent design of its products was a direct and proximate cause and a substantial factor in the injuries sustained by Plaintiffs and Class Members.

353.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its

conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

354.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**NINTH CAUSE OF ACTION**
**Negligence – Failure to Warn (Asserted on behalf of Product Liability Class)**

355.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

356.    Plaintiffs bring this claim individually and on behalf of all other Product Liability Class Members.

357.    DraftKings knew or could reasonably foresee that its products were designed in a way that made them dangerous and likely to cause harm to a substantial portion of users.

358.    The risks associated with DraftKings products was knowable to DraftKings in light of DraftKings's own internal data and knowledge regarding its products and promotions at the time of their design, marketing, and deployment.

359.    DraftKings knew, or by the exercise of reasonable care, should have known that ordinary consumers such as Plaintiffs and Class Members would not have realized the potential risks and dangers of its products including the risk of developing and exacerbating gambling addictions and the cascade of negative consequences that flow from such addictions including profound financial, mental, and emotional distress.

360.    Had Plaintiffs and Class Members received proper or adequate warnings or instructions as to the risks of using DraftKings products, they would have heeded the warning

and not have become addicted to gambling, lost as much money, and suffered the foreseeable consequences of doing so.

361.    DraftKings owed a duty to all reasonably foreseeable users to provide adequate warnings about the risk of using its products that were known to it, or that it should have known through the exercise of reasonable care.

362.    DraftKings owed a heighted duty of care to users it knew were particularly susceptible to developing gambling addictions through the use of its products.

363.    DraftKings breached its duty by failing to use reasonable care in providing adequate warnings to Plaintiffs and Class Members, as set forth above.

364.    A reasonable company under the same or similar circumstances as each Defendant would have provided adequate warnings to consumers as described herein.

365.    DraftKings could have provided adequate warnings to prevent the harms and injuries to Plaintiffs and Class Members described herein.

366.    As a direct and proximate result of DraftKings's breach of its duty to provide adequate warnings, Plaintiffs and Class Members were harmed and sustained the injuries set forth herein.

367.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

368.    Plaintiffs demand judgment against each Defendant for injunctive relief and for

compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
### Conversion (Asserted on behalf of Plaintiff Setton)

369.    Plaintiff Setton repeats and realleges the other allegations in this Complaint as if fully set forth herein.

370.    Plaintiff Setton is the owner of approximately $45,000 of un-wagered funds in his closed DraftKings account.

371.    DraftKings deprived Plaintiff Setton of his right to his $45,000 when it closed his account without warning and retained his funds without his consent and in spite of his requests for their release.

372.    DraftKings has no lawful justification to retain the $45,000 that Plaintiff Setton deposited in his account or won with money that he deposited in his account and that belongs to him.

373.    Plaintiff Setton seeks all available remedies, damages, and awards as a result of DraftKings's conversion, including the return of his property, compensatory and punitive damages, interest, fees, and costs.

## ELEVENTH CAUSE OF ACTION
### Breach of Contract (Asserted on behalf of Plaintiff Setton in the alternative)

374.    Plaintiff Setton repeats and realleges the other allegations in this Complaint as if fully set forth herein.

375.    Plaintiff Setton and DraftKings entered into a valid and enforceable contract for DraftKings to close Setton's account to prevent him from compulsively gambling on July 22, 2020.

376.    Plaintiff Setton relied on DraftKings's confirmation that it would close his

account to prevent him from continuing to gamble.

377.    DraftKings breached its obligation to close Plaintiff Setton's account and instead took no action.

378.    As a result of DraftKings's breach, Plaintiff Setton continued to have access to DraftKings's app, on which he was unable to resist gambling (as DraftKings knew).

379.    Plaintiff Setton lost approximately $350,000 as a result of DraftKings's breach.

380.    Plaintiff Setton seeks all available remedies, damages, and awards as a result of Defendants' breach, including compensatory and punitive damages, fees, and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A.  Certifying the proposed Classes, appointing Plaintiff Setton as representative of each of the asserted Classes, appointing Plaintiffs Alicea, Macek, Harner, and Spencer as representatives of the Targeted Gambling Addiction Classes, appointing Plaintiffs Alicea, Macek, Harner, Spencer, and Sadagopan as representatives of the Product Liability Class, and appointing counsel for Plaintiffs as Class Counsel;

B.  Declaring that Defendants are financially responsible for notifying the Class Members of the pendency of this suit;

C.  Declaring that Defendant's policies and practices as described herein constitute a violation of the state consumer protection statutes;

D.  Enjoining Defendant from the wrongful conduct as described herein;

E.  Awarding actual and/or compensatory, multiple, punitive (as available according to law), and statutory damages;

F.  Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

G.  Awarding pre- and post-judgment interest to the extent the law allows; and

H.  Awarding such further relief as this Court may deem just and proper.

### DEMAND FOR A JURY TRIAL

Plaintiffs hereby demands trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: July 15, 2025                        Respectfully submitted,

*/s/ Michael Kanovitz*

Counsel for Plaintiffs


Michael Kanovitz (*pro hac vice*)
Jon Loevy (*pro hac vice application forthcoming*)
Isaac Green (*pro hac vice*)
Aaron Tucek (*pro hac vice application forthcoming*)
Alexandra Wolfson (*pro hac vice application forthcoming*)

LOEVY & LOEVY
311 N Aberdeen Street, Suite 3
Chicago, IL 60607
(312) 243-5900
mike@loevy.com

Amelia Maxfield
LOEVY & LOEVY
1712 N Street NW Ste. 401
Washington DC 20011
(312) 243-5900


### CERTIFICATION

I, Michael Kanovitz, the undersigned attorney of record for Plaintiff, do hereby certify that this complaint was filed via electronic filing system and will be served on the Defendants. I further

certify, pursuant to Local Rule 53.2(3)(C) that the damages sought in this case exceed $150,000

exclusive of interests and costs.

Dated: July 15, 2025

*/s/ Michael Kanovitz*

LOEVY & LOEVY
311 N Aberdeen Street, Suite 3
Chicago, IL 60607
(312) 243-5900
mike@loevy.com