**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KENNETH MACEK, MATTHEW HARNER, AVI SETTON, LIONEL ALICEA, SHANE SPENCER, and RANGARAJ SADAGOPAN, *individually and on behalf of all others similarly situated*, <br> Plaintiffs, | : <br> : <br> : <br> : <br> : <br> : | No. 5:25-cv-1995 |
| v. | : <br> : | |
| DRAFTKINGS, INC., CROWN PA GAMING INC. *D/B/A DRAFTKINGS*, GOLDEN NUGGET ONLINE GAMING LLC, <br> Defendants. | : <br> : <br> : <br> : | |

**O P I N I O N**
**Motion to Dismiss Plaintiffs' First Amended Complaint, ECF No. 34 – Granted**

**Joseph F. Leeson, Jr.**                                      **March 23, 2026**
**United States District Judge**

## I.    INTRODUCTION

Plaintiffs Kenneth Macek, Matthew Harner, Avi Setton, Lionel Alicea, Shane Spencer, and Rangaraj Sadagopan bring this action against Defendants DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC (collectively, "DraftKings"). Plaintiffs challenge DraftKings' marketing strategies and Very Important Person ("VIP") loyalty programs. Plaintiffs allege that DraftKings and its subsidiaries caused or aggravated their gambling addictions by continually sending promotions and targeting vulnerable persons. DraftKings has filed a Motion to Dismiss Plaintiffs' First Amended Complaint. For the reasons that follow, the Motion to Dismiss is granted.

## II.    BACKGROUND

### A.  Factual Background

#### 1.  History of Online Gambling in Pennsylvania

DraftKings, an online sports betting company, began operating in Pennsylvania shortly after the United States Supreme Court struck down the Professional and Amateur Sports Protection Act.[1] *See* Am. Compl. ¶¶ 38–39. Plaintiffs, who are all DraftKings users, allege that "DraftKings engages in a variety of tactics" which are "designed to inculcate gambling addiction and extract as much money as possible from users." *Id.* ¶ 85.

#### 2.  DraftKings' Interface

DraftKings' mobile phone application ("the App") engages users through "visual displays, sounds, and haptic feedback." *Id.* ¶ 87. Users can "wager on the outcome of individual [sports game] plays and [can] string these bets together into multi-leg bets." *Id.* ¶ 91. DraftKings serves "rapid fire updates for ongoing bets—with scores and odds refreshing fast[]—and serving users precisely timed pop-ups" in bright colors and with emojis. *Id.* ¶ 92. When a user places a bet, whether it is successful or not, "celebratory animations and pop-ups" appear. *See id.* ¶ 94. Once a user links a bank account or credit card, users can bet directly from their checking account or on credit. *See id.* ¶ 97.

#### 3.  VIP Hosts

When DraftKings' data indicates a user "has the potential to gamble significant amounts of money in the [A]pp," users can receive a VIP Host ("VIP Host").[2] *Id.* ¶ 121. Plaintiffs allege

---

[1]    *See Murphy v. NCAA*, 584 U.S. 453 (2018).

[2]    DraftKings' job description for VIP Hosts states that they will:
Create strong, authentic, and trusted player relationships. Exceed engagement and service level performance targets. Assist in reactivation efforts to re-engage inactive users. Effectively distribute an allotted promotional budget. Compile

that the VIP Hosts foster close relationships with users and encourage them to gamble. *Id.* ¶¶ 122–23. VIP Hosts regularly offer users promotions or site credit. *See id.* ¶¶ 133–35. "Player Development Managers" supervise the VIP Hosts.[3] *Id.* ¶ 124.

### 4. Plaintiffs' Individual Allegations

Plaintiffs allege that DraftKings' practices caused them to become addicted to gambling. *See id.* ¶¶ 138–237. Plaintiffs assert that they tried to stop betting, but DraftKings would entice them back with new promotions. *See id.* Plaintiffs allege they developed "severe mental illnesses," including anxiety, panic disorder, "distorted perception of money," suicidal thoughts, PTSD, insomnia, and "loss of family and business." *Id.* ¶¶ 170–73; 190–92; 203–04; 220; 229–35.

Plaintiff Macek began gambling on DraftKings in November 2020. *See id.* ¶ 20. DraftKings later provided him with a VIP Host. *See id.* ¶ 142. DraftKings permitted him to make deposits from PayPal, where he could deposit "significantly more money than what was presently available in his bank account." *Id.* ¶¶ 148–49. Macek allegedly trusted his VIP Host, even admitting to one that he lost tens of thousands of dollars. *See id.* ¶¶ 151, 154–58, Ex. 14 (presenting an email from Macek to a VIP Host that he lost $15,000 in a day). In August 2023, DraftKings assigned Macek a new VIP Host "who pretended to take interest in his hobbies, work

---

player feedback to support improvements to the platform and identify commercial opportunities.

*Id.* ¶ 123.

[3] "Player Development Managers" supervise VIP Hosts, and their responsibilities include Driv[ing] key VIP sales metrics, contributing to customer engagement, market share, and net revenue while maintaining and enhancing relations with existing customers," and "[w]ork[ing] closely with Analytics teams to monitor reinvestment programs including promotions and other reward incentives by routinely checking reports and actual transactions."

*Id.* ¶ 124.

life, and living situation." *Id.* ¶ 155. "This VIP Host also learned about Plaintiff Macek's limited financial resources." *Id.* Macek told his new VIP Host about his financial losses. *See id.* ¶ 156, Ex. 15 (presenting texts between Macek and his VIP Host in October 2023 where Macek stated that he appreciated big wins when he was "not already 10 grand in the hole," to which his VIP Host responded that there was "lots of great sports action on this weekend!"). Macek asked Golden Nugget and DraftKings to close his accounts in January 2024, and they placed him on a temporary suspension period. *See id.* ¶ 158. Once that period ended, Golden Nugget offered him "bonus funds, more promotions, and encouraged him to attempt another deposit" in January 2025. *Id.* ¶ 160. Macek began gambling again. *See id.* ¶¶ 161–65.

Plaintiff Setton created his DraftKings account in 2019. *See id.* ¶ 22. Setton allegedly tried to close his account on July 22, 2020. *See id.* ¶¶ 176, 285–87. Yet, Setton logged into his account in August 2020 and began gambling again, losing approximately $350,000. *Id.* ¶¶ 179–82. Setton had two VIP Hosts who regularly communicated with him, who he alleges knew "that he was a gambling addict." *Id.* ¶ 184. On November 19, 2024, Plaintiff Setton was locked out of his DraftKings account. *See id.* ¶ 185. When he contacted DraftKings support, he "was told" that "You requested permanent account closure on 2020-07-22. Once a player requests to have their account closed we cannot reopen the account under any circumstances. This is due to responsible gaming regulations." *Id.* ¶ 185. There is $45,000 in un-wagered money in his account that DraftKings has not returned, despite his request. *See id.* ¶¶ 186–87.

Plaintiff Harner created DraftKings and Golden Nugget accounts in 2024. *See id.* ¶ 199. Harner had been on the Pennsylvania brick-and-mortar casino self-exclusion list since 2022 but could still register for accounts. *See id.* ¶¶ 21, 198. DraftKings assigned Harner a VIP Host "who

exhorted him to continue gambling more and more, including immediately after he suffered losses." *Id.* ¶ 194.

Plaintiff Spencer signed up for a DraftKings account in September 2021. *See id.* ¶¶ 24, 221. DraftKings placed Spencer in the highest "VIP Tier" and his VIP Host "bombard[ed] him with 'free money' promotional offers and promises of site credit." *Id.* ¶ 223. He "began to lose tens, and then hundreds, of thousands of dollars, and his VIP Host continued to send him texts with promotions and site credit, particularly after big losses or rough weekends." *Id.* ¶ 224. Spencer's VIP Host offered many "gifts, including tickets to luxury suites at professional sporting events." *Id.* ¶ 225. Spencer alleges he gambled constantly, lost large sums of money, switched his method of depositing often, regularly contacted his VIP Host in the middle of the night, and had "days with dozens of deposits that shrunk from several thousand dollars each to [] $10-50." *Id.* ¶ 230.

Two Plaintiffs never received VIP Hosts but maintain that DraftKings targeted them. Plaintiff Alicea created Golden Nugget and DraftKings accounts in 2024 and allegedly "rapidly developed a gambling addiction . . . due to the compulsion-inducing features of [the DraftKings] [A]pp." *Id.* ¶¶ 23, 206. Similarly, Plaintiff Sadagopan allegedly became addicted to gambling after creating a DraftKings account in January 2024. *See id.* ¶¶ 25, 212.

Plaintiffs allege that DraftKings targets new users and casual gamblers, who are more likely to lose money gambling. *See id.* ¶¶ 48–52. Plaintiffs acknowledge that DraftKings has a "responsible gaming" page but call the page "lip service" to compulsive gamblers. *Id.* ¶ 106. Plaintiffs maintain that DraftKings tracks user behavior both on its interfaces and on other digital platforms, including "betting frequency, betting times of day, average bet size, length of time on the App, and the length of the user's relationship with the platform." *Id.* ¶¶ 110–11. Plaintiffs

maintain that even if they were on "cool-off periods" from the App, DraftKings used their gambling data to consistently send push notifications. *See id.* ¶¶ 114–15. Plaintiffs argue "DraftKings solicits users who have opted into the cool-down or self-exclusion period and heavily targets them with offers as soon as the period expires." *Id.* ¶ 117.

### 5. Plaintiffs' Claims

Plaintiffs Macek, Harner, Setton, Alicea, and Spencer bring a negligence claim. Plaintiffs request that this Court recognize that DraftKings has a duty of care to its customers as "foreseeable victims of gambling addictions." *Id.* ¶ 250. Plaintiffs intend for this duty to include "the obligation to not deploy VIP Hosts and other direct inducements to encourage customers who DraftKings knows or has reason to know are addicted gamblers or are gambling beyond their means" and should involve acting as needed to stop users from developing addictions. *Id.* ¶¶ 251, 252, 256–60, 262–65.

Macek, Harner, Setton, Alicea, and Spencer allege that DraftKings' VIP Hosts had fiduciary relationships with Plaintiffs and that they breached their fiduciary duties. *See id.* ¶¶ 273, 155. They maintain that DraftKings, through VIP Hosts, deliberately cultivated relationships of trust with them, "creating the impression the VIP Hosts were acting in [their] best interest;" "fostering dependency by encouraging frequent communication and establishing patterns of regular contact;" and exploiting their vulnerabilities. *Id.* Plaintiffs, in turn, "reposed trust and confidence in their VIP Hosts." *Id.* ¶ 274.

Macek, Harner, Setton, Alicea, and Spencer also bring an intentional infliction of emotional distress ("IIED") claim. *See id.* ¶¶ 303–09. They allege that DraftKings perpetrated extreme and outrageous conduct by continually sending promotions and bonus bet opportunities after they told their VIP Hosts or management about their excessive gambling. *See id.* ¶¶ 305–06.

All Plaintiffs plead an unjust enrichment claim. *See id.* ¶ 297. Plaintiffs claim that they "conferred a benefit upon DraftKings" by depositing money for gambling, and DraftKings should not retain the benefit without paying Plaintiffs "the difference of the full value of the benefits compared to the value actually received." *Id.* ¶¶ 298–300.

Plaintiffs bring strict products liability design defect and failure to warn claims. Plaintiffs allege that DraftKings' App and promotions are either a single product, or the promotions and features are individual products. *See id.* ¶¶ 312–13. Plaintiffs argue that DraftKings' products, "including the promotions [] and its app fail to meet ordinary consumers expectations regarding the propensity of its product to cause addiction when used in an intended or reasonably foreseeable manner." *Id.* ¶ 317. Plaintiffs allege that DraftKings' App and promotions are defectively designed "because they create an inherent risk of danger of addiction, compulsive use, and serious financial, professional, personal, and emotional consequences in its users." *Id.* ¶ 318. Plaintiffs also plead that DraftKings failed to warn them of the risks of gambling. *See id.* ¶¶ 329–38. Plaintiffs provide preferred warnings. *Id.* ¶ 333.

Additionally, Plaintiffs bring negligent products liability design defect and failure to warn claims. *See id.* ¶¶ 341–54 (presenting the negligent design defect claim), 355–68 (presenting the negligent failure to warn claim). Plaintiffs argue that "DraftKings owed a duty to all reasonably foreseeable users of its products to design products that were reasonably safe." *Id.* ¶ 344. Plaintiffs argue that "DraftKings owed a duty to all reasonably foreseeable users to provide adequate warnings about the risk of using its products that were known to it, or that it should have known through the exercise of reasonable care." *Id.* ¶ 361.

Setton alleges that DraftKings negligently failed to close his account upon his request. *See id.* ¶¶ 285–89 (seeking to establish a duty "to prevent [] user[s] from gambling when they

have temporarily or permanently suspended their accounts or asked that their accounts be closed."). Setton also alleges DraftKings created a contract with him to close his account and breached the contract by failing to close his account after he requested to close it. *See id.* ¶¶ 176, 375, 377. Setton also brings a conversion claim relating to the $45,000 of un-wagered funds in his account. *See id.* ¶¶ 369–73.

### B. Procedural History

On April 18, 2025, Plaintiffs initiated the above-captioned action against DraftKings. *See* ECF No. 1. On July 15, 2025, after DraftKings moved to dismiss the Complaint, *see* ECF No. 29, Plaintiffs filed an Amended Complaint against DraftKings, *see* ECF No. 31.

On July 29, 2025, DraftKings filed the present Motion. *See* Mot., ECF No. 34. DraftKings argues (1) Pennsylvania has not recognized a casino's duty toward compulsive gamblers; (2) the VIP Hosts did not have a fiduciary relationship to Plaintiffs; (3) sending promotions and text messages was not "extreme or outrageous" conduct to sustain an IIED claim; (4) the DraftKings App is not a "product" and DraftKings is not a "seller"; (5) DraftKings warned its consumers of the risks of gambling; (6) Plaintiff Setton's request to close his account did not create a contract; (7) Plaintiff Setton does not state a conversion claim; and (8) the unjust enrichment claim fails. *See generally id.*

Plaintiffs filed a Response in Opposition on August 12, 2025. *See* Resp., ECF No. 35. Plaintiffs cite Restatement (Second) of Torts § 323, alleging that DraftKings voluntarily assumed a duty. *See id.* at 14. Plaintiffs analogize the App to electricity, which Pennsylvania courts have recognized is a product. *See id.* at 26. Plaintiffs also cite to out-of-District precedent finding that technological functionalities are products. *See id.* at 27; *see also* ECF No. 42 (presenting a

Northern District of Illinois case denying a similar motion to dismiss); ECF No. 43 (presenting a case from the Southern District of New York granting a similar motion to dismiss).

DraftKings filed its Reply on August 19, 2025. *See* Reply, ECF No. 36.

## III.    LEGAL STANDARDS

### A.  Motion To Dismiss, Rule 12(b)(6) – Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223,

230 (3d Cir. 2010); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) (holding that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that "a document integral to or explicitly relied upon in the complaint may be considered" (internal quotations omitted)). Courts may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### B. Negligence – Review of Applicable Law

"A plaintiff must prove four elements to establish negligence by a defendant: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Toro v. Fitness Int'l LLC.*, 150 A. 3d 968, 976–77 (Pa. Super. Ct. 2016). "Whether the defendant owed a duty of care under the first element is a question of law." *Sabric v. Martin*, 532 F. App'x 286, 289 (3d Cir. 2013) (citing *Matharu v. Muir*, 29 A.3d 375, 384 (Pa. Super. Ct. 2011)).

### C. Breach of Fiduciary Duty – Review of Applicable Law

In Pennsylvania, "a fiduciary relationship exists where one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 (E.D. Pa. 1998) (internal marks omitted) (citing *Commonw. Dep't of Transp. v. E-Z Parks*, 620 A.2d 712,

717 (Pa. Commw. Ct. 1993)). A business relationship "may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his or her affairs to the other." *McDermott*, 11 F. Supp. 2d at 626 (internal marks and citation omitted).

> In a claim for breach of fiduciary duty, a plaintiff must prove the following elements:
>
> (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;
> (2) that the plaintiff suffered injury; and
> (3) that the agent's failure to act solely for the plaintiff's benefit was a real factor in bring about plaintiff's injuries[.]"

*Id.* n.18 (internal marks and citation omitted).

### D. Intentional Infliction of Emotional Distress ("IIED")

In Pennsylvania, "a claim for intentional infliction of emotional distress requires a plaintiff to establish the following elements: '(1) the conduct must be extreme or outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe.'" *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp. 3d 631, 645 (E.D. Pa. 2014) (quoting *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979)). Pennsylvania courts are reluctant to declare conduct "outrageous," requiring "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (quoting *Buczek v. First Nat'l Bank*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)); *Kornegey v. City of Phila.*, 299 F. Supp. 3d 675, 683 (E.D. Pa. 2018). "Additionally, Pennsylvania law requires that some type of physical harm be shown in order to satisfy the severe emotional distress element." *Villarosa v. N. Coventry Twp.*, No. 15-4975, 2016 WL 4062731, at * (E.D. Pa. July 28, 2016) (citing *Di Loreto v. Costigan*, 600 F. Supp. 2d 671, 691 (E.D. Pa. 2009)). At the pleading stage, the court is "to

decide as an initial matter whether the conduct at issue can reasonably be regarded as sufficiently extreme to constitute 'outrageousness' as a matter of law." *Simpson v. Phila. Sheriff's Off.*, 351 F. Supp. 3d 919, 926–27 (E.D. Pa. 2019) (citation omitted).

### E.  Unjust Enrichment

"To state a claim for unjust enrichment under Pennsylvania law, the plaintiff must allege that (1) he conferred a benefit on the defendant, (2) the defendant knew of the benefit and accepted or retained it, and (3) it would be inequitable to allow the defendant to keep the benefit without paying for it." *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203–04 (Pa. Super. Ct. 1999)); *see also Greenwald Caterers Inc. v. Lancaster Host, LLC*, 599 F. Supp. 3d 235, 262 (E.D. Pa. 2022) **(**citing *Argue v. Triton Digital Inc.*, 734 F. App'x 148, 151 (3d Cir. 2018) (quoting *Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 817 (Pa. Super. Ct. 2017))). To plead unjust enrichment in a tort claim, the plaintiff must plead facts demonstrating the damages from the tort "could be supported by a theory of unjust enrichment." *Whitaker*, 198 F. Supp. 3d at 492–93 (citing *Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 561 (E.D. Pa. 2010)). "To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'" *Whitaker*, 198 F. Supp. 3d at 493 (citing *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985) (quoting *Roman Mosaic & Tile Co. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. Ct. 1973)).

A claim for unjust enrichment is "inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Greenwald*, 599 F. Supp. at 262 (citing *Benefit Tr. Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir. 1985)). A plaintiff "may bring a claim for both unjust enrichment and breach of contract as claims in the

alternative, even though it is legally impossible to recover under both." *Greenwald*, 599 F. Supp. at 262 (citing *Park v. Conn. Gen. Life Ins. Co.*, No. 06-4225, 2007 WL 9810908, at *4 (E.D. Pa. Mar. 9, 2007)). Unjust enrichment claims are often brought "as an alternative to a breach of contract claim," but they can also be brought "based on unlawful or improper conduct established by an underlying claim, such as fraud" as a "companion." *Whitaker*, 198 F. Supp. 3d at 492; *accord Zafarana*, 724 F. Supp. 2d at 561; *Lisowski v. Henry Thayer Co.*, 501 F. Supp. 3d 316, 338–39 (W.D. Pa. 2020).

### F.  Products Liability

#### 1.  Strict Liability

The Supreme Court of Pennsylvania adopted the doctrine of strict products liability as set forth in section 402A of the Second Restatement of Torts. *See Parks v. AlliedSignal, Inc.*, 113 F.3d 1327, 1330 (3d Cir. 1997) (citing *Webb v. Zern*, 220 A.2d 853 (Pa. 1966)). Section 402A provides that:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or the consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> a. The seller is engaged in the business of selling such product, and
>> b. It is expected to and does reach the consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1) (1965).

To be liable for strict liability in Pennsylvania, one must be a "seller." *Anastasio v. Kahn*, No. 09-5213, 2010 WL 114879, at *2–3 (E.D. Pa. Jan. 13, 2010). In general, Pennsylvania courts "expansively interpret[] the term 'seller.'" *Voelker v. United Airlines, Inc.*, No. 93–1653,1993 WL 274012, at *2 (E.D. Pa. July 6, 1993) (citing *Musser v. Vilsmeier Auction Co., Inc.*, 562 A.2d 279, 281–82 (Pa. 1989) ("Consistent with fidelity to the purpose of the policy considerations underlying the rule, we have given the term "seller" broad application and extended its

13

conventional meaning to include those who market by sale, lease or bailment.")). Yet, generally, "the word 'seller' must still involve the 'transfer of possession of the subject product.'" *Anastasio*, 2010 WL 114879, at \*3 (citing *Voelker,* 1993 WL 274012, at \*2).

Pennsylvania has two tests to determine whether one is a "seller." *See Oberdorf v. Amazon.com, Inc.*, 818 F. App'x 138, 141 (3d Cir. 2020), *certified question accepted*, 237 A.3d 394 (Pa. 2020). (certifying the question of whether Amazon.com could be strictly liable for a defective product sold by a third-party vendor). The first test provides a one-step analysis to determine whether one is a "seller":

> (1) is the defendant the only member of the marketing chain available to the injured party for redress;
> (2) does imposition of strict liability serve as an incentive to safety;
> (3) is the defendant in a better position than the consumer to prevent circulation of the defective product; and
> (4) can the defendant distribute the costs of strict liability?

*Id.* (citing *Musser*, 562 A.2d  at 282–83). *Francioni v. Gibsonia Truck Corp.* provides a second step to the four-part analysis. *See* 372 A.2d 736, 739 (Pa. 1977). A prerequisite to applying the four factors is determining whether a defendant is in the business of selling the kind of product at issue. *See id.*; *see also Oberdorf*, 818 F. App'x at 141–42; *Blanding v. Walmart, Inc.*, No. 23-5142, 2025 WL 886946, at \*2 (E.D. Pa. Mar. 20, 2025) (permitting a strict products liability claim to proceed to discovery since the plaintiff pleaded that the defendant took possession of the product).

### 2.  Strict Liability – Design Defect

To prevail on both a strict liability design defect claim, a "plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm." *Riley v. Warran Mfg., Inc.,* 688 A.2d 221, 224 (Pa. Super. Ct. 1997); *see also Lehmann v. Louisville,* 610 F. Supp. 3d 667, 677 (E.D. Pa. 2022).

In Pennsylvania, a plaintiff may recover in strict products liability by establishing that the product's design is defective under one of two standards: the "consumer expectations standard" and the "risk-utility standard." *See Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 401–02 (Pa. 2014). Under the consumer expectations standard, a plaintiff may prove "the product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer." *Id.* at 387. Yet, the consumer expectations test may not cover all factual situations, and the risk-utility standard can supplement a strict liability design defect claim. *See id.* at 389. Accordingly, under the risk-utility standard, "a product is in a defective condition if a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Id.* at 389. The Pennsylvania Supreme Court provided seven factors relevant to the risk-utility standard:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
> (6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
> (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* at 389–90.

### 3.  Strict Liability – Failure to Warn

Pennsylvania recognizes strict liability for failure to warn under the Second Restatement of Torts § 402A. *See Hatcher v. SCM Group N.A., Inc.*, 167 F. Supp. 3d 719, 725 (E.D. Pa. 2016) (citing *Pavlik v. Lane Ltd.*, 135 F.3d 876, 881 (3d Cir. 1998)). "[A]n otherwise properly designed

product may still be unreasonably dangerous (and therefore 'defective') for strict liability purposes [in Pennsylvania] if the product is distributed without sufficient warnings to apprise the ultimate user of the latent dangers in the product." *Id.* (citing Restatement (Second) of Torts § 402A). "[T]he threshold determination is whether the product is defective because of a lack of sufficient warnings." *Hatcher*, 167 F. Supp. 3d at 725. "A plaintiff therefore must show that the product was sold without sufficient warnings to 'adequately notif[y] the intended user of the unobvious dangers inherent in the product.'" *Id.* (citing *Mackowick v. Westinghouse Elec. Corp.*, 575 A.2d 100, 102 (Pa. 1990)). A plaintiff "may recover only if 'the lack of warning rendered the product unreasonably dangerous.'" *Hatcher*, 167 F. Supp. 3d at 725 (citing *Barton v. Lowe's Home Ctrs., Inc.*, 124 A.3d 349, 355 (Pa. Super. Ct. 2015)); *see also Philips v. A-Best Products Co.*, 665 A.2d 1167, 1170–71 (Pa. 1995) ("[A] plaintiff raising a failure-to-warn claim must establish only two things: that the product was sold in a defective condition 'unreasonably dangerous' to the user, and that the defect caused plaintiff's injury.") (citation omitted).

### 4.  Negligence – Design Defect

Negligent design claims in Pennsylvania are governed by Restatement § 398. *See McGrain v. C.R. Bard, Inc.*, 551 F. Supp. 3d 529, 541 (E.D. Pa. 2021) (citing *Lance v. Wyeth*, 85 A.3d 434, 445 n.13 (Pa. 2014).

> A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel lawfully or to be in the vicinity of its probable use for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

Restatement (Second) of Torts § 398 (1965)).

"To prevail in a [negligent design] action, a plaintiff 'must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such

16
032326

breach caused the injury in question, and actual loss or damage.'" *Smith v. Howmedica Osteonics Corp.*, 251 F. Supp. 3d 844, 852 (E.D. Pa. 2017) (citing *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 61 (3d Cir. 2009) (quoting *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003))). To plead negligent design defect, a plaintiff must plead facts to plausibly show that the defendant failed to exercise reasonable care adopting a safe design. *See Smith*, 251 F. Supp. 3d at 853–54.

### 5. Negligence – Failure to Warn

Negligent failure to warn claims in Pennsylvania are governed by Restatement § 388. *See McGrain*, 551 F. Supp. 3d at 542 (citing *Baldino v. Castagna*, 478 A.2d 807, 810 (Pa. 1984)). A supplier is liable for negligent failure to warn if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388 (1965). "[A] plaintiff must allege facts sufficient to plausibly show that the defendant 'fail[ed] to exercise reasonable care to inform those for whose use the product is supplied of the facts which make it likely to be dangerous.'" *McGrain*, 551 F. Supp. 3d at 542 (citing *Baldino*, 478 A.2d at 810). Negligent failure to warn claims are viable where the "complaints contained factual allegations as to the content of the warnings the defendants should have provided." *McGrain*, 551 F. Supp. 3d at 542 (citing *Terrell v. Davol, Inc.*, No. 13–5074, 2014 WL 3746532, at *9–10 (E.D. Pa. July 30, 2014)).

### G. Conversion – Review of Applicable Law

"[U]nder Pennsylvania law, conversion is the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Tr. Co.*, 69

F.3d 695, 704 (3d Cir. 1995) (citing *Cenna v. United States*, 402 F.2d 168, 170 (3d Cir. 1968)). Courts do not require the actor to have specific intent, rather, any intent to assert dominion or control over the chattel that is inconsistent with the owner's right is sufficient. *See id.*

### H.  Breach of Contract – Review of Applicable Law

A successful breach of contract claim requires that a plaintiff establish three things: (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) the plaintiff suffered damages as a result of the breach. *See Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002). "To satisfy the first element—the existence of a contract itself—a party must plead enough facts to demonstrate (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *Abdul-Rahman v. Chase Home Fin. Co., LLC*, No. 13-5320, 2014 WL 3408564, at *2 (E.D. Pa. July 11, 2014) (cleaned up). "[E]vidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F. 2d 291, 298 (3d Cir. 1986).

## IV.    ANALYSIS

### A.  Negligence

The first question is whether the Court should recognize an online sportsbook's duty of care to players who may be at risk of developing a gambling addiction when such a duty has not been recognized by the Pennsylvania courts. The Court finds it should not.

"Where 'there [is] no reported decision by the Pennsylvania Supreme Court or another Pennsylvania court addressing the precise issue before [the Court], it [is] the duty of the District Court to predict how the Pennsylvania Supreme Court would [rule] if presented with this case.'"

*See Polt v. Sandoz*, 462 F. Supp. 3d 557, 566 (E.D. Pa. 2020) (citing *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000)). When predicting the Pennsylvania Supreme Court's ruling,[4] the Court "consider[s] relevant state precedents, analogous decisions, consider[s] dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue." *Polt*, 462 F. Supp. 3d at 567 (citing *Nationwide Ins. Co. v. Resseguie,* 980 F.2d 226, 230 (3d Cir. 1992) (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980))). In making this prediction, "[f]ederalism concerns require that [federal courts] permit state courts to decide whether and to what extent they will expand state common law." *Polt*, 462 F. Supp. 3d at 566–67 (citing *City of Phila. v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993) ("A federal court may act as a judicial pioneer when interpreting the United States Constitution and federal law. In a diversity case, however, federal courts may not engage in judicial activism.")); *accord Vargus v. Pitman Mfg. Co.*, 675 F.2d 73, 76 (3d Cir. 1982) (holding that "[this court has] been asked to deliver prematurely a new doctrine of Pennsylvania tort law, and as a federal court we are unwilling to do so"). Generally, "it is not the function of the federal court to expand the existing scope of state law." *Polt*, 462 F. Supp. 3d at 567 (citing 9 Wright & Miller, Federal Practice and Procedure § 4507 (3d ed. 1998)).

No Pennsylvania state court, nor any federal court applying Pennsylvania law, has found that casinos (or online sportsbooks) owe a duty of care to compulsive gamblers. However, in analyzing the casino-gambler relationship, a case from this District reasoned that, under

---

[4]    The Third Circuit indicated that "in the absence of a pronouncement on the issue by the state's highest court, decisions by the intermediate appellate courts must be given serious consideration in ascertaining and applying state law." *Robinson v. Jiffy Exec. Limousine Co.,* 4 F.3d 237, 242 (3d Cir. 1993) (citing *Burke v. Maassen*, 904 F.2d 178, 182 (3d Cir. 1990)). "Decisions of state intermediate appellate courts which have not been reviewed by the highest court of the state, while not dispositive, are evidence of state law." *Comm'r v. Estate of Bosch*, 387 U.S. 456, 464–65 (1967).

Pennsylvania law, a casino did not owe a duty of care for the emotional wellbeing of a gambler. *See Okane v. Tropicana Entm't, Inc.*, No. 12-6707, 2013 WL 56088, at *2–3 (E.D. Pa. Jan. 3, 2013) (reasoning in dicta that there was no special relationship between the plaintiff gambler and defendant casino that "'encompass[es] an implied duty to care for the plaintiff's emotional well-being'") (citing *Weiley v. Albert Einstein Med. Ctr.,* 51 A.3d 202, 218 (Pa. Super. Ct. 2012)). In so reasoning, the court cited a New Jersey case that found a casino did not have a duty to protect a plaintiff from the consequences of her gambling. *See id.* (citing *Taveras v. Resorts Int'l Hotel, Inc.*, No. 07–4555, 2008 WL 4372791, at *4 (D.N.J. Sept. 19, 2008) ("[C]ommon-law tort principles do not require casinos to rescue compulsive gamblers from themselves.")). At least one Pennsylvania court has cited *Okane* as notably not finding a casino's implied duty to care for the plaintiff's emotional well-being. *See Snyder v. West Penn Allegheny Health Sys.*, 2014 Pa. Dist. & Cnty. Dec. LEXIS 10808, at *5 (Allegheny C.P. Feb. 19, 2014). *Okane* differs from the above-captioned case because it involved a different duty, as well as a different claim: negligent infliction of emotional distress (NIED) based on maintenance of the plaintiff's security file. *See* 2013 WL 56088, at *3. Nevertheless, the Court considers *Okane*'s holding, that the casino-gambler relationship does not impose a duty of care for the gambler's emotional well-being, to support its conclusion that the Pennsylvania Supreme Court would not find that the casino-gambler relationship imposes a duty of care to protect the gambler from addiction.

In a similar case, applying New Jersey law, the United States Court of Appeals for the Third Circuit recently issued an unreported decision holding that a casino has no duty of care toward a compulsive gambler. *See Antar v. BetMGM, LLC*, No. 24-1364, 2025 WL 1219316, at *3 (3d Cir. Apr. 28, 2025). In *Antar*, the plaintiff gambled with an online sportsbook and had a VIP Host. *See id.* at *1. The plaintiff communicated frequently with his VIP Host regarding

20
032326

bonuses, incentives, and promotions. *See id.* (presenting facts that the plaintiff and his VIP Host communicated by email and over 1,800 text messages in a seven-month period). The Third Circuit held that courts across the country "uniformly rejected imposing such a duty on casinos."[5] *Id.* at *3 n.36.

The Third Circuit's decision in *Antar* is persuasive here because Pennsylvania's General Assembly has also actively regulated online sportsbooks yet has not established a duty of care to potential compulsive gamblers. *See Antar*, 2025 WL 1219316, at *4 (noting that an "elaborate regulatory scheme" over a gaming industry would foreclose a duty where the state legislature has not created one). Pennsylvania, like New Jersey, has actively regulated online sportsbooks since

---

[5]    *Id.* (citing *Allen v. Caesars Ent. Corp.*, No. 23-989, 2023 WL 7181654, at *3 (E.D. Mo. Nov. 1, 2023) (finding that there was no reason to believe "that the Supreme Court of Missouri would recognize a duty by casinos to 'protect patrons from developing a habit' of 'going to a casino daily'"); *Merrill v. Trump Ind. Inc.*, 320 F.3d 729, 733 (7th Cir. 2003) (holding that "Indiana law does not protect a drunk driver from the effects of his own conduct, and we assume that the Indiana Supreme Court would take a similar approach with compulsive gamblers"); *Stevens v. MTR Gaming Grp., Inc.*, 788 S.E.2d 59, 66 (W. Va. 2016) (holding "that no duty of care under West Virginia law exists on the part of manufacturers of video lottery terminals, or the casinos in which the terminals are located, to protect users from compulsively gambling. Consequently, an action in negligence against the manufacturer or the casino may not be maintained for damages sustained by a user of the terminals as a result of his or her gambling."); *NOLA 180 v. Harrah's Operating Co.*, 94 So. 3d 886, 889 (La. Ct. App. 2012) (determining that casino has no "duty to identify and recognize compulsive gamblers"); *Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1124 (Ind. 2010) (holding that the Indiana Legislature's regulatory scheme over to gambling abrogated any common law claim "against casinos for damages resulting from enticing patrons to gamble and lose money at casino establishments"); *Logan v. Ameristar Casino Council Bluffs, Inc.*, 185 F. Supp. 2d 1021, 1023–25 (S.D. Iowa 2002) (finding that the Iowa Legislature had not established a common law duty of casinos to prevent gamblers from "drinking and gambling" excessively)); *see also Rahmani v. Resorts Int'l Hotel, Inc.*, 20 F. Supp. 2d 932, 937 (E.D. Va. 1998) (applying New Jersey law and concluding that a compulsive gambler had no duty to stop gamblers from gambling)). *See also De Leon v. DraftKings, Inc.*, No. 25-644, 2025 WL 3551627, at *10 (S.D.N.Y. Dec. 11, 2025) (concluding that New York courts generally do not find a duty of care "premised on a failure to control the conduct of others" and that the plaintiffs failed to show "there is a reasonable expectation by society that a commercial relationship with a gaming platform creates a duty by the platform's employees to control the consumer's choice to engage in betting").

2017 and requires employee training on problem (compulsive) gambling.[6] *See* 4 Pa. C.S. § 1201 (creating the Pennsylvania Gaming Control Board to regulate online gambling). The Pennsylvania Gaming Control Board has established myriad duties for licensed gaming operators, *see* 58 Pa. Code §§ 814a.1 *et seq.* (outlining the Pennsylvania Rules and Regulations for licensed gaming operators), and its failure to establish the duty Plaintiffs seek here, guides this Court's prediction that the Pennsylvania Supreme Court would not impose one, *see Antar*, 2025 WL 1219316, at *4 (The Third Circuit held that New Jersey provided an "'elaborate regulatory scheme' over [its] casino and gambling industry," and would have created a duty had it intended to.); *Hakimoglu v. Trump Taj Mahal Assocs.*, 70 F.3d 291, 294 (3d Cir. 1995) (holding that extending liability into the "highly regulated" casino industry without legislative intent was not a predictable extension of common-law tort principles); *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 936 A.2d 111, 121 (Pa. Super. Ct. 2007) (recognizing that the Pennsylvania Superior Court "has consistently expressed reluctance to judicially expand tort liability on public policy grounds as such is properly the role of the legislature") (citation omitted).

For all these reasons, this Court predicts that the Pennsylvania Supreme Court would not impose a duty on a casino to protect gamblers from gambling addictions. Moreover, this Court, sitting in diversity, will not expand on existing duties in Pennsylvania by creating a new duty of

---

[6]    Pennsylvania law requires casinos operating within Pennsylvania to train their employees annually about gambling addictions. *See* 58 Pa. Code § 814a.4. Plaintiffs plead in conclusory fashion that "DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its income or source-of-funds verification practices," and did not have "a compulsive and problem gambling plan" or adequate employee training according to Pennsylvania state regulations, without plausibly pleading *how* DraftKings fails to meet industry standards. Am. Compl. ¶¶ 258–61. Conclusory statements are not entitled to the presumption of truth. *See Iqbal*, 556 U.S. at 678 (holding that conclusory statements are insufficient to state a claim). Therefore, Plaintiffs fail to plead that DraftKings fails to meet industry standards in support of their negligence claim.

care that could have far-reaching public policy consequences.[7] The Court finds that DraftKings

has no duty of care to protect Plaintiffs from spending too much money or from developing or

fueling a gambling addiction.

Moreover, Pennsylvania law immunizes casinos from liability to persons who have

voluntarily excluded themselves from gambling:

> A licensed gaming entity or employee thereof shall not be liable to any self-excluded person or to any other party in any judicial proceeding for any harm, monetary or otherwise, which may arise as a result of: (1) the failure of a licensed gaming entity to withhold gaming privileges from or restore gaming privileges to a self-excluded person; (1.1) the failure of an interactive gaming certificate holder or interactive gaming operator to withhold interactive gaming privileges from or restore interactive gaming privileges to a self-excluded person; or (2) otherwise permitting or not permitting a self-excluded person to engage in gaming activity in the facility or participate in interactive gaming while on the list of self-excluded persons.

4 Pa. C.S. § 1516(c). Thus, the allegedly self-excluded Plaintiff Harner fails to state a claim for

negligence because self-excluded persons may not sue DraftKings under Pennsylvania law.

With regard to Plaintiff Setton's negligence claim, Plaintiffs cite Restatement (Second) of

Torts § 323, which provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Setton alleges that he relied on DraftKings' representation that it would close his account.

However, Setton fails to plead how DraftKings voluntarily assumed a duty to close Setton's

---

[7]    Perhaps such a duty could be used against retailers to stop compulsive shoppers from purchasing too many items or against grocery stores to stop individuals with binge eating disorders from buying too much food.

account. Rather, Setton requested that DraftKings close his account, and DraftKings eventually did. The Court finds that DraftKings had no duty to close Setton's account.

The Court dismisses Counts I and III.

### B. Breach of Fiduciary Duty

Plaintiffs do not plead facts alleging that they had fiduciary relationships with their VIP Hosts. In determining whether a fiduciary relationship exists, "'the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side.'" *Etoll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 23 (Pa. Super. Ct. 2002) (citing *Basile v. H & R Block,* 777 A.2d 95, 101 (Pa. Super. Ct. 2001)).

Although Plaintiffs Macek, Harner, Alicea, Setton, and Spencer allege that they had trust and confidence in their VIP Hosts, trust and confidence alone are insufficient to establish a fiduciary relationship. *See Lehrer v. Crane Co.,* 448 F. Supp. 1127, 1131 (E.D. Pa. 1978) (finding that, to plead facts of a fiduciary relationship, plaintiffs must plead, "a relationship involving trust and confidence, and 'the proof must show confidence reposed by one side and domination and influence exercised by the other'"); *Antinoph v. Laverell Reynolds Sec., Inc.*, 703 F. Supp. 1185, 1188–89 (E.D. Pa. 1988) ("'[M]ere trust and confidence in another, may not, in itself, create a fiduciary duty,' even where the defendant benefits from the relationship." (citation omitted)). Plaintiffs do not plead facts that their VIP Hosts exercised control over their betting or made betting decisions for Plaintiffs. Rather, Plaintiffs' VIP Hosts communicated with them about upcoming sports games and encouraged them to place bets. *See* Am. Compl. ¶¶ 155 (Macek alleges that he trusted his VIP Host but does not allege that the VIP Host placed bets on his behalf.), 224 (Spencer alleges that his VIP Host regularly texted him encouraging him to

24
032326

bet.). Encouraging them to place bets is insufficient to create a fiduciary relationship. *See De Leon*, 2025 WL 3551627, at \*11 ("The allegation in the [first amended complaint] that VIP Hosts 'exercise influence over the gamblers and keep them from limiting their betting' is also insufficient to plead the existence of a fiduciary relationship."). That Plaintiffs trusted their VIP Hosts and told them about their finances also does not make the VIP Hosts fiduciaries.[8] *See id.* (declining to recognize a fiduciary duty on the VIP Hosts that allegedly "engaged in a commercial relationship with plaintiffs, offering them promotions and site credits" because the amended complaint did "not plead that the VIP Hosts had the ability to control plaintiffs or to place bets on their behalf").

At most, the facts plead arms' length commercial transactions between the VIP Hosts and Plaintiffs;[9] however, arms' length transactions do not create fiduciary relationships simply because one party has a greater level of skill or expertise. *See id.* (finding that "[t]he relationships between the plaintiffs and VIP Hosts are closer to arm's length business transactions than those relationships that create a relationship of higher trust"); *Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d

---

[8]    Plaintiffs rely upon *Jacobs v. DraftKings, Inc.*, where the court concluded that plaintiffs plausibly alleged that the plaintiff's VIP Host created a relationship of trust by "'recruit[ing]' and 'induc[ing]' plaintiff to engage in legal sports betting with defendant 'by offering bonuses and other VIP perks,'" thereby creating a relationship "'of trust and 'akin to a friendship.'" No. 24-3077, 2025 WL 746012, at \*6 (E.D.N.Y. Mar. 7, 2025). *Jacobs* is not relevant to this case because it relates to disclosure of personal information, not a duty of care toward compulsive gamblers. *See id.* In *Jacobs*, the plaintiff alleged that his VIP Host had leaked his private information, even after telling the plaintiff that "DraftKings would 'put a stop' to any efforts to gain access to [the] plaintiff's personal information." *Id.* The facts wholly differ from this case. Here, all allegations relate to DraftKings' practices of sending promotions to the plaintiffs and there are no such allegations that DraftKings improperly handled personal information.

[9]    Plaintiff Macek's presented conversation exclusively discusses that weekend's promotions and how Macek (and only Macek) would place bets. *See* Am. Compl. ¶ 156, Ex. 15. None of the other Plaintiffs plead specific facts regarding conversations with their VIP Hosts. *See id.* ¶¶ 174 (Setton), 194 (Harner), 223–24 (Spencer's only claim is that his VIP Host would "bombard him with 'free money' promotional offers and promises of site credit" and sent him text messages, without further elaboration).

811, 822–23 (Pa. 2017). The reference to "trust" in the job description for DraftKings' VIP Hosts does not change this conclusion. *See De Leon*, 2025 WL 3551627, at *11 (reasoning that the reference to a "trusted" relationship the job description for the VIP Hosts did not create a fiduciary relationship and did not "reflect a relationship greater than that that ordinarily prevails between customer service agents or salespersons and their customers").

Plaintiffs also do not allege that the VIP Hosts accepted the fiduciary relationship. *See Antinoph*, 703 F. Supp. at 1188 (requiring the fiduciaries to accept the fiduciary relationship). Absent a fiduciary relationship between Plaintiffs and the VIP Hosts, this Court need not identify whether the VIP Hosts breached any fiduciary duties to Plaintiffs. This Court dismisses Count II.

### C. Intentional Infliction of Emotional Distress (IIED)

Plaintiffs fail to plead that DraftKings committed extreme and outrageous conduct. The VIP Hosts' encouraging Plaintiffs to gamble, even after Plaintiffs told them about their losses, is not extreme and outrageous conduct. Encouraging persons to gamble, even if the persons are compulsive gamblers, does not meet the high bar of extreme and outrageous conduct. *See Taveras*, 2008 WL 4372791, at *6 ("In allowing, even encouraging, Plaintiff to continue gambling, Defendants acted well within the bounds of the community norms reflected in state law."). Furthermore, sending numerous text messages, even if unsolicited, does not comprise extreme and outrageous conduct. *See Prukala v. Elle*, 11 F. Supp. 3d 443, 450 (M.D. Pa. 2014) (finding that unsolicited text messages and emails soliciting the purchase of services, like the notifications and text messages in this case, do not present extreme conduct).[10] In sum, Plaintiffs

---

[10]    Plaintiffs also allege that DraftKings targets users on the self-exclusion lists. *See* Am. Compl. ¶¶ 306–07. As this Court previously recognized, Pennsylvania immunizes casinos from liability for permitting a self-excluded person to engage in gaming activity. *See* 4 Pa. C.S. § 1516(c). Such immunized conduct is thus not extreme and outrageous.

fail to allege that DraftKings' conduct was extreme and outrageous. *See Salaam v. Trump*, 777 F. Supp. 3d 414, 441 (E.D. Pa. 2025) (citing *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (holding that extreme and outrageous conduct includes "(1) killing the plaintiff's son with an automobile and then burying the body, rather than reporting the incident to the police; (2) intentionally fabricating documents that led to the plaintiff's arrest for murder; and (3) knowingly releasing to the press false medical records diagnosing the plaintiff with a fatal disease"). The Court dismisses Count IV.

### D.  Products Liability

#### 1.  Whether the DraftKings App and promotions are products

No Pennsylvania state court or federal court applying Pennsylvania law has found a website or application to be a product subject to liability. Nevertheless, the Court must predict how the Pennsylvania Supreme Court would rule. *See Buffetta*, 230 F.3d at 637. When considering how the Pennsylvania Supreme Court would rule, the Court notes that the Western District of Pennsylvania previously found that a technological process is not a product. *See Snyder v. ISC Alloys, Ltd.*, 772 F. Supp. 244, 251 (W.D. Pa. 1991) (involving a license to use a patented process to manufacture zinc dust). The Western District found that a product must be a "finished item with a tangible form," and "mere ideas, information, communications, and drawings" are not products. *Id.* (citing Restatement (Second) Torts § 402A, comment (d) (1965) (finding that the rule applies to "an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair and an insecticide")). The Pennsylvania Superior Court also held that a book is not a product subject to strict products liability. *See generally Smith v. Linn*, 563 A.2d 123, 126 (Pa. Super. Ct. 1989) (explaining that a book "espouse[s] a writer's theory, opinions or ideology" distinguishable from the tangible

binding and printing). To the extent DraftKings' App and promotions do not have a tangible form, this law supports the prediction that the Pennsylvania Supreme Court would not find that they comprise a single product.

Plaintiffs request that this Court analogize the DraftKings App and promotions to electricity, which Pennsylvania courts have held is a product once it passes through a customer's meter. *See Schriner v. Pa. Power & Light Co.*, 501 A.2d 1128, 1132–34 (Pa. Super. Ct. 1985). In so holding, the Pennsylvania Superior Court cited many state courts, including the Wisconsin Supreme Court:

> While there probably are numerous technical definitions of "electricity," we need not be concerned with those accurate descriptions here—suffice it to say it is a form of energy that can be made or produced by men, confined, controlled, transmitted and distributed to be used as an energy source for heat, power and light and is distributed in the stream of commerce. The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.

*Id.* at 1133 (citing *Ransome v. Wisconsin Elec. Power Co.,* 275 N.W. 2d 641, 643 (Wi. 1979)). A court in this District also found that electricity is a product after it has been delivered to a customer. *See Cincinnati Ins. Co. v. PPL Corp.*, 979 F. Supp. 2d 602, 610 (E.D. Pa. 2013).[11]

---

[11]    Plaintiffs urge this Court to find that the App is a product because other state and federal courts have found that websites and mobile phone applications are products. *See* Resp. 27–28, *see also In re Soc. Media Adolescent Addiction/Personal Injury Prod. Liab.*, 702 F. Supp. 3d 809, 849–50 (N.D. Cal. 2023) (finding that the defects in the social media platform's functionalities "are classified as products"); *Garcia v. Character Tech., Inc.*, 785 F. Supp. 3d 1157, 1180 (M.D. Fla. 2025) (finding that the plaintiffs plausibly pleaded that artificial intelligence was a product); *Brookes v. Lyft Inc.,* No. 50-2019-CA-004782, 2022 WL 19799628 at *5 (Fla. Cir. Ct. Sep. 30, 2022) ("The Lyft application is a product under Florida law for purpose of Plaintiffs product liability claims in this case."); *T.V. v. Grindr, LLC*, No. 22-864, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024) ("Grindr designed the Grindr app for its business; made design choices for the Grindr app; placed the Grindr app into the stream of commerce; distributed the Grindr app in the global marketplace; marketed the Grindr app; and generated revenue and profits from the Grindr app . . . T.V. is trying to hold Grindr liable for Grindr's design choices, like Grindr's choice to forego age detection tools and Grindr's choice to provide an interface displaying the

However, unlike electricity, the DraftKings App and promotions cannot be "confined" and do not present a "consumable product." The Court declines to accept Plaintiffs' analogy.

Although based under New Jersey law, the Third Circuit also declined to find that an algorithm is a product subject to liability. The Third Circuit held that, under New Jersey law, an application's algorithm is not a product because it is not tangible. *See Rodgers v. Christie*, 795 F. App'x 878, 880 (3d Cir. Mar. 6, 2020) (recognizing that the App was "an 'algorithm' or 'formula' using various factors to estimate a defendant's risk of absconding or endangering the community," and not a product). While the Third Circuit noted that the algorithm was not commercially distributed, *see id.* at 879, and the DraftKings App and promotions are commercially distributed, the Court finds the Third Circuit's holding persuasive.

Based on the foregoing, the Court predicts that the Pennsylvania Supreme Court would not find that the DraftKings App and promotions are a single product. "Pennsylvania courts will not favor a broad definition of the word 'product.'" *Snyder*, 772 F. Supp. at 250 (citation omitted); *see also De Leon*, 2025 WL 3551627, at *7 (finding that the DraftKings App is not a product because "[t]he product is an online betting service, which is not a physical product and therefore not generally covered by products liability law"). Pennsylvania's General Assembly has extensively regulated online gambling but has not ever established that a website, nor its functionalities, comprise a single product. The Court, sitting in diversity, previously declined to expand the scope of Pennsylvania tort law without guidance from Pennsylvania's General Assembly or courts. *See*, *supra*, § IV, A. Although it is likely that questions relating to software

---

nearest users first."). Additionally, Plaintiffs cite *Beyer v. DraftKings, Inc.*, a case from the Northern District of Illinois, which found that the DraftKings interface is a product and denied the motion to dismiss. *See* No. 25-1336, 2025 WL 3281680, at *13–14 (N.D. Ill. Nov. 25, 2025). Nevertheless, the Court declines the opportunity to establish a new *Pennsylvania* state tort cause of action without guidance from *Pennsylvania's* General Assembly or courts.

functionalities will become more prevalent, the Court will not answer those questions in a manner that expands Pennsylvania state tort law. *See Lead Indus. Ass'n, Inc.*, 994 F.2d at 129 (holding that a federal court sitting in diversity jurisdiction should not expand state tort law).[12] In light of the Court's finding that the DraftKings App and promotions do not comprise a single product, all of Plaintiffs' products liability claims, Counts VI through IX, are subject to dismissal.

### 2. Negligent Products Liability

Even if Plaintiffs alleged that the DraftKings App and promotions constituted a single product, their negligent products liability claim would fail. Regarding Plaintiffs' negligent products liability claims, whether to create a duty of care for online sportsbooks to design their interfaces differently to prevent plaintiffs from gambling compulsively is best left to the Pennsylvania General Assembly. The Court previously found that casinos have no duty toward compulsive gamblers. *See supra*, ¶ IV, A. For the reasons discussed therein and because no court applying Pennsylvania law has applied negligent products liability to gambling platforms, this Court will not do so now. *See Hakimoglu*, 70 F.3d at 293 (citing *Hakimoglu v. Trump Taj Mahal Assocs.*, 876 F. Supp. 625, 633 (D.N.J. 1994) (affirming the district court's finding that extending a common law tort cause of action into an area "so fully regulated, without a glimmer of legislative intent" did not properly extend common law tort principles)). Counts VIII and IX fail.

### 3. Failure to Warn

Even if Plaintiffs plausibly pleaded that the DraftKings App and promotions constituted a single product, Plaintiffs do not plausibly plead that DraftKings failed to warn them of the risks

---

[12]    Since this Court will not determine whether DraftKings' App is a product subject to sale, this Court will not consider whether Plaintiffs plausibly plead that DraftKings is a seller.

of gambling. Rather, Plaintiffs concede that DraftKings provides a "responsible gaming" page with numerous resources for potential compulsive gamblers. *See* Am. Compl. ¶ 106. Plaintiffs' only argument is that the page is "lip service," to compulsive gamblers. *Id.* This allegation is conclusory and thus fails to state a claim. *See Blanding v. Walmart, Inc.*, No. 23–5142, 2024 WL 3433321, at *7 (E.D. Pa. July 5, 2024) (dismissing negligent and strict liability failure to warn claims based on conclusory allegations about the inherent dangers of the product). Plaintiffs do not specify what information DraftKings provided on the "responsible gambling" page, what information was missing from the page, or how and why the warnings were inadequate for potential compulsive gamblers. *See Foge, McKeever LLC v. Zoetis Inc.*, 565 F. Supp. 3d 647, 653 (W.D. Pa. 2021) (dismissing a negligent failure to warn claim for failure to specify the warning)*; Hrkach v. Samsung Elec. Am., Inc.*, No. 24-6837, 2025 WL 2312322, at *5 (E.D. Pa. Aug. 11, 2025). *See also Terrell*, 2014 WL 3746532, at *9–10 (citing *Bergstresser v. Bristol–Myers Squibb Co.*, No. 12–1464, 2013 WL 6230489, at *8 (M.D. Pa. Dec. 2, 2013)) ("[The Plaintiff] must provide sufficient factual allegations as to *why* the information provided []was inadequate, *what* information should have been provided, and *how* that information would have caused the [defendant] to act differently."). Plaintiffs thus fail to state a failure to warn claim, in either negligence or strict liability. Counts VII and IX fail.

For all these reasons, the Court dismisses Counts VI-IX.

## E. Breach of Contract

Setton fails to plead that there was a bargained-for exchange when he requested that DraftKings close his account. *See Pa. Workers' Comp. Judges Prof'l Ass'n v. Exec. Bd. of Com.*, 39 A.3d 486, 493 (Pa. Commw. Ct. 2012), *aff'd*, 66 A.3d 765 (Pa. 2013) (citation omitted) ("Consideration is sufficient when it confers a benefit upon the promisor or a detriment upon the

promisee, i.e., there is a bargained for exchange."). Setton merely requested that DraftKings close his account, which it later did. He did not offer money or any other promise in exchange for DraftKings closing his account. There is no other allegation in the Amended Complaint that, at any point prior to this, there was a contract. Thus, Setton fails to plead that his request to close his DraftKings account formed a valid contract.

Additionally, Setton's breach of contract claim is time-barred. *See* 42 Pa. Cons. Stat. § 5525(a) (noting that breach of contract actions have a four-year statute of limitations in Pennsylvania). The alleged breach occurred when Setton requested to close his account in 2020. Since Setton did not bring his breach of contract claim until April 18, 2025, almost five years after the alleged breach, his breach of contract action is time-barred.

The Court dismisses Count XI.

### F. Conversion

This Court finds that Setton states a claim for conversion. *See Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. Ct. 1987) ("Money can be the subject of conversion."). Setton alleges there is $45,000 in un-wagered money remaining in his DraftKings account, which he requested that DraftKings return following DraftKings' closure of his account, which DraftKings has not returned. Setton's allegations are sufficient to state a claim for conversion. However, because this is the only remaining claim, the amount in controversy does not exceed $75,000, which is required to satisfy diversity jurisdiction.[13] Instead of dismissing Count X, Pennsylvania law provides that the Court may transfer the matter "to the proper court . . . of this Commonwealth where it shall be treated as if originally filed in the transferee court . . . on the date when first

---

[13]    "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—(1) citizens of different States." 28 U.S.C. § 1332(a)(1).

filed in the other tribunal." 42 Pa. C.S. § 5103(a)–(b). Since Setton is a resident of Lehigh County, Pennsylvania, the Court transfers the conversion claim in above-captioned case to the Court of Common Pleas for Lehigh County as to the sole remaining Plaintiff, Setton.

### G. Unjust Enrichment

To the extent this Court dismissed Plaintiffs' tort claims, the Court dismisses the unjust enrichment claims that rest on the same conduct as such claims. *See Whitaker*, 198 F. Supp. 3d at 493 ("Where the unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim.") (citation omitted). "[A]n unjust enrichment claim based on wrongful conduct cannot stand alone as a substitute for the failed tort claim." *Id.* at 494 (citation omitted); *see also De Leon*, 2025 WL 3551627, at *6 ("The allegedly deceptive conduct identified in the [first amended complaint] is critical to each of the [first amended complaint's] claims. There is no separate conduct identified by the claim for unjust enrichment and no distinct damages are sought.").

Furthermore, any money Plaintiffs claim unjustly enriched DraftKings came from Plaintiffs' gambling losses, which are inherently speculative. Plaintiffs maintain that they would not have gambled and suffered these losses had DraftKings not caused them to gamble by and through its use of promotions and VIP Hosts. Yet, these facts cannot replace Plaintiffs' failed tort claims. Plaintiffs received what they paid for: a gambling experience where they could win or lose. *See Antar*, 2025 WL 1219316, at *3 (finding no ascertainable loss under New Jersey law because Plaintiffs received "a gambling experience where winning was not guaranteed"); *Hakimoglu*, 70 F.3d at 294 (noting that "gambling losses present almost metaphysical problems of proximate causation" and "under the prevailing rules and house odds, 'the house will win and the gamblers will lose'") (citation omitted). Plaintiffs do not plead facts that DraftKings refused

to provide a gambling platform; only that they did not recover all wins.[14] *See Zafarana*, 724 F. Supp. 2d at 561 (dismissing an unjust enrichment claim for failing to allege that the defendants refused to provide a service or good).

Regarding Setton's conversion claim, which is the only tort claim that was not dismissed on the merits and is being transferred, this Court likewise transfers his unjust enrichment claim. *See* 42 Pa. C.S. § 5103(a)–(b). Significantly, the unjust enrichment claim does not alter the Court's finding that the amount in controversy does not satisfy the diversity jurisdiction statute. "Conversion and unjust enrichment are alternative bases for recovery." *Pa. Gear Corp. v. ACSA Steel Forgings, S.P.A.*, No. 02-4359, 2002 WL 32113734, at *2 (E.D. Pa. Nov. 20, 2002). "A plaintiff may recover ordinary tort damages for conversion or restitution damages for unjust enrichment but not both." *Id.* (citing *Lindsley v. First Nat'l Bank of Phila.,* 190 A. 876, 878 (Pa. 1937) (permitting a plaintiff whose check was converted to recover restitution damages instead of tort damages); *Rogers v. Studebaker Sales Co.,* 157 A. 6, 6–7 (Pa. Super. Ct. 1931) (allowing the plaintiff to recover restitution damages, rather than tort damages, when the defendant converted and sold the plaintiff's automobile).

In *Pa. Gear Corp.*, the court granted a motion to remand and found "[t]here is a legal certainty that the plaintiff cannot recover for both conversion and unjust enrichment because these are alternative bases for recovery," and because the claims could not "be aggregated for amount in controversy purposes." 2002 WL 32113734, at *2. Since the amount in controversy was below $75,000, the court remanded the case to state court. *See id.*

---

[14]    To the extent that Setton pleads an unjust enrichment claim as an alternative to his breach of contract claim, he fails to plead how DraftKings deprived him of a good or service. *See Zafarana*, 724 F. Supp. 2d at 561 (dismissing an unjust enrichment claim in quasi-contract for failing to allege that the defendants refused to provide a service or good).

34
032326

Similarly, here, because Setton's conversion claim relates to the $45,000 of un-wagered funds in his account, he may plead an unjust enrichment claim as a companion to conversion. Nevertheless, his total recovery cannot exceed $45,000. The Court thus does not have jurisdiction to hear the claim, given the total amount in controversy does not exceed $75,000. The Court dismisses Count IV as to the previously dismissed tort claims. The Court transfers Count IV as a companion cause of action to Setton's conversion claim to the Lehigh County Court of Common Pleas.

### H.  Dismissal With or Without Prejudice

Since most of the dismissed claims fail as a matter of law, leave to amend these claims would be futile. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile"). It would also be futile to permit a second amended complaint because Plaintiffs, who are represented by counsel, filed the Amended Complaint after receiving a Motion to Dismiss, but failed to cure the deficiencies discussed herein. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (holding that leave to amend may be denied "based on . . . repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment"). The Court dismisses Counts I, II, III, V, VI, VII, VIII, IX, and XI with prejudice. The Court also dismisses Counts IV and X with prejudice as to all Plaintiffs, except Setton, whose claims in Counts IV and X are transferred to the Lehigh County Court of Common Pleas.

## V.    CONCLUSION

Upon review of the Amended Complaint and the Motion to Dismiss, this Court grants DraftKings' Motion to Dismiss the Amended Complaint. This Court finds that DraftKings has no

duty of care toward Plaintiffs and that the DraftKings App and promotions do not comprise a single product. Furthermore, Plaintiffs fail to plead facts stating claims for all other causes of action. The Court transfers Setton's conversion and unjust enrichment claims to the Lehigh County Court of Common Pleas. All other claims are dismissed with prejudice.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge